NELSON P. COHEN
United States Attorney

RICHARD L. POMEROY
Assistant U.S. Attorney
222 West Seventh Avenue, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail:  richard.pomeroy@usdoj.gov

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHNNIE CRISCO and THE ESTATE OF ANNA CRISCO BY HER PERSONAL REPRESENTATIVE, ROBIN BOOKER,<br><br>        Plaintiffs,<br><br>   v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | Case No. 3:03-cv-00011-HRH<br><br>**DEFENDANT'S PROPOSED FINDINGS OF FACT** |

**The parties have previously stipulated to the following facts at Docket 66**:

Plaintiff Johnnie Crisco was born in Rockingham, North Carolina, on August 14, 1938. His formal education ended after he completed the seventh grade. He enlisted in the Coast Guard in 1958 and was honorably discharged in 1960. He and Anna married in 1959. They moved to Alaska in 1996. He worked a variety of jobs over the years, his last being a bagger at Safeway in 2000.

Mr. Crisco has an extensive medical history. In 1973, he was involved in an elevator accident in which both knees were injured. He had left and right knee arthroscopies in 1978 to remove cartilage.

He was injured in a motor vehicle accident on March 20, 1983. In May, 1983 he was diagnosed with osteoarthritis of both knees, the right being worse than the left. He was hospitalized on July 7, 1983 with severe bilateral post-traumatic degenerative arthritis of his knees and abdominal pain. Mr. Crisco rejected the option to have his right knee joint fused. On November 2, 1984, he received a right total knee replacement as the Veteran's Administration Medical Center in Durham, North Carolina. He later had a revision of this knee replacement performed.

On October 14, 1986, Mr. Crisco had a high tibial valgus osteotomy on his left leg to alleviate pain. He reported to his doctor continued pain in the knee on January 28, 1987.

Mr. Crisco had his gallbladder removed in 1996. He had back surgery in February and March 1998. He had shoulder surgery in 1999.

On November 9, 2000, Mr. Crisco informed VA physician assistant Ben Hull that he wanted to proceed with a replacement of his left knee after the first of the year. He was scheduled for surgery in January, 2001.

On January 9, 2001, Mr. Crisco was informed by Dr. Bhagia of the risks of surgery, including the risk of infection, implant failure, and the need for further surgery. X-rays showed advanced degenerative joint disease in the left knee, with total loss of medial joint space and osteophyte formation. His left knee range of motion was 5-120 degrees.

The total left knee replacement surgery was performed on January 10, 2001 at the DOD/VA Joint venture hospital at Elmendorf Air Force Base, Alaska.. Mr. Crisco complained of significant

pain after the surgery. He was given IV morphine. On January 13, 2001, he reported that his knee was feeling good and he was ambulating with crutches. He was discharged that day.

Mr. Crisco returned to the VA on January 22, 2001 complaining of pain. His range of motion was 15-75 degrees. He reported falling down some stairs on January 28, 2001; findings were negative. By February 13, his range of motion had improved to 10-110 degrees. The incision at the staple removal site had become infected and Mr. Crisco was prescribed antibiotics. A suture that was sticking out of the incision site was removed on February 20. Mr. Crisco reported falling on the ice on February 28, but did not recall whether he fell on his left leg. Mr. Crisco continued to complain of knee pain. An examination on April 12, 2001 revealed no effusion of the left knee, a range of motion of 5-100 degrees, the incision site was well healed, the joint was stable, and the patella and joint line anteriorly seemed tender.

On April 16, Mr. Crisco requested a second opinion. He saw Dr. Gregory Schumacher, an orthopedic surgeon at Elmendorf AFB on May 8, 2001.

Mr. Crisco complained of continued pain on June 11, 2001. His range of motion was 0-115 degrees and x-rays showed no evidence of loosening and good patellar tracking. He was prescribed Percocet and advised to follow up in three months. Again on July 19, 2001 Mr. Crisco complained of constant pain and swelling. His range of motion was 5 - 90 degrees and significant quadricep atrophy was noted. Mr. Crisco again requested a second opinion.

Mr. Crisco went to the VA Medical Center in Seattle for another opinion. He was seen by Dr. Howard Chansky on August 27, 2001.

Mr. Crisco requested revision surgery on September 17, 2001. He wanted a prosthesis similar to the one in his right knee. Dr. Bhagia requested a pain clinic consult.

On October 2, 2001, Mr. Crisco was referred to Dr. Peter Ross, an orthopedic surgeon at Elmendorf for another opinion.

On October 5, 2001, Mr. Crisco went to Dr. Robert Hall, an orthopedic surgeon in Anchorage in private practice. Dr. Hall had a bone scan and x-rays taken. He told Mr. Crisco that the tibial plateau appears to have been placed in anterior slope rather than posterior slope, producing abnormal body mechanics which most likely is contributing to his pain.

A revision to the left knee was performed on November 7, 2001 by Dr. Hall at Providence hospital. He was discharged on November 11.

Mr. Crisco returned to the hospital on November 15 complaining of pain in his left knee. He was readmitted for pain control and diagnosed with a S. aureus infection that was resistant to penicillin. Dr. Bundtzen treated Mr. Crisco for this infection. He prescribed an 8 week IV antibiotic treatment. Mr. Crisco was transferred from Providence hospital to the transitional Care Unit at Alaska regional Hospital on November 22, 2001.

Because of the persistent infection around the knee and Mr. Crisco's pain, Dr. Hall removed the left knee prosthesis on December 8, 2001 and replaced it with a spacer containing antibiotics. He was placed in a knee immobilizer. Mr. Crisco still reported pain. By December 13, Mr. Crisco's white blood cell count and C-reactive protein levels were decreasing, indicating that the infection was decreasing. His leg was put in a cast on December 18. Dr. Brundtzen also noted on that day that the pain medication requirements were decreased. Mr. Crisco was discharged on December 18.

A left knee prosthesis was reimplanted by Dr. Hall on January 25, 2002 at Providence hospital. He was discharged on January 30.

Mr. Crisco was readmitted to Providence on February 19, 2002 complaining of knee pain and

purulent drainage from his knee. Cultures grew S. aureus. IV antibiotics were administered for the infection. He was discharged on March 5, 2002. IV antibiotics were discontinued in April.

Through 2002 and 2003, Mr Crisco continued to have problems with infection and with pain in his left knee.

Mr. Crisco's left leg was amputated above the knee on February 25, 2004.

On June 8, 2004, Mr. Crisco was involved in an automobile accident in which he injured his left leg. A lawsuit was filed in state court that was settled on October 28, 2004. Mr. Crisco received $58,562.33.

In early November, 2004, Anna Crisco died. Her daughter, Robin Booker, has been substituted as the administrator of her estate.

Mr. Crisco was diagnosed with lung cancer in 2006. He had surgery to remove part of his lung.

Mr. Crisco is not making a claim for any economic damages.

**Defendant proposes the following additional findings of fact**:

By the fall of 2001, Mr. Crisco wanted to have a revision surgery on his left knee. Dr. Bhagia documents that fact at D4, pp 103 and 107, Dr. Ross notes it in his deposition (D36 at 15), and Dr. Hall notes it on his first visit with Mr. Crisco (Ex 2 at CRI 5002).

Dr. Chansky, Dr. Bhagia, and Dr. Ross disagreed with Mr. Crisco that a revision was warranted.

Numerous x-rays were taken of Mr. Crisco's left knee between the first and second surgeries, but none definitively show the slope of the tibial component because none show the full tibia, so that there could be a precise measurement of slope.

The opinions as to the slope of the tibial component varied, from an extreme of 7 degrees anterior slope, by Dr. Hall, to zero degree slope, by Dr. Vigeland looking at the x-rays taken in March 2001.  D17-20.

The x-ray that Plaintiff offered, indicating a 5 degree anterior slope, did not have much of the tibia showing, leaving room for error, and did not account for the built-in 3 degree posterior slope of the plastic tibial part of the Profix knee.

Dr. Hall testified that he used the knee replacement manufactured by Zimmer and was not familiar with the Profix knee manufactured by Smith & Nephew.  The Zimmer knee installed with a 7 degree posterior slope and the plastic component is flat;  it does not have a built-in slope.

The Profix knee is installed with a zero or 4 degree slope and the plastic component has a built-in 3 degree posterior slope.

An anterior slope of the tibial component would have had a gradual onset and would be reported only after several months of use.  By contrast, Mr. Crisco reported pain almost immediately after surgery and his reports of pain were continual.

Between his two surgeries in 2001, Mr. Crisco consistently had good reports of range of motion,  well within the range that one would seek after knee replacement surgery.  He did not report a loss of flexion, which would be one sign of an anterior tibial slope.

The radiologist's report, at Plaintiff's Exhibit 6, stated that the "findings consistent with previous bilateral total knee arthroplasties with asymmetrically increased uptake on the left at the prosthesis borders, consistent with recent prosthesis placement." This view is shared by Dr. Bhagia and Dr. Chansky.  Dr. Hall however, read the scan to confirm his diagnosis that a revision surgery was necessary.

A bone scan measures localized bone cell turnover, not the presence of white blood cells as Dr. Hall testified. Increased uptake can be evidence of tumors, fractures and infections. For the majority of the orthopedic surgeons who testified in this case, a negative finding is more helpful than a positive finding.

Dr. Greg Schumacher, an orthopedic surgeon with the United States Air Force saw Mr. Crisco in May, 2001 for a second opinion. His opinion, found at his chart note at Exhibit D-1 and his testimony, preserved in a deposition at Exhibit D-2, was that "it is probably best to continue to wait and work on range of motion."

Dr. Howard Chansky, chief of Orthopedics at the Seattle VA hospital and a professor of orthopedics at the University of Washington Medical School, saw Mr. Crisco for another second opinion in August, 2001. His opinion was that Mr. Crisco's pain was consistent with reflex sympathetic dystrophy (RSD) and not with any surgically amenable cause.[1] An aggressive physical therapy program was recommended.

Mr. Crisco was referred to Dr. Peter Ross for a second opinion on October 2, 2001. Dr. Ross, now in private practice, was at the time an orthopedic surgeon with the U. S. Air Force. His opinion, found at his chart note at Exhibit D-6 and his testimony, preserved in a deposition at Exhibit D-36, was that he agreed with the possibility of RSD as an etiology and recommended that the patient keep his appointment with the pain clinic and continue with physical therapy.

Dr. Ted Vigeland is a professor of orthopaedic surgery at the Oregon Health & Science University. His medical opinions were that Dr. Bhagia met the standard of care in the knee

---

[1] Exhibit D-5 at 7.

replacement surgery and post-operative care for Mr. Crisco and that Mr. Crisco's pain was not caused by the placement of tibial component, even if there was a slight anterior slope to the component. He suggested that a low grade infection was the likeliest source of Mr. Crisco's pain.

**Based on the above findings and its review of the evidence, the Court finds:**

Dr. Bhagia was not negligent and did not breach the applicable standard of care for the knee replacement surgery that he performed on Mr. Crisco on January 10, 2001 and his post-surgical care.

. The subsequent complications, pain and suffering, and resulting amputation of Mr. Crisco's left leg were not legally caused by any negligence of Dr. Bhagia.

Mr. Crisco has failed to meet the burden of proof for his claims of medical malpractice against Dr. Bhagia under AS 09.55.540.

Respectfully submitted this 28th day of September, 2007, in Anchorage, Alaska.

NELSON P. COHEN
United States Attorney

s/Richard L. Pomeroy
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: richard.pomeroy@usdoj.gov
Alaska Bar No. 8906031

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2007, a copy of the foregoing **DEFENDANT'S PROPOSED FINDINGS OF FACT** was served electronically on:

George M. Kapolchok, Esq.

s/ Richard L. Pomeroy