NELSON P. COHEN
United States Attorney

RICHARD L. POMEROY
Assistant U.S. Attorney
222 West Seventh Avenue, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail:  richard.pomeroy@usdoj.gov

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHNNIE CRISCO and THE ESTATE OF ANNA CRISCO BY HER PERSONAL REPRESENTATIVE, ROBIN BOOKER,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　Defendant. | Case No. 3:03-cv-00011-HRH<br><br>**DEFENDANT'S CLOSING ARGUMENT** |

　　　　In this medical malpractice case, Mr. Crisco has the burden, under Alaska law, of proving by a preponderance of the evidence: "(1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing; (2) that the health care providers lacked this degree of knowledge or skill or that the health care providers

failed to exercise this degree of care; and (3) that as a proximate cause of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred." AS 9.55.540(a). There is no presumption of negligence on the part of the defendant. AS 9.55.540(b).

The standard of care for doctors in general, and orthopedic surgeons in particular, is not perfection. Tort law neither holds a doctor to a standard of perfection nor makes him an insurer of his patient's well-being. Professional standards require normative judgments, not merely proof that a better way to treat a particular patient could have been devised.[1] That is why, in part, patients are informed of the risks that surgery may not solve their problems. Mr. Crisco was informed before his initial surgery by Dr. Bhagia of the risks of surgery, including the risk of infection, implant failure, and the need for further surgery. These are all within the range of known risks that can happen in the absence of any negligence on the part of the surgeon. At the time, Mr. Crisco indicated that he understood and accepted those risks.

Mr. Crisco seeks noneconomic damages (there is no claim for economic damages) for injuries he claims were the result of the total knee replacement surgery performed on January 10, 2001. He claims that the tibial component of this replacement knee was installed with an anterior slope, and that this anterior slope was the cause of the pain he experienced beginning immediately after his surgery.

Plaintiff's sole testimony that Dr. Bhagia's January 2001 surgery did not meet the standard of care comes from Dr. Hall. Mr. Crisco's actual injuries and damages – the treatment-

---

[1] <u>Rolon-Alvarado v. Municipality of San Juan</u>, 1 F.3d 74, 78 (1st Cir.1993)

resistant staph infection, the multiple surgeries to try to treat the persistent infection, and the amputation of his left leg – all followed Dr. Hall's decision to operate in November, 2001. Dr. Hall was quick to blame Dr. Bhagia, but his reasoning is unpersuasive.

By the fall of 2001, Mr. Crisco wanted a revision surgery. Dr. Bhagia documents that fact at D4, pp 103 and 107; Dr. Ross notes it in his deposition (D36 at 15); and Dr. Hall notes it on his first visit with Mr. Crisco (Ex 2 at CRI 5002). On can easily understand Mr. Crisco's thinking – he had his right knee revised and was quite happy with the results[2], so he was convinced that he needed his left knee revised. Dr. Chansky, Dr. Bhagia, and Dr. Ross disagreed with Mr. Crisco that a revision was warranted.. However, Mr. Crisco found what he was looking for when he went outside the VA system to a surgeon in private practice, Dr. Hall, who agreed to perform a revision surgery despite the contrary opinions of the other three doctors.

Numerous x-rays were taken of Mr. Crisco's left knee between the first and second surgeries, but none provide a definitive view or answer as to the slope of the tibial component. Dr. Hall, who was the only one of the five[3] orthopedic surgeons who thought there was a problem with the tibial component, did not order an x-ray of the full tibia, so that there could be a precise measurement of slope. The opinions as to slope of the tibial component varied, from an extreme of 7 degrees anterior slope, by Dr. Hall, to zero degree slope, by defense expert Dr. Vigeland, looking at the x-rays taken in March 2001. D17-20. The x-ray that Plaintiff offered, indicating a

---

[2] Mr. Crisco's testimony at trial that he had his initial right knee replacement in the 1960's belies the fact that the operation note from 1984 shows that it was an initial replacement surgery. That is why the parties did not file a revision to the Stipulated Facts. See Docket 66, 73.

[3] Six counting defendant's expert, Dr. Vigeland.

5 degree anterior slope, did not have much of the tibia showing, creating room for error, and did not account for the built-in 3 degree posterior slope of the plastic tibial part of the Profix knee. Therefore, the best that can be said of the x-rays is that they are ambiguous regarding the slope of the tibial component. They may show a slight anterior slope of the metal part of the tibial component that, coupled with the built-in posterior slope of the Profix knee, resulted in a tibial component that had a slope of zero to plus or minus a few degrees, anterior or posterior, depending on which x-ray is being viewed. This is a far cry from the 14 degree error that Plaintiff claims.

      Dr. Hall testified that he used the knee replacement manufactured by Zimmer and was not familiar with the Profix knee manufactured by Smith & Nephew. As Dr. Bhagia and Dr. Vigeland explained, the Zimmer knee is installed with a 7 degree posterior slope, but the Profix knee is installed with a zero or 4 degree slope. Dr. Hall's opinion concerning the slope at which a tibial component should be placed is limited to the Zimmer knee replacemnt, which was not used by Dr. Bhagia. Dr. Hall is not familiar with the Profix knee that Dr. Bhagia used and it is undisputed that the Profix knee called for a different cutting plane than the Zimmer knee, and that the plastic part of the Profix knee (that replicates the cartilage on which the knee pivots) comes with a built-in posterior slope that the Zimmer knee lacks. Thus, Dr. Hall's opinion regarding the slope of the knee is seriously flawed. Dr. Hall did not get Mr. Crisco's complete medical records from the VA, and he did not consult with any of the four orthopedic surgeons who had examined Mr. Crisco. One wishes that he had.

      Only Dr. Hall looked at the x-rays of Mr. Crisco's knee and claimed to see anything amiss. Dr. Bhagia, Dr. Schumacher, Dr. Chansky and Dr. Ross all reviewed Mr. Crisco's x-rays,

specifically looking for a possible mechanical explanation for his pain.  Neither they nor defense expert Dr. Vigeland saw anything that would explain the pain.  As Dr. Vigeland explained, if one were to suspect a mechanical cause for Mr. Crisco's pain, it would have had a gradual onset and been reported only after several months of use.  By contrast, Mr. Crisco reported pain almost immediately after surgery and his reports of pain were continual.

Another objective finding that is contrary to a mechanical explanation for Mr. Crisco's pain are the consistently good reports of range of motion he had with his left knee.  The Stipulated Facts at Docket 66 document Mr. Crisco's range of motion between surgeries as always being well within the range that one would seek after knee replacement surgery.  He did not report a loss of flexion, which would be one sign of an anterior slope.

Plaintiff has placed a great reliance on the bone scan that Dr. Hall ordered to confirm his diagnosis of a mechanical misplacement of the tibial component.  The radiologist's report, at Exhibit 6, stated that the "findings consistent with previous bilateral total knee arthroplasties with asymmetrically increased uptake on the left at the prosthesis borders, consistent with recent prosthesis placement."  This view is shared by Dr. Bhagia and Dr. Chansky.  Dr. Hall, however, read the scan to confirm his diagnosis that a revision surgery was necessary.  A bone scan measures localized bone cell turnover, not presence of white blood cells as Dr. Hall testified.  Increased uptake can be evidence of tumors, fractures and infections.  For the majority of the orthopedic surgeons who testified in this case, a negative finding is more helpful than a positive finding.  The limited value of a bone scan is perhaps best reflected by the fact that no one else ordered a bone scan for Mr. Crisco because of its limited diagnostic value and the fact that, as the radiologist report reflects, a person can report increased uptake simply due to having had a

prosthesis replacement nine months before. The bone scan is of much less diagnostic value than the x-rays that were taken.

Dr. Vigeland testified that a slight anterior slope would not cause the type of pain that Mr. Crisco reported. Indeed, such a slight slope would not cause pain at all. Five orthopedic surgeons looked at the same x-rays, saw the same slope, and reported no mechanical cause for the pain. If there was an anterior slope, one might expect increased wear of the component so that it might have to be replaced earlier than normal. This would occur over a lengthy period of time, five to seven years at the earliest, and then a revision surgery might have to be performed.

Defendant is not required to prove what was causing Mr. Crisco's pain, although relying on the testimony that 10 percent of pain reported after total knee replacements is of unknown etiology may not be satisfying to patients. People want to know what is causing their pain. However, the source of pain is not always known and it may take significant time to arrive at a diagnosis. Reflex sympathetic dystrophy (RSD) is an operating diagnosis for such situations. That is what Dr. Chansky and Dr. Ross thought best described the source of Mr. Crisco's pain. Dr. Vigeland thinks that Mr. Crisco's pain might have been caused by a low grade infection, even though lab work had not indicated the presence of an infection. Unfortunately, we will never know what was the true source of Mr. Crisco's because his impatience coupled with the surgery by Dr. Hall resulted in a cascading series of far worse problems and far worse outcomes. What happened to Mr. Crisco after Dr. Hall's surgery is indeed tragic. The tragedy lies in the unpleasant but unavoidable fact that it need not have happened because the revision surgery was not needed. Mr. Crisco's desire for a revision surgery was not indicated or warranted, which was the opinion of Drs. Bhagia, Schumacher, Chansky, Ross and Vigeland.

Dr. Bhagia's surgery was not negligently performed and did not need to be revised by Dr. Hall. Further, the complications, injuries, and eventual amputation that followed Dr. Hall's revision surgery were not caused by any breach of the medical standard care by Dr. Bhagis. Thus, Plaintiff has failed to meet his burden of proof as to breach of the medical standard of care and legal causation under AS 09.55.540. Accordingly, Plaintiff should not recover damages in this case.

Respectfully submitted this 28th day of September, 2007, in Anchorage, Alaska.

NELSON P. COHEN
United States Attorney

s/Richard L. Pomeroy
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: richard.pomeroy@usdoj.gov
Alaska Bar No. 8906031

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2007,
a copy of the foregoing **DEFENDANT'S
CLOSING ARGUMENT** was served electronically
on George M. Kapolchok, Esq.

s/ Richard L. Pomeroy