Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


JOHNNIE CRISCO and THE ESTATE  )
OF ANNA CRISCO by HER PERSONAL  )
REPRESENTATIVE, ROBIN BOOKER,  )
                        )
       Plaintiffs,  )
                        )
   vs.  )
                        )
UNITED STATES OF AMERICA,  )
                        )
       Defendant.  )
_____)
Case No. 3:03-cv-0011-HRH




TRANSCRIPT OF EXCERPT OF PROCEEDINGS

HELD BEFORE THE HONORABLE H. RUSSEL HOLLAND

Tuesday, September 18, 2007


Testimony of Dr. Chansky and Dr. Vigeland

Pages 1 - 71, inclusive

Anchorage, Alaska

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

Page 2

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2   For Plaintiffs:

 3   KAPOLCHOK LAW OFFICES, LLC
     BY:  George M. Kapolchok, Esq.
 4   360 K Street, Suite 100
     Anchorage, Alaska 99501
 5   907/278-8850

 6

 7   For Defendant:

 8   OFFICE OF THE U.S. ATTORNEY
     BY:  Richard L. Pomeroy, Esq.
 9   222 West 7th Avenue, #9, Room 253
     Anchorage, Alaska 99501
10   907/271-5071

11

12

13   Transcribed By:

14   Katherine L. Novak, RPR
     Registered Professional Reporter
15

16

17

18

19

20

21

22

23

24

25
```

Crisco v. United States of America
September 18, 2007                          Case No. 3:03-cv-0011-HRH

Page 3

1                           I-N-D-E-X

2

3    WITNESS:

4    HOWARD A. CHANSKY

5    Direct Examination by Mr. Pomeroy.................5
     Cross-Examination by Mr. Kapolchok...............16
6

7    JOHN VIGELAND

8    Direct Examination by Mr. Pomeroy................23
     Cross-Examination by Mr. Kapolchok...............45
9    Redirect Examination by Mr. Pomeroy..............65

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

Page 4

1       ANCHORAGE, ALASKA; TUESDAY, SEPTEMBER 18, 2007

2                              -oOo-

3                          *  *  *  *  *

4       (Counter 9:01:01)

5               THE CLERK:  All rise.

6               His Honor the Court, the United States

7    District Court for the District of Alaska is now in

8    session with the Honorable H. Russell Holland

9    presiding.

10              Please be seated.

11              THE COURT:  Good morning, ladies and

12   gentlemen.

13              MR. KAPOLCHOK:  Good morning, Your Honor.

14              THE COURT:  This is the continuation of

15   trial in Crisco versus United States, 03 Civil No.

16   11.

17              We are ready for your next witness,

18   Mr. Pomeroy.

19              MR. POMEROY:  Government would call

20   Dr. Howard Chansky.

21              THE CLERK:  Dr. Chansky, please stand

22   before me so I can swear you in.

23              Please raise your right hand.

24       (Witness sworn.)

25              THE CLERK:  Thank you.  Please have a seat

Page 5

 1   in the witness box.

 2           Please speak into the microphone at all

 3   times.

 4           If you would state your full name,

 5   spelling your last name, and a current address.

 6           THE WITNESS:  Howard Alan Chansky,

 7   C-H-A-N-S-K-Y.  And my address is 8530 Southeast

 8   80th Street, Mercer Island, Washington.

 9           THE CLERK:  Thank you.

10           THE COURT:  You may inquire.

11                   DIRECT EXAMINATION

12   BY MR. POMEROY:

13       Q.   Dr. Chansky, what's your profession?

14       A.   I'm an orthopedic surgeon.

15       Q.   And where are you employed?

16       A.   I'm employed at the University of

17   Washington and the Puget Sound Veterans Hospital.

18       Q.   And how do you come to be employed at both

19   places?

20       A.   Well, I was hired by the university and

21   that's my academic appointment.  And I practice

22   primarily at the VA, but I also have a practice at

23   the university.

24       Q.   Okay.  Do you have particular job titles

25   at each institution?

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

Page 6

    1        A.    At the university I'm a professor and

    2    vice-chairman of our orthopedic department.  At the

    3    VA I'm chief of orthopedics.

    4        Q.    And what's your educational background?

    5        A.    I got my undergraduate degree in

    6    electrical engineering at Cornell University, and

    7    then my medical degree at University of

    8    Pennsylvania.  I did a residency University of

    9    Pennsylvania, and then a fellowship at the

   10    University of Washington.

   11        Q.    And when did you graduate from medical

   12    school?

   13        A.    1987.

   14        Q.    And when did you complete residency in

   15    orthopedic surgery?

   16        A.    1992.

   17        Q.    And do you have certain board

   18    certifications?

   19        A.    I'm board certified in orthopedic

   20    surgery.

   21        Q.    And within orthopedic surgery, do you have

   22    particular specializations?

   23        A.    My specialization is orthopedic oncology

   24    and adult reconstructive surgery.

   25        Q.    And would adult reconstructive surgery

Page 7

1    include total knee replacements?

2        A.   Correct.

3        Q.   There's a book of exhibits in front of

4    you.  I would ask you to turn to -- it's tabbed as

5    D-5.

6        A.   Okay.

7        Q.   Which actually, I believe, has been

8    previously admitted.

9            You came to, in 2001, examine the

10   plaintiff in this case, Mr. Crisco; is that

11   correct?

12       A.   Correct.

13       Q.   Okay.  Do you have an independent

14   recollection of that examination?

15       A.   Vague.  I see Mr. Crisco today and I

16   recognize him and I recall seeing him; but I --

17   other than what's written here, I don't recall the

18   details.

19       Q.   Okay.  Then I'll ask you to just sort of

20   refer to your note, which is on page 1.

21           When did you come to see Mr. Crisco?

22       A.   It says here August 27th, 2001.

23       Q.   And in what context were you -- did you

24   see him?

25       A.   Well, I had got a call from Dr. Bhagia and

Page 8

1   we talked about him a little bit, and I said sure,

2   you know, I would be happy to give you a second

3   opinion, and so he was sent down to Seattle.

4       Q.   And what were looking for in your -- sort

5   of when you were giving a second opinion, and what

6   were you -- giving a second opinion on what?

7       A.   Why his knee was so painful.

8       Q.   Okay.  And again, if you need to look

9   through your note, please do.  But what was it --

10  what did you look for?

11      A.   Well, the two typical things that I look

12  for when someone has chronic knee pain that doesn't

13  have a distinct or clear, you know, etiology,

14  distinct or clear cause, would be loosening of the

15  prosthesis, infection, or reflex sympathetic

16  dystrophy, which is now referred to as complex

17  regional pain syndrome.

18      Q.   And what is RSD?

19      A.   Well, it's -- again, it's a poorly

20  defined, probably neurogenic mediated pain syndrome

21  that some people can get after sort of the slightest

22  injury, but it typically follows a more severe

23  course.  But it's not really well understood.

24      Q.   So would those -- those were the possible

25  explanations for Mr. Crisco's knee pain?

Page 9

```
 1        A.    Correct.

 2        Q.    And then you did a physical examination of

 3   Mr. Crisco?

 4        A.    Correct.

 5        Q.    What did that entail?

 6        A.    Well, referring to my notes, for me the

 7   important things were that he didn't have any

 8   evidence of local inflammation in his knee that

 9   wasn't an effusion, wasn't red or warm.  There was

10   no evidence of an abscess.

11        Q.    Did those rule out particular things?

12        A.    Rule out is tough in total joints, but it

13   makes -- it makes infection much less likely.

14        Q.    Please go on.

15        A.    And it makes it a little less likely that

16   he has RSD.  But again, for either of those, it

17   doesn't rule them out.  So I also looked at his

18   motion, which was actually good.  I have here 5 to

19   about 115 degrees and his knee was also stable.  In

20   other words, there was no ligamentous instability

21   that I could detect.

22        Q.    And what range of motion would you expect

23   to find for an individual that had a total knee

24   replacement?

25        A.    Well, in my opinion, you know, ideally you
```

Crisco v. United States of America
September 18, 2007                                   Case No. 3:03-cv-0011-HRH

Page 10

1    want about 0 to about 110.  You know, 90 degrees is

2    fair, but it makes negotiating stairs a little more

3    difficult, and 115 degrees is fine.  I mean, I'm

4    happy when my patients get that.

5           Q.   So his range of motion was good?

6           A.   Yeah.

7           Q.   What else did you find on your

8    examination?

9           A.   Can you be more specific?

10          Q.   Well -- well, okay, let me -- one thing

11   that's noted here is that the records or the x-rays

12   and such from the VA were not forwarded to you.

13          A.   Correct.

14          Q.   Were those essential in, you know, making

15   your diagnosis when you saw him in --

16          A.   In the end --

17          Q.   -- August?

18          A.   In the end you need to see them.

19          Q.   Yes.  And did you ultimately -- you know,

20   did the --

21          A.   Apparently two weeks later, instead of

22   sending them, he hand delivered them and I was able

23   to look at them.

24          Q.   Okay.  And that's, I think, on page 7.

25          A.   Correct.

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

Page 11

1      Q.   And did reviewing the x-rays change your

2  assessment of Mr. Crisco in any way?

3      A.   No.

4      Q.   So what was your overall evaluation of the

5  possible cause for his knee pain?

6      A.    It makes loosening less likely when you

7  don't see radiographic changes.  And something

8  called his erythrocyte sedimentation rate was normal

9  at that time.  Again, it's imperfect, but it makes

10  infection less likely.

11          And so I guess the two things I would be

12  left with is just painful knee of unknown etiology,

13  sometimes you never figure that out.  Or also

14  possibility of reflex sympathetic dystrophy.

15      Q.   Okay.  And would there be additional tests

16  that you would want to order or have taken to rule

17  in or rule out RSD?

18      A.   Well, again, you know, in some sense in my

19  mind RSD is a diagnosis of exclusion.  And so there

20  is no perfect test.  Bone scan is a reasonable thing

21  to do.  But in the end we sort of often diagnose

22  people with RSD when everything else doesn't pan out

23  and they have a painful extremity.

24      Q.   And was -- did you consider malposition of

25  the tibial plate as a possible cause of Mr. Crisco's

Page 12

1    knee pain?

2          A.    Two things.  At this point all I can say

3    is that I didn't note it in my -- in my -- the notes

4    from clinic.  And I usually look for it to see if

5    it's extreme.

6          Q.    And would the range of motion --

7          A.    Well, the --

8          Q.    -- do any diagnostic clues?

9          A.    Well, the way that malpositioning

10   typically manifests is instability.  So ligamentous

11   instability, soft tissue instability, or lack of

12   range of motion.  And those are sort of the two main

13   things, two main ways it manifests.

14         Q.    And you didn't see either in Mr. Crisco in

15   your examination?

16         A.    Well, he lacked a little bit of extension.

17   But his flexion was excellent.

18         Q.    And if -- in this case, I think you're

19   familiar, that the allegation is that there was

20   negligence with anterior slope, if there was an

21   anterior slope to the tibial component, would that

22   affect extension or flexion?

23               MR. KAPOLCHOK:  Your Honor, I would object

24   to that.  This witness is a medical fact witness; he

25   hasn't been designated as an expert.  I think it's

Page 13

1   beyond -- you know, they have a duty to disclose

2   opinions if they're going to use him as an expert.

3   And on that basis, Your Honor, I would object.  In

4   all due respect to Dr. Chansky and his medical

5   background.

6           THE COURT:  Is it correct that he's not

7   been formally designated in your pleadings with the

8   court as a testifying expert?

9           MR. POMEROY:  Correct.  The only witness

10  that's been designated as an expert by either the

11  plaintiff or the defendant is Dr. Vigeland.

12          THE COURT:  Okay.  I had some trouble

13  following the question and was going to interrupt it

14  at this point and say, wait a minute, you've lost

15  me.

16          MR. POMEROY:  Okay.

17          THE COURT:  So either try it again and

18  you're going to get another objection, or move on.

19  It's your choice.

20          MR. POMEROY:  Okay.  Thank you, Your

21  Honor.

22  BY MR. POMEROY:

23      Q.  So moving on.

24          With Mr. Crisco, were there -- what was

25  your -- were there any other additional tests that

Page 14

1    you thought of ordering to help try to rule out what

2    may have been the cause of his pain?

3        A.    There are always other tests you can get,

4    but I -- you know, again, this is a recollection in

5    reading my note.  I felt that -- I didn't think

6    other tests were going to turn up anything.

7        Q.    And what was your recommendation, as far

8    as a course of treatment for Mr. Crisco?

9        A.    Well, I can't remember specifically

10   discussing it with Mr. Crisco, but I know I did call

11   Dr. Bhagia and I just felt that he was not going to

12   be helped by additional surgery.

13       Q.    And so what recommendations did you

14   make?

15       A.    To observe him, just to watch him and try

16   to treat his pain.

17       Q.    I think you noted also that physical

18   therapy would be --

19       A.    Okay.  Right.

20       Q.    -- of help?

21       A.    Possibly of help.

22       Q.    Any other treatment modalities that would

23   possibly be of assistance?

24       A.    You're referring to my notes or asking me

25   just in general?

Page 15

```
 1        Q.   In general.

 2             MR. KAPOLCHOK:   Same objection, Your

 3   Honor.

 4             THE COURT:   Sustained.

 5   BY MR. POMEROY:

 6        Q.   Well, now I'll refer to your notes on

 7   page 1.

 8        A.   Okay.  I don't see that I recommended

 9   anything else.

10        Q.   Okay.  And in the middle of your physical

11   examination you state that he would be best treated

12   in Alaska by rehabilitation medicine and perhaps

13   anesthesiology?

14        A.   Right.  With the focus -- right, as I had

15   mentioned, with the focus being on trying to treat

16   him symptomatically, treat him medically.

17        Q.   And the rehabilitation medicine, that

18   would be the physical therapy?

19        A.   Well, rehabilitation medicine also, in

20   most places, takes charge of certain patients with

21   chronic orthopedic pain also.

22        Q.   And other than the -- now, you said you

23   saw Mr. Crisco briefly a second time?

24        A.   I don't know that I saw him.  The note

25   said that Chief Resident Carla Smith saw him and
```

Page 16

1    basically he was there for me to see the x-rays, and

2    I looked at those.

3         Q.   And then you spoke to Dr. Smith?

4         A.   Correct.

5         Q.   And her notes are there on page 7?

6         A.   Correct.

7              MR. POMEROY:  I have no further

8    questions.

9              THE COURT:  You may cross-examine.

10             MR. KAPOLCHOK:  Thank you, Your Honor.

11                     CROSS-EXAMINATION

12   BY MR. KAPOLCHOK:

13        Q.   Good morning, Dr. Chansky.

14        A.   Hello.

15        Q.   My name is George Kapolchok.  We actually

16   had some peripheral contact in another matter

17   involving your interest in orthopedic oncology; your

18   patient was Warren Bailey.  Do you remember

19   Mr. Bailey?

20        A.   Yes.

21        Q.   You did a number of surgeries on

22   Mr. Bailey?

23        A.   Yes.

24        Q.   Do you actually remember picking up the

25   telephone and calling Dr. Bhagia with reference to

Page 17

1    Mr. Crisco?

2         A.   I can't say I remember picking up the

3    telephone and calling him.  I remember us having a

4    conversation.

5         Q.   Do you remember whether that conversation

6    was before the x-rays were brought back down by

7    Mr. Crisco and he was seen by your chief resident,

8    or whether it was after?

9         A.   It was before I saw Mr. Crisco the first

10   time.

11        Q.   Oh, you had a conversation with Dr. Bhagia

12   before you saw --

13        A.   Correct.

14        Q.   -- Mr. Crisco?

15        A.   Correct.

16        Q.   All right.  To alert you that he was

17   coming down?

18        A.   To ask if I would see him and what I

19   thought initially without seeing him, and then to

20   give him an opinion after I saw him.

21        Q.   So one telephone call with Dr. Bhagia

22   concerning Mr. Crisco?

23        A.   I spoke with him after I saw him, and I

24   don't remember whether that was after the first

25   visit or the second visit.

Crisco v. United States of America
September 18, 2007                           Case No. 3:03-cv-0011-HRH

Page 18

 1      Q.    Okay.  Fine.

 2            With respect to your examination on the --

 3      was that the 11th of September?  I'm looking at D-5,

 4      Doctor, the first page.  Or was that --

 5      A.    Right.  No, that --

 6      Q.    -- August 27th?

 7      A.    That was August 27th.

 8      Q.    All right.  Thank you for clarifying that.

 9            You noted -- I'd like to focus first on

10      your consideration of infection as being the

11      problem.

12            You state under physical exam, there is no

13      significant knee effusion.  What is that?  What is

14      knee effusion?

15      A.    Fluid inside the knee joint.

16      Q.    You continue to address that issue, do you

17      not, Doctor, when you say there is no warmth, no

18      redness; do you see where that is?

19      A.    Correct.

20      Q.    And no effusion, same thing, and I highly

21      doubt infection.  I highly doubt what, that he has

22      any sort of infection?

23      A.    Correct.

24      Q.    If you had had the lab results and they

25      did show negative indications of infection, I take

Page 19

1    it your impression would be closer to a diagnosis

2    then?

3          A.    Well, there's a small proportion of

4    patients that have just slow chronic indolent

5    infections and their labs are always normal.  And

6    you ultimately don't really know until you go in and

7    revise them.

8          Q.    And if you did that, if you went in to

9    revise and took --  what would you do, take fluid

10   samples and tissue samples?

11         A.    Correct.

12         Q.    All right.  Is there a distinction,

13   Doctor, where you say, still my impression is that

14   he has a reflex sympathetic dystrophy-like syndrome.

15              Is that on a scale comparing a diagnosis,

16   is that just what it is based on the limited

17   information, it's just an impression that he could

18   fall within that diagnosis of exclusion?

19         A.    It was an impression, because nothing else

20   seemed very likely at that point.

21         Q.    Doctor, do you have a recollection --

22   would you turn to page 7?

23              Am I correct in reading this, that this is

24   a note by Carla Smith?

25         A.    Correct.

Page 20

```
 1        Q.   If I could go over it with you and see if
 2   I'm understanding this correctly.  She starts off by
 3   saying, "Please see the comprehensive note by
 4   Dr. Chansky dated two weeks ago."
 5             That's what we were just looking at?
 6        A.   Right.
 7        Q.   Okay.  And it goes on to say, "Mr. Crisco
 8   is a 63-year-old gentleman who presents now from
 9   Alaska having had total knee replacement on the left
10   approximately nine months ago.  Full evaluation was
11   done by Dr. Chansky and appears in the computer."
12             Now, is that something we don't have, or
13   is that the note we looked at where Mr. Crisco
14   showed up without his records?
15        A.   That is the note from that first visit.
16        Q.   Okay.  Now, Carla Smith is a resident --
17   what's the relationship, professionally, between you
18   and Carla Smith?  Is she training under you?
19        A.   She's training at that point in time under
20   me, correct.
21        Q.   Okay.  It says here, "Nothing of substance
22   was changed today; however, the patient brings with
23   him his x-rays and fax laboratory reports from
24   Alaska."
25             Okay.  Do you know if she did an
```

Page 21

1    examination?

2        A.    I don't.

3        Q.    All right.  Ms. Smith makes a comment

4    about his radiographs, which demonstrate well-placed

5    components with reasonable alignment and an

6    unsurfaced patella.

7            She goes on to state, "His ESR" -- what is

8    that?

9        A.    Erythrocyte sedimentation rate.

10        Q.    Okay.  -- "was apparently three on July

11    18th, '01."

12            What does that tell you?

13        A.    As she said, as Dr. Smith said, it makes

14    it unlikely that there's an infection.  Not

15    impossible, but unlikely.

16        Q.    Okay.  So the level of confidence, as you

17    did to rule out infection, is increased to some

18    degree?

19        A.    To some degree.

20        Q.    Okay.  And then it talks about her filling

21    in a letter to hand carry to his primary care

22    physician.  And it says that "We continue to believe

23    that his symptoms are consistent with reflex

24    sympathetic dystrophy and not with any surgical

25    amenable cause."

Page 22

1              Okay.  It says, "The films were reviewed

2    with Dr. Chansky."  Now, is that something Dr. Smith

3    did with you?

4         A.    Correct.

5         Q.    Do you have a recollection of what films

6    Mr. Crisco brought with him?

7         A.    No.

8         Q.    Obviously it would not be films that had

9    been in this courtroom from November, correct?

10        A.    I don't understand that question.

11        Q.    It was not worth responding to.  I

12   apologize.

13             This meeting with -- that Mr. Crisco had

14   with Dr. Smith was on what date?

15        A.    September 10th.

16             MR. KAPOLCHOK:  Okay.  If I may have a

17   minute, Your Honor.

18             Thank you, Doctor.

19             THE COURT:  Any redirect?

20             MR. POMEROY:  No, Your Honor.

21             THE COURT:  Thank you, Doctor.  You may

22   step down.

23             Call your next witness.

24             MR. POMEROY:  Dr. Vigeland.

25             THE CLERK:  Please stand before me so I

Crisco v. United States of America
September 18, 2007                                      Case No. 3:03-cv-0011-HRH

Page 23

1    can swear you in.

2              Please raise your right hand.

3        (Witness sworn.)

4              THE CLERK:  Thank you.

5              Please have a seat in the witness box.

6              Please speak into the microphone at all

7    times.

8              State your full name, spelling your last

9    name, and a current address.

10             THE WITNESS:  Theodore John Vigeland.

11   V-I-G-E-L-A-N-D.   1517 Southwest College Street,

12   Portland, Oregon.

13             THE CLERK:  Thank you.

14                  DIRECT EXAMINATION

15   BY MR. POMEROY:

16        Q.   Dr. Vigeland, what's your profession?

17        A.   Orthopedic surgery.

18        Q.   And we've identified your CV as

19   Exhibit D-7 in the book there.  Could you turn to

20   that.

21        A.   D-7?  You probably have to help me here.

22             Okay.  Got it.

23        Q.   Okay.  Let me just go through your sort of

24   background.  What's your current position?

25        A.   Presently I'm an assistant professor of

Crisco v. United States of America
September 18, 2007                                  Case No. 3:03-cv-0011-HRH

Page 24

1    orthopedics and rehabilitation at Oregon Health &

2    Sciences University, and a consultant at the

3    Portland Veterans Administration Hospital.

4         Q.   How long have you been with the University

5    of Oregon?

6         A.   Since 2000.

7         Q.   And before that, what did you do?

8         A.   I was in private practice in Portland

9    doing orthopedic surgery.

10        Q.   Where did you obtain your medical

11   degree?

12        A.   I graduated from the University of Oregon

13   medical school and spent a year of internship there,

14   prior to serving in the medical corps in the Army

15   for four years, and then I completed my four years

16   of residency in orthopedics at the University of

17   Oregon before entering private practice.

18        Q.   When did you obtain your medical degree?

19        A.   1968.

20        Q.   And when did you complete your

21   residency?

22        A.   1977.

23        Q.   And when -- I assume you're board

24   certified?

25        A.   Yes.

Page 25

```
 1        Q.   Okay.  When did you obtain
 2   certification?
 3        A.   1979.
 4        Q.   And does that require recertification?
 5        A.   Well, technically I was grandfathered in.
 6   But I did recertify ten years later, so I have been
 7   recertified.
 8        Q.   And when you were in private practice, was
 9   that as an orthopedic surgeon?
10        A.   Yes.
11        Q.   And now at the university, what's the
12   nature of your professorship?
13        A.   Well, it's a training program, so I train
14   orthopedic residents.  I generally have a chief
15   resident or a fourth-year resident, and I do,
16   essentially, exclusively hip and knee replacement
17   surgery.
18        Q.   And just taking a look at your -- the CV
19   that you provided that was a couple of years ago,
20   I'd just ask you to identify if there is anything in
21   that that needs to be updated or changed?
22        A.   No, I don't think so.  There have been
23   some additional presentations and so on, but the
24   activities I participate in are the same.
25             MR. POMEROY:  Okay.  I'd move for the
```

Page 26

 1   admission of D-7.

 2             THE COURT:  Is there objection?

 3             MR. KAPOLCHOK:  No.

 4             THE COURT:  D-7 is admitted.

 5        (Exhibit D-7 admitted into evidence.)

 6             MR. POMEROY:  And I'd also move for the

 7   admission that Dr. Vigeland is an expert in

 8   orthopedic surgery.

 9             MR. KAPOLCHOK:  No objection.

10             THE COURT:  Accepted.

11   BY MR. POMEROY:

12        Q.   Doctor, I asked -- I've asked -- retained

13   you as an expert in this case to review materials

14   and render an opinion.

15             I'd like you to sort of identify briefly

16   what materials you have reviewed in conjunction with

17   this case.

18        A.   Well, essentially I reviewed all the

19   medical records from 1983 through 2003 when

20   Mr. Crisco was anticipating his amputation.  I

21   didn't review medical records subsequent to that,

22   but from 1983 to 2003, approximately.

23        Q.   And then have you reviewed things in

24   addition to the medical records?

25        A.   X-rays, a large number of x-rays pre- and

Page 27

1  post-op.

2      Q.   And were you provided any depositions to

3  review?

4      A.   Pardon?

5      Q.   Were you provided any depositions taken in

6  this case to review?

7      A.   Yes.  Yes.  Approximately a year ago a

8  deposition was taken in regard to this case.

9      Q.   Okay.  Were you --

10      A.   In Portland.  I was deposed, yes.

11      Q.   You were deposed.  But also, did you

12  review depositions that I provided you?

13      A.   Oh, I'm sorry.  Yes, I reviewed I believe

14  all the depositions of the people that are here

15  today.

16      Q.   And that's --

17      A.   Mr. Crisco and Dr. Bhagia and Dr. Chansky.

18  And there may have been another one; I don't

19  recall.

20      Q.   You reviewed Dr. Ross -- or, excuse me,

21  Dr. Hall's deposition?

22      A.   Oh, Dr. Hall.  Yes, Dr. Hall's as well.

23  Yes.

24      Q.   And you've reviewed the complaint in this

25  case?

Page 28

 1      A.   Yes.

 2      Q.   And the allegation is Dr. Bhagia's surgery

 3 in January 2001 was negligently performed.  Do you

 4 have an opinion on that?

 5      A.   Yes.  I don't believe it was negligently

 6 performed.  I think the position of the prosthesis

 7 was satisfactory.  It was difficult to assess very

 8 accurately with the x-rays that were available, but

 9 I think that the allegation that the anterior slope

10 of the tibial component contributed to the

11 postoperative course was not -- is not accurate.

12      Q.   Okay.  I'd like to elaborate upon that.

13 The postoperative -- well, let's start with the

14 anterior -- or the allegation that there was an

15 anterior slope to the tibial component.

16           You said that you reviewed the x-rays that

17 were taken.

18      A.   Yes.

19      Q.   And you said that they were not helpful or

20 definitive?

21      A.   Well, I don't believe they were

22 definitive.  It's very difficult to assess anterior

23 slope unless you have an accurate lateral x-ray that

24 will show you the axial alignment of the tibia so

25 that you can measure that against the perpendicular

September 18, 2007

1    of the proximal tibial where the slope is

2    measured.

3         Q.   And what --

4         A.   And --

5         Q.   And when you say -- what type of x-ray are

6    you talking about when you --

7         A.   Lateral x-ray of the -- preferably of the

8    entire tibia or at least a good deal of the tibia,

9    including the knee and ankle joint would be ideal.

10   But you always have to include the knee joint and

11   the farther down the tibia you have the x-ray

12   exposed, the more accurate the measurement would be

13   of anterior slope, posterior slope, or neutral.

14        Q.   And none of those -- and you didn't find

15   any of the x-rays that were reviewed in this case

16   provided that -- adequate views to assess the

17   axis?

18        A.   I think they were limited.  My

19   recollection is that it was limited.  None of them

20   showed the ankle joint.  And they also had to have

21   perfectly correct rotation, because if you have an

22   oblique x-ray, then it alters the measurement of

23   slope.

24             So my recollection is that some of them

25   looked reasonable, and you could make a measurement,

Page 30

1    but the measurements would vary.  And some looked

2    like they were in some anterior slope at 3 degrees,

3    some looked like maybe 5 degrees, some -- one AP

4    x-ray particularly looked like it may be just

5    neutral and no anterior slope.

6           But, again, it's pretty well -- pretty

7    well considered that you need very accurate x-ray to

8    make an accurate measurement of slope.

9           Q.   And does the degree of slope make a

10   difference, as far as diagnosing pain?

11          A.   Well, I don't think that -- I don't think

12   anterior slope in a postoperative period would cause

13   pain, no.  I think that if there were a problem with

14   anterior slope, and I'm not convinced that anterior

15   slope of 3 to 5 degrees or whatever you'd like the

16   number to be, would be a significant factor in

17   postoperative pain.

18          If someone had excessive anterior slope, I

19   would expect the symptoms to arise gradually over a

20   period of months or longer, as the knee stresses

21   increase and pain occurred.  But it would not be

22   expected to produce acute, severe unrelenting pain

23   from day one.

24          Q.   What type -- what things do -- or would be

25   causing acute significant unrelenting pain, such as

 1   Mr. Crisco reported?

 2        A.    Correct.  Well, I have no doubt that he

 3   had pain.  And it's very difficult sometimes.  Some

 4   studies will estimate that up to 10 percent of

 5   people with knee replacements will have persistent

 6   pain for a long period of time, even a year or

 7   longer, up to five years before resolving.  Acute

 8   unrelenting pain from day one suggests to me an

 9   infection, obviously, is one possibility.

10             It was discussed earlier about complex

11   regional pain syndrome, and that's a possibility.

12   That's usually more of a delayed onset, but can be.

13   And just unexplained pain.  People with multiple

14   previous operations, for instance, will have severe

15   unrelenting pain and stiffness.  And it's basically

16   unexplained.  I don't think we can put a specific

17   diagnosis on it.  We rule out as many things as we

18   can, but it's not unusual to be left with:  We don't

19   know why it hurts so much.

20        Q.    And for RSD, since we've sort of been

21   using that term, are there particular diagnostic

22   tests for that?

23        A.    Well, I think there's a clinical pattern

24   as has been discussed, it's unexplained pain after

25   either a trivial injury or major insult, like

Page 32

1    surgery is.

2           Probably the most diagnostic test would be

3    to have an anesthesiologist do sympathetic blocks.

4    And that's done through pain management.  You can

5    get a sympathetic block and see if you get relief.

6    It's one of the many options to try to rule out

7    sympathetic dystrophy.

8           I'm not an expert on that, because I think

9    it's such a rare condition.  I'm not sure that I've

10   seen RSD in a knee replacement patient.

11      Q.   What's more common, if RSD is very rare?

12      A.   Yeah.  Well, most common is unexplained.

13   But in terms of explained pain, infection is

14   probably the most common.

15           In the acute phase, you know, if you get

16   out five to ten years, then you look at mechanical

17   loosening as being much more common of course than

18   infection.  But in the short-term I would say

19   infection.

20      Q.   And I was just going to ask about

21   loosening, because there's been testimony about that

22   as a source of pain.  But you said that that's only

23   more common --

24      A.   It's a long-term diagnosis.  We rarely see

25   loosening acutely unless there's been some problem

Crisco v. United States of America
September 18, 2007                               Case No. 3:03-cv-0011-HRH

Page 33

1    with the surgery itself that left the component

2    loose and it was never absolutely fixed.

3              But most common kind of loosening is what

4    occurs with wear over a period of time.  And it's

5    generally -- you know, we hope that it's in ten

6    years, we hope that it's 20 years, but sometimes

7    it's three years and in that range when it becomes

8    mechanically loose because of the body's effect on

9    the implant-surrounding bone.

10        Q.   But within nine months of total knee

11   replacements, that would not be something that you

12   would seriously consider?

13        A.   No, not -- not unless it's infection.

14        Q.   Now, you had indicated that one of the

15   x-rays you looked at you thought provided a zero

16   slope?

17        A.   Uh-huh.

18        Q.   And that's, I think -- that had been

19   identified during your deposition.  And I'd --

20        A.   Correct.

21        Q.   -- like to show you a couple of x-rays I

22   think will show, and you can explain what you mean

23   by that.

24        A.   Yes.

25        Q.   And these were the x-rays taken in March

Page 34

1   12th of 2001 that have been previously identified as

2   D-17, 18, 19, and 20.

3            So I'll -- permission to approach and set

4   up the light table?

5            THE COURT:  Go ahead.

6            THE WITNESS:  This will be fine there.

7            THE COURT:  It may be fine for you --

8            THE WITNESS:  Sorry.

9            THE COURT:  -- but not fine for me,

10  Doctor.

11           THE WITNESS:  Sorry.

12           THE WITNESS:  Well, what I was referring

13  to is the AP x-ray here.  And --

14           THE COURT:  Which one is --

15  BY MR. POMEROY:

16       Q.   What does AP stand for?

17       A.   I'm sorry.  Anterior -- anterior to

18  posterior x-ray, which is this x-ray on my right.

19           THE COURT:  Which one are we looking at?

20           THE WITNESS:  This one right here.

21  BY MR. POMEROY:

22       Q.   And that's D-17.

23       A.   I'm sorry, D-17.

24           And so one way you can tell anterior slope

25  of the tibial component is to imagine that we've got

Page 35

1    a flat surface here and the shadow in the back is

2    the back of the tibial component, the metal base

3    plate.

4              And so if you figure that this is flat,

5    then that's a 0 degree anterior slope if the leg is

6    extended fully.  It's just one x-ray that suggests

7    that if the x-ray was taken appropriately that there

8    was not any excessive anterior slope.

9              Now the other x-ray is a lateral x-ray.

10   And --

11        Q.   And that's --

12        A.   And that's D-18.

13        Q.   D-18.

14        A.   And that, on the face of it, looks like

15   there's anterior slope in the tibial component.

16   This is going down instead of being neutral or

17   tilting backwards.

18        Q.   How much is the tibia is --

19        A.   Well, there's very little of the tibia.

20   And one would like to have more of the tibia to

21   determine exactly what the anterior slope is.  And

22   also the rotation is very difficult, because he's

23   had a previous bone-cutting operation at the upper

24   end of the tibia prior to this operation, and that

25   makes anatomy all distorted.  And so it makes it

Page 36

1    difficult to determine whether the rotation is

2    correct to make an accurate measurement of the

3    anterior slope.

4             So looking at that, I would say that it

5    looks like he's got some anterior slope, but I don't

6    think there's any way to make an accurate

7    measurement of whether it's 2 degrees, 3 degrees, or

8    5 degrees.

9        Q.   And are you taking into account the

10   plastic component of the -- or plastic part of the

11   tibial component?

12       A.   Right.  Well this particular -- all this

13   measures is the base plate.  And then the plastic

14   component has some posterior slope built into it,

15   and so that would be -- that would neutralize, in

16   effect, any of the anterior slope of the base

17   plate.

18            So if the anterior slope of the base

19   plate, for instance, was 5 degrees and the posterior

20   slope of the plastic were 4 degrees, then its

21   anterior slope would be 1 degree.

22            You can't -- you have to just measure the

23   base plate, that's all you can see accurately, not

24   the plastic, which is the dark shadow present.

25       Q.   Thank you.

Crisco v. United States of America
September 18, 2007                          Case No. 3:03-cv-0011-HRH

Page 37

 1            Now, there's been some reference to a
 2    diagnostic bone scan that Dr. Hall performed in
 3    October of 2001.  And I believe you've seen
 4    Dr. Hall's deposition and his medical records
 5    relating to that.
 6            Does that affect your sort of opinion on
 7    the cause of Mr. Crisco's pain in any way?
 8    A.    No.  The bone scan was positive and a
 9    positive bone scan gives you some information.  It's
10    not as valuable as a negative bone scan.
11            A negative bone scan is very valuable in
12    terms of ruling out infection, loosening,
13    sympathetic dystrophy and all these other things.  A
14    positive bone scan is nonspecific.  It basically
15    tells us that there is some active bone change going
16    on around the knee.  It could be infection, it could
17    be mechanical loosening, it could be stress, it
18    could be microfractures, it could be all sorts of
19    things.
20            But it's a nonspecific finding that just
21    suggests that -- in many instances, it suggests
22    that, yes, that's real, that's -- there's something
23    going on there that's not normal.  A bone scan will
24    typically be normal after about three months after a
25    knee replacement, but -- and sometimes longer.  But

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

Page 38

1    it's very nonspecific.

2        Q.   And what does the bone scan measure?

3        A.   Well, it measures -- it can measure

4    inflammatory change, it basically measures bone

5    turnover.  Inflammatory change, it can be due to

6    multiple causes, as I mentioned.  You look for it in

7    terms of infection, but in an infection you really

8    have to do an additional scan that's called a white

9    cell scan, and then hope that the white cell scan is

10   positive and the bone scan is negative, and then you

11   think you might have an infection, but a bone scan

12   per se is very nonspecific.  Negative being more

13   valuable than a positive.

14       Q.   And you said typically a bone scan may be

15   negative after three months?

16       A.   It can be -- it could be positive for some

17   time, depends on patient activity level and whether

18   the implant was cemented or not cemented in, whether

19   it was -- so I don't really --

20       Q.   What --

21       A.   Go ahead.

22       Q.   I'm sorry, what effect does cementing have

23   on the bone scan?

24       A.   Well, it makes it more instantly stable,

25   so that the micromotion is eliminated at the time of

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

Page 39

1    surgery, whereas if you don't cement an implant then

2    the bone gradually has to grow into that implant to

3    make it solid, and that requires a lot of metabolic

4    bone activity in order for that to happen.  So

5    that's the difference.

6            And I'm not certain how soon a bone scan

7    would cool off on average.  I'm sure it's very

8    variable, but we just don't do bone scans routinely

9    on normal knees, so, you know, a knee that's not

10   hurting doesn't get a bone scan, so I don't know

11   exactly when a bone scan would be absolutely cool or

12   negative after a successful knee replacement.

13       Q.   But do you know how -- I guess maybe I

14   might be asking the converse of that question, but

15   on -- is there any -- do you know how long a bone

16   scan may be, to use the term, "hot," after a knee

17   replacement surgery, sort of like at the outer edge

18   of time?

19       A.   In a successful knee replacement?

20       Q.   Yes.

21       A.   The patient is asymptomatic, I don't know

22   that that data is available.

23       Q.   Okay.

24       A.   How long a bone scan would remain warm.

25       Q.   Okay.  What's the purpose -- or what's the

Page 40

 1  diagnostic value of range of motion after a knee

 2  replacement surgery?

 3      A.   Well, it's critical to a patient's

 4  recovery.  We like to have them have, you know, full

 5  extension, 0 degrees of extension, and flexion

 6  beyond 110 degrees is kind of the gold standard for

 7  a standard knee replacement.

 8          Somebody who has had previous surgery,

 9  particularly an osteotomy, would not necessarily be

10  expected to get that kind of motion.

11          Postoperative motion is determined a lot

12  by preoperative motion, so if you're stiff before

13  the surgery, it's not unlikely that you'll be stiff

14  after the surgery.

15          But in Mr. Crisco's record, it suggested

16  he had gained excellent motion and there was some

17  records in there that suggested that he had 0 to 123

18  degrees, I believe, that I saw in one of the

19  therapist's records.

20          But at any rate, even if it's as high as

21  it was described earlier, 5 to 105 degrees, that

22  would be considered a good result after an osteotomy

23  following -- or followed by a knee replacement.

24      Q.   And concerning the allegation that

25  Mr. Crisco's had a negligently placed anterior

Crisco v. United States of America
September 18, 2007                      Case No. 3:03-cv-0011-HRH

Page 41

1    slope.  Does the range of motion give any indication

2    whether there was unacceptable tibial slope, or

3    not?

4         A.   Well, there's never -- until just

5    recently, there's never been a real study on the

6    effectiveness of slope on range of motion.  There

7    have been computer analyses and so on, but there is

8    a recent study that shows that from 0 to 5 degrees

9    of posterior slope doesn't make any difference in

10   the range of motion.  I mean, there's been an

11   argument that if you have abnormal slope,

12   particularly inadequate posterior slope, you're

13   going to be limited in your motion of your knee.

14         But none of those were clinical studies

15   that actually measured people until just recently in

16   any routine studies; there is a study out of Wayne

17   State that compared 0 degrees of slope to 5 degrees

18   of posterior slope and there was actually no

19   difference in range of motion.

20         And some of the people in that study with

21   0 degrees -- or with -- had 4 degrees of anterior

22   slope and it did not affect motion.  They were part

23   of that study.

24         So I don't -- I think in general we

25   thought that posterior slope, we don't talk about

Page 42

1   anterior slope, because they're really -- that's not

2   the goal is to have somebody have anterior slope,

3   but the argument is about 0, 5, 7 degrees of

4   posterior slope, and that argument's never been

5   settled, but the concern was in terms of motion.

6           So, you know, intuitively I would think if

7   someone gains excellent motion, then one can -- one

8   can believe that the slope of the implant had

9   nothing to do with that motion, or it certainly

10  didn't restrict that motion, abnormal slope.

11      Q.   And I sort of asked you, but why do you

12  not believe that if -- assuming there was some

13  anterior slope to his component, why did that not

14  cause Mr. Crisco's pain?

15      A.   Well, I just don't believe that mechanical

16  malalignment causes acute unrelenting postoperative

17  pain.  We see this in people who are malaligned, the

18  symptoms generally arise months, years later because

19  of abnormal stresses put on the knee because of the

20  malpositioning of the implant.  Most commonly that's

21  in a patient who is too bow-legged, for instance,

22  after a knee replacement.  They put a lot of stress

23  on the inside half of their knee and they gradually

24  loosen, et cetera.

25           In someone who -- if someone had excessive

Crisco v. United States of America
September 18, 2007                          Case No. 3:03-cv-0011-HRH

Page 43

1    anterior slope, then I would expect them possibly

2    over time to develop some anterior knee pain.  But I

3    would not expect that to happen for, you know,

4    months, if not years after a person's active and

5    fully recovered and it's that kind of a pain.

6              And I would not expect it to cause

7    unrelenting, narcotic-requiring pain from day one.

8         Q.   And just to be clear.  Your opinion is not

9    that the tibial component was negligently positioned

10   in Crisco's case?

11        A.   I don't believe it was, no -- well -- no,

12   I don't believe it was.

13        Q.   And there's been some discussion about --

14   sorry -- different manufacturers of knee components.

15   Now, what kind of -- do you have a preference among

16   the different manufacturers?

17        A.   Well, I do have a couple of different

18   knees that I use from different manufacturers,

19   depending on patient age, activity level, et cetera.

20   And I probably use more from a manufacturer called

21   Zimmer.  And then the second most commonly from a

22   manufacturer called DePuy, which does the mobile

23   bearing type of knee, which is a little different

24   concept.  But there are multiple manufacturers of

25   total knees.  They basically all have come from the

Crisco v. United States of America
September 18, 2007                                Case No. 3:03-cv-0011-HRH

Page 44

1    concept of the total condylar, which has been around

2    for 30 years, and I put in as a resident.

3              And so the manufacturers now have modified

4    these implants slightly, but there are no good

5    clinical studies that would suggest that one

6    manufacturer's knee is superior to another

7    manufacturer's knee.  A lot of it's opinion and

8    training and what you use.  It is determined --

9    determined by a lot of things.

10             I've done Smith & Nephew knees as well,

11   because it was a favorite of the chief of

12   orthopedics at the VA in Portland who was there for

13   many years, so he did all Smith Nephew knees, so

14   you'd see those in follow-up, and revised some of

15   those too.

16        Q.   And Smith & Nephew is the manufacturer of

17   the Profix knee?

18        A.   Yes.  Yeah.

19        Q.   So you're familiar with the Profix knee?

20        A.   Yes, uh-huh.

21        Q.   And that component has -- the plastic

22   component has an anterior slope -- I mean, excuse

23   me.  A posterior slope built into it; is that

24   correct?

25        A.   My recollection, yeah.  I do not use -- I

Page 45

```
 1   have not used it as a primary knee, I've used it as
 2   a revision knee, and so revision knees are much
 3   different than primary knees, but my recollection is
 4   that the primary knee does have a built-in slope in
 5   the polyethylene.
 6              MR. POMEROY:  Those are all the questions
 7   I have, so...
 8              THE COURT:  Are you going to
 9   cross-examine?
10              MR. KAPOLCHOK:  Yes.  Thank you, Your
11   Honor.
12                    CROSS-EXAMINATION
13   BY MR. KAPOLCHOK:
14        Q.   Dr. Vigeland, welcome to Alaska.
15        A.   Thank you.
16        Q.   First trip?
17             Just to follow up on your last comment.
18   You recall me going to Oregon and deposing you?
19        A.   Yes.
20        Q.   And at that time, sir, you told me that
21   you never installed a Profix knee as a primary; and
22   that's correct, isn't it?
23        A.   Yes.  I believe so, yeah.
24        Q.   Okay.  All right.  So when you're familiar
25   with them, you're familiar with them like Dr. Hall
```

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

Page 46

1    is familiar with them, and that's revising them or

2    fixing them or replacing them?

3        A.    Sure.  But we look at knees -- I try to

4    encourage the residents to use all different kinds

5    of knees, so that they are comfortable with

6    different manufacturers and understand the

7    differences, and then they can make their selection

8    when they go into practice.  I may have implanted

9    some primary Profix knees at the VA.  I do so many

10   knees, I'm not certain about that.  But I'm not --

11   it's not my primary knee.

12       Q.    To begin, Doctor.  I'd like you to assume

13   that the following questions I'm going to ask do

14   refer to a primary, as you surgeons call them, or a

15   first-time knee replacement; okay?  All right?

16       A.    Yes.

17       Q.    And just to be absolutely clear that you

18   have not, or you do not recall ever installing a

19   Profix component knee as Mr. Crisco had in this

20   case?

21       A.    That's correct.

22       Q.    All right.  I believe you told me, sir,

23   that you typically use the components manufactured

24   by Zimmer?

25       A.    Yes.

Crisco v. United States of America
September 18, 2007                          Case No. 3:03-cv-0011-HRH

Page 47

 1      Q.    All right.  And you're aware that Dr. Hall
 2   used a Zimmer knee to replace?
 3      A.    Yes.
 4      Q.    All right.  Installing the Zimmer
 5   component, unless there's very unusual
 6   circumstances, I believe you told me, you always
 7   install the knee with a 7 degree posterior slope on
 8   the tibial component?
 9      A.    That's correct, but it is because I
10   sacrificed the posterior cruciate ligament when I do
11   knee replacements.  Not everybody does that.  And so
12   if you don't sacrifice the posterior cruciate
13   ligament you tend to put them in -- it's recommended
14   you put them in neutral, 0 sloped.  By some people.
15   There's a lot of debate about that.
16      Q.    In fact, the manufacturer provides a
17   so-called cutting block that --
18      A.    Correct.
19      Q.    -- measures 7 degrees?
20            All right.
21      A.    And also a 3 degree cutting block is
22   provided.
23      Q.    Have you reviewed Dr. Ross's deposition in
24   this matter?  Dr. Ross is a young orthopedic
25   surgeon, now practices in Soldotna?

September 18, 2007

Page 48

```
 1        A.   No, I don't believe so.

 2        Q.   Dr. Ross will testify in this case, and he

 3   uses the Zimmer and he also uses the 7 degree

 4   posterior slope.

 5             Dr. Hall testified, and you've read

 6   Dr. Hall's deposition?

 7        A.   Yes.

 8        Q.   He uses the 7 degree posterior slope.

 9        A.   Yes.

10        Q.   The normal knee, Doctor, the normal knee,

11   the tibial part of it has a normal posterior slope

12   to it, does it not?

13        A.   Correct.

14        Q.   And the Profix knee that Mr. Crisco had,

15   the manufacturer recommends -- they never tell you

16   what to do, do they?

17        A.   No, sir.

18        Q.   No.  They leave it to your discretion.

19   But they recommend a 7 degree posterior slope, don't

20   they?

21        A.   I don't know that.

22        Q.   Okay.

23        A.   I would be surprised, because this is a

24   posterior cruciate retaining knee, and consensus is

25   not among surgeons that they would recommend a
```

Crisco v. United States of America
September 18, 2007                                Case No. 3:03-cv-0011-HRH

Page 49

1    degree slope with a cruciate retaining knee, but as

2    they say, those recommendations are all over the

3    map.  But I don't argue that the manufacturer

4    recommends that if that's what's in the brochure.

5         Q.    In the manufacturer's literature that

6    comes with the kit?

7         A.    Correct.

8         Q.    All right.  If that's true, Doctor, then

9    an implantation of the Profix knee with a 7 degree

10   anterior slope, that would be a 14 degree deviation,

11   would it not, using at least my mathematics?

12        A.    Well, my understanding is that the

13   polyethylene has built in posterior slope.  And the

14   cutting jig, I don't know what the cutting jig is

15   set at.

16             If the cutting jig is set at 0, then it's

17   a 4 degree posterior slope.  You know, if the

18   cutting jig is set at something more than that, then

19   it's more, of course.

20        Q.    If your students installed a Zimmer knee

21   that recommends a 7 degree posterior slope and the

22   net result after that was a 7 degree anterior slope,

23   do you give them a passing grade?

24        A.    No.  I wouldn't give myself a passing

25   grade.

Crisco v. United States of America
September 18, 2007                        Case No. 3:03-cv-0011-HRH

Page 50

1       Q.   Okay.  With respect to your practice, sir,
2    you've been out of practice -- private practice,
3    private clinical practice, for about seven years?
4       A.   Yes.  However, my university practice is a
5    private practice.  It's unusual, I mean, I -- you
6    know, it's basically no different than a private
7    practice.
8       Q.   I see.  Okay.  Two days a week, at least,
9    you work for the Veterans Hospital, which is part of
10   that complex in Oregon State, right?
11      A.   That was correct at the time of
12   deposition, now it's one day a week at the present
13   time.
14      Q.   And during that one day a week now, two
15   days a week when I deposed you, you would actually
16   do surgery for the veterans?
17      A.   Correct.
18      Q.   The Veterans Hospital did not have an
19   orthopedic surgeon on staff?
20      A.   Oh, yes.  They have -- there are several,
21   but I was kind of the designated joint replacement
22   surgeon.  Some of my partners there also did joint
23   replacements, but I did the majority of them and the
24   more difficult ones.  But there are four of us.
25      Q.   Would you agree, Doctor, that malposition

Page 51

 1   problems are complications that are controlled by

 2   surgical technique?

 3        A.   Yes.

 4        Q.   In the knee replacements that you do, sir,

 5   do you typically use the -- and correct my

 6   pronunciation if it's wrong, intramedullary guides

 7   when making the tibial cut?

 8        A.   Yes.

 9        Q.   All right.  And perhaps to repeat that,

10   that's an external kind of framework that is

11   attached to the leg?

12        A.   Yes.

13        Q.   Are you aware in this case that Dr. Bhagia

14   used an intramedullary guide?

15        A.   Yes.

16        Q.   Which, my understanding is a drill is

17   used, and then a rod is placed in the tibial bone,

18   and then the cutting blocks are attached to that; is

19   that true?

20        A.   Yes.

21        Q.   Is that -- is that approach to making the

22   tibial cut, is that subject to more -- is that -- is

23   that subject to more or a higher degree of error, in

24   your view?

25        A.   No.  I may have thought differently, but

Crisco v. United States of America
September 18, 2007                          Case No. 3:03-cv-0011-HRH

Page 52

1    there are recent -- the recent science out of Wayne

2    State measured that very specific question, and the

3    intramedullary cutting guide was found to be

4    extremely accurate in both 0 degrees and 5 degrees

5    of posterior slope cutting blocks.

6              I have felt that it's more difficult to

7    use an intramedullary cutting block, and so I have

8    used an extramedullary cutting block, which is --

9    which is basically eyeballing it.  You stand back

10   and you think, yeah, that's it.

11             So it's not real scientific and we've

12   checked that with computer navigation, and I think

13   we do a little bit better job than one would

14   anticipate with that kind of rather archaic method

15   of aligning something.

16        Q.   In your deposition, Doctor, I asked if you

17   were going to rely on any literature to support any

18   opinions you had, and you told me no.  And this

19   morning I was given, and heard about, an article

20   that I guess you recently found.  The article is

21   dated 2006?

22        A.   Correct.

23        Q.   And it concerns -- I read it very hastily,

24   but it concerns whether or not slope has a

25   correlative or correlation to range of motion?

Page 53

1        A.    Correct.

2        Q.    The study doesn't involve pain or other

3    problems that might result from --

4        A.    Yes, it did.  Yes.  It -- I don't remember

5    the exact clinical rating that was used, but they

6    indicated the clinical result was the same also.

7    And that includes pain, function, everything else

8    was also -- I don't remember if it was HSS or what.

9    This is just part of my routine monthly reading.

10        Q.    Do you recall preparing a letter of

11    opinion in this case, Doctor?  An opinion letter?

12        A.    I may have.  It's been a long time.

13        Q.    It's dated May 4th, 2004.

14        A.    2004?

15        Q.    Yes.

16        A.    I have no recollection of what I said.

17        Q.    Well, let me ask you about that, and I

18    will get you a -- if you'd like to look at a copy, I

19    can get one for you.  I assumed you had one.

20            You say in this letter, Doctor, and

21    perhaps this will refresh your memory, you state "I

22    have measured several of Mr. Crisco's x-rays and

23    find the degree of anterior slope varies from 2

24    degrees to 7 degrees."

25            Do you remember doing that?

Page 54

```
 1        A.    I do.

 2        Q.    You looked at all his x-rays?

 3        A.    Yes.

 4        Q.    Okay.  And your conclusion then was that

 5   you found anterior slope that varied from 2 degrees

 6   to 7 degrees?

 7        A.    Yes.

 8        Q.    Do you recall that?

 9        A.    Yes.

10        Q.    And do you recall that during your

11   deposition I had you look at a particular x-ray that

12   had been marked by a different orthopedic surgeon.

13   And you agreed with me that that showed 5 or 6

14   degrees of anterior slope?

15        A.    Correct.

16        Q.    And, for the record, sir, I'll show you

17   that.

18              That little exhibit sticker, which is

19   No. 1 to your deposition, and that's -- I believe

20   it's been admitted as 3-A.  In fact, I'm sure.

21        A.    No, I can see.

22        Q.    Well, the judge can't.

23              Okay.  Let me ask you a few questions

24   about that.

25              Would you agree, Dr. Vigeland, that the
```

Crisco v. United States of America
September 18, 2007                                     Case No. 3:03-cv-0011-HRH

Page 55

1    most accurate way to measure -- do you have it
2    there?
3         A.   Uh-huh.
4         Q.   The most accurate way to measure or to
5    determine whether the tibial component has an
6    anterior or posterior slope or is neutral is from a
7    lateral film?
8         A.   Yes.
9         Q.   And does that appear to be a lateral view
10   of the knee?
11        A.   Yes.
12        Q.   Do you recall during your deposition,
13   Doctor, telling me that that film was a reasonable
14   representation of the anterior slope -- and by that
15   film, I mean the actual lines that have been
16   superimposed on it to attempt to determine the
17   reasonable slope -- the anterior slope.
18        A.   It's a reasonable attempt, yes.
19        Q.   Do you recall telling me in your
20   deposition that you thought the 5 degree measurement
21   looked appropriate?
22        A.   I don't recall that, but I wouldn't
23   disagree with that.
24        Q.   Do you recall telling me that that film
25   looks very close to a true lateral?

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

Page 56

 1       A.   I don't disagree with that.

 2       Q.   Okay.  All right.  Dr. Vigeland, I'm going

 3  to apologize, since we can't seem to find a copy of

 4  your opinion letter, I'm going to hand you one

 5  that's been written all over.

 6       A.   That's fine.

 7       Q.   You can disregard that.  Mine is even

 8  worse.

 9            I use red and yellow.

10            Do you need a moment to refresh your

11  memory on what you presented in this case?

12       A.   No.

13       Q.   Okay.  If you'd look on page 2 of your

14  letter, Doctor.

15       A.   Uh-huh.

16       Q.   Starting down that first paragraph.  You

17  say, "I have measured several of Mr. Crisco's x-rays

18  and find the degree of anterior slope varies from 2

19  degrees to 7 degrees."

20            You say, "These measurements have a

21  significant standard of error and I did not have

22  available to me a true standing, long leg lateral

23  film to assist in the accurate determination of the

24  degree of anterior slope."

25            What kind of film were you not provided or

Crisco v. United States of America
September 18, 2007                                Case No. 3:03-cv-0011-HRH

Page 57

1    was not made available to you?

2         A.   Well, I think as I mentioned earlier, to

3    make a precise measurement you really have to have a

4    good portion of the tibia, preferably the entire

5    tibia, but, you know, it would be nice to have more

6    of the tibia than was available on these films.  The

7    more the better, in terms of making it accurate.

8         Q.   But, you continue to say, Doctor, and this

9    is my concern, "I doubt that there would" -- I guess

10   there should be a "be" in there.

11           "I doubt that there would be a significant

12   clinical difference between the degrees measured on

13   the current films available."  That's your

14   opinion?

15        A.   Correct.  By clinical, of course, I meant

16   in the patient outcome, not in -- not in terms of

17   exact measurements, the patient's outcome.  I don't

18   think the clinical outcome would vary whether it was

19   2 degrees of anterior slope or 7 degrees of anterior

20   slope.  I wouldn't expect a clinical outcome in the

21   early stages to be any different.

22        Q.   Now, you agree, don't you, Doctor, that

23   malalignment or this anterior slope could cause

24   excessive wear?

25        A.   Long-term, yes.

Summit Court Reporting, LLC
907/264-6776

Crisco v. United States of America
September 18, 2007                          Case No. 3:03-cv-0011-HRH

Page 58

1      Q.    Okay.  You agree also that this anterior
2   slope could cause instability?
3      A.    Yes.  Flexion instability.  Going down
4   stairs and so on where the femur would have a
5   greater potential for riding forward on that base
6   plate without -- despite the resistance of the
7   quads, quadriceps muscle and the kneecap.  So, yeah,
8   you can develop a little bit of instability.  I
9   suspect with anterior slope there's nothing in the
10  literature that I've ever found that addresses that
11  topic.
12     Q.    And is the reason for that, that the
13  majority of knees implanted in the United States,
14  anyway, attempt to achieve posterior slope?
15     A.    They attempt to achieve neutral to
16  posterior, yes.  Depending on their philosophy.
17     Q.    When you were using your fist to
18  demonstrate, that's the femoral component on the
19  tibial --
20     A.    Right.
21     Q.    -- tray?  And you were talking about going
22  down stairs causing some instability.  What's the
23  curve of that femoral component called?  Is it the
24  Burmeister curve?  It isn't a perfect --
25     A.    It's a J curve, it's not a perfect radius.

September 18, 2007

Page 59

1    Radius changes from front to back in the knee.  It

2    depends on the design of the knee replacement.

3            There are some knee manufacturers that

4    think that you can have a perfect radius on the

5    lateral versus others that say you need a J curve,

6    and that's -- the engineers debate that, I would

7    say.  And whether there's a different clinical

8    significance to that, I don't think I'm familiar

9    with it being significant.

10        Q.   The instability we're talking about, and

11   the example you used is like going down the stairs,

12   if you've got an anterior slope, would that be

13   exacerbated or increased if, as in this case, the --

14   that posterior ligament is retained?  In other

15   words, that it's tighter back there?

16        A.   Posterior cruciate ligament?

17        Q.   Yes.

18        A.   That would help restrain that, yes, if the

19   posterior cruciate ligament were normal.

20        Q.   Doctor, you have not been asked to review

21   the bone scan that was done in this case; is that

22   correct?

23        A.   I have a recollection that I've seen that,

24   but I can't tell you for sure.

25        Q.   Dr. Hall testified yesterday, and he

Page 60

1    talked about increased uptake.

2         A.   Yes.

3         Q.   Let's talk about the bone scans generally

4    first.

5              I believe you testified today that a bone

6    scan after a knee replacement, especially if it's

7    cemented, is typically normal about three months

8    out.

9         A.   Well, I -- and then I addended that,

10   because I -- that was my assumption, but I don't

11   think there's any good literature on that, because

12   we would not have any particular reason to do a bone

13   scan in an asymptomatic knee, so I think that was my

14   supposition that I would think that it would be

15   normal, but I don't think there's -- I don't think I

16   have any good data to tell you when a bone scan

17   becomes normal after an uneventful total knee

18   replacement.

19        Q.   Okay.

20        A.   We don't order -- we don't order them for

21   that.

22        Q.   By normal, Doctor, you mean negative; it

23   doesn't show?

24        A.   Negative.  Correct.

25        Q.   None of these, what's been referred to, I

Crisco v. United States of America
September 18, 2007                                                  Case No. 3:03-cv-0011-HRH

Page 61

1    believe, by Dr. Hall as hot spots or --

2         A.    Correct.

3         Q.    -- uptake?

4         A.    Correct.

5         Q.    All right.  And I believe you testified

6    today that if it is positive or abnormal, that could

7    show abnormal stress transfer to the bones?

8         A.    Yes.

9         Q.    And you also said it could be infection?

10        A.    Yes.

11        Q.    You'd agree with me, though, in this case,

12   all of Mr. Crisco's lab work throughout his

13   treatment by the VA, from the day Dr. Bhagia

14   implanted his knee until Dr. Hall revised that, all

15   of his lab work as to his infection was negative?

16        A.    All the lab work that I saw was negative.

17   I believe there was lab work that I didn't see the

18   results of, but what I have heard today about the

19   sed rate being normal.  And what I saw in the record

20   about lab work, the culture negative, et cetera, was

21   negative, that's correct.

22        Q.    And you realize from a review of the

23   records that during the revision surgery Dr. Hall

24   took fluid and tissue samples and had them cultured

25   and that they were negative?

Crisco v. United States of America
September 18, 2007                            Case No. 3:03-cv-0011-HRH

Page 62

1        A.    That I didn't -- it wasn't clear from the

2    record to me whether there was tissue samples sent

3    in addition to -- typically we'll send three to five

4    specimens and a cell count from the fluid in the

5    joint, and a frozen section, to rule out infection

6    at that time.  I didn't see that.  And I don't know

7    how many cultures were done.  I saw a note that

8    culture was negative and I don't recall what else

9    was there.

10       Q.    If what I said is true, and Dr. Hall has

11   testified in court to that, isn't it more likely

12   than not that the bone scan showing these hot spots

13   on the tibia and on the patella, isn't that more

14   likely than not the result of stress?

15       A.    The bone scan was what, eight months after

16   the surgery?

17       Q.    Bone scan was done in October.  And the

18   surgery was done in January.

19       A.    January.  I don't think I could say that,

20   no.  Have an increased uptake in the patella, yes, I

21   think that's possibly the case with a non-resurfaced

22   patella.  I would suspect at nine months may show

23   some increased uptake on the bone scan.  The tibia,

24   I would be surprised at that point in time,

25   depending on how active somebody is.  I mean if

Crisco v. United States of America
September 18, 2007                                     Case No. 3:03-cv-0011-HRH

Page 63

 1   somebody goes out three months after a total knee

 2   and starts jogging again, then, yes, if it's

 3   malaligned, but...

 4       Q.   Dr. Hall testified that he always reads

 5   his own bone scans.  And you do that --

 6       A.   Oh, sure.

 7       Q.   -- as an orthopedic surgeon.

 8           You don't rely on a radiologist to

 9   interpret the bone scan?

10       A.   No.

11       Q.   You do it?

12       A.   Yes.

13       Q.   Is it your opinion today that Mr. Crisco's

14   pain was -- is the result of a reflex sympathy

15   dystrophy?

16       A.   I don't know.

17       Q.   You testified on direct, I believe,

18   Doctor, that you've seen RSD very rare occasions; is

19   that correct?

20       A.   Yes.

21       Q.   I believe you told me six cases post-knee

22   replacement that you have seen maybe six cases in 30

23   years of practice?

24       A.   I'd be surprised if there were that many.

25   It may have been six.  It's very rare.

Crisco v. United States of America
September 18, 2007                          Case No. 3:03-cv-0011-HRH

Page 64

1      Q.   Not to beat a dead horse, but the results

2   of the bone scan, you don't recall whether you

3   reviewed it or not, that's fine.

4           The hot spots that Dr. Hall saw,

5   infection, stress, or mechanical -- I believe you

6   called them -- yeah, mechanical issues.  What else

7   could it possibly be?

8      A.   Well, you mentioned RSD, although

9   that's -- it's much more uniform, usually, in RSD,

10  my recollection is, although it's rare.  I think

11  those are basically the ones.  Mechanical stress or

12  infection.  Or a loosening, of course.  Mechanical

13  loosening.  That goes into the mechanical idea.  I

14  mean, if it's loose, it's abnormal mechanics.

15     Q.   But there was no -- there's been no

16  indication or assertion that anything on

17  Mr. Crisco's original knee put in by Dr. Bhagia

18  loosened up, is there?

19     A.   No.

20     Q.   In fact, Dr. Hall's operative report

21  indicates that everything -- the cement had held and

22  everything was --

23     A.   Stable.

24     Q.   -- stable?

25     A.   Yes.

September 18, 2007

```
 1      Q.   Right.  Okay.

 2           MR. KAPOLCHOK:  Dr. Vigeland, thank you.

 3           THE COURT:  Redirect?

 4                REDIRECT EXAMINATION

 5   BY MR. POMEROY:

 6      Q.   Doctor, I want to clarify a couple of

 7   points on -- Mr. Kapolchok talked about on

 8   cross-examination.

 9           You talked about flexion instability.

10   What is that?

11      A.   Well, it's a relatively new concept.  And

12   it refers to instability in knees that occurs

13   primarily with knee in partial flexion.  And I think

14   the most common cause is in knees where the

15   posterior cruciate ligament was retained and

16   therefore the implant does not substitute for the

17   posterior cruciate ligament, and then the posterior

18   cruciate ligament gradually stretches out.  And so

19   they have trouble with a feeling of instability,

20   like the knee is getting where it just doesn't feel

21   quite right.

22           And we think it's because of some abnormal

23   motion between the femoral component and the tibial

24   component due to the lack of the posterior cruciate

25   ligament now.  And that puts additional stress on
```

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

Page 66

1    the patella of course, and creates mostly a -- it's

2    a pretty obscure symptom of feeling, like the knee

3    just doesn't feel quite stable.

4              And these usually resolved when we go in

5    and replace the tibial plastic with a plastic that

6    substitutes for the posterior cruciate ligament and

7    it will generally resolve.  It's not a pain problem,

8    it's, you know, a feeling of instability.

9         Q.   Okay.  So that in Dr. Bhagia's surgery

10   where he retained the posterior cruciate ligament?

11        A.   Uh-huh.

12        Q.   I mean, that's within standard of care?

13        A.   Oh, very much so, yes.

14        Q.   And also, I think we mentioned a little

15   bit, that Dr. Bhagia retained the patella and also

16   did not resurface the patella in the primary

17   operation.

18              Is that within standard of care?

19        A.   Yes.  Very commonly done.

20        Q.   And if, as you said, if there's some, you

21   know, instability or something from the resurfacing,

22   what's typically done to correct that?

23        A.   If they have flexion instability,

24   typically we just replace the polyethylene and in

25   most cases you have to replace the femoral component

Page 67

1    also to solve that instability problem, to

2    substitute with the implant, you substitute for the

3    lack or the damage or the stretching or the

4    incompetence of the posterior cruciate ligament that

5    was retained.

6         Q.   But that's not the situation in

7    Mr. Crisco's -- I mean, it wasn't --

8         A.   No.

9         Q.   -- the instability?

10        A.   No.

11        Q.   In examining, cross-examination, the x-ray

12   offered by Mr. Kapolchok, you said that that was a

13   true lateral view.  And maybe just for

14   clarification, what do you mean by true lateral?

15        A.   Well, it's perpendicular to a true AP, I

16   guess.  It's a side view that is accurate to be at

17   90 degrees to the anterior axis.  It's hard to

18   define that, I guess, but it's -- it's an accurate

19   lateral.

20        Q.   Okay.  And did that x-ray show a

21   significant enough portion of the tibia in order to

22   make an accurate determination of the long axis?

23        A.   Well, it was an estimate of the long axis.

24   And I think, as I mentioned, it was a reasonable

25   estimate of the anterior slope from the film

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

Page 68

1    available.

2         Q.   But it wasn't an ideal --

3         A.   It wasn't ideal.

4         Q.   Okay.

5         A.   And in a clinical study, they probably --

6    as in the Wayne State study, they would probably

7    eliminate those x-rays as not being adequate because

8    of the decreased length of the tibia available to

9    make an accurate measurement.  But it's within

10   clinical relevance, I think.

11        Q.   And there was some discussion about the

12   Zimmer cutting block with a 7 degree posterior

13   slope.  Different manufacturers of knee replacements

14   provide different cutting blocks with different

15   slopes; is that -- I think you've testified to

16   that?

17        A.   That's correct.

18        Q.   And did you testify that actually the

19   Zimmer also provides a 0 degree cutting block?

20        A.   Yes.  And I believe a 3 degree as well.

21             There are -- in the course -- the plastic

22   in a Zimmer knee is neutral, it doesn't have any

23   built-in posterior slope.  And the polyethylene that

24   we put in on a Zimmer knee.  So the bone cut is what

25   you get.

Page 69

```
 1              And there are -- there are experts who
 2      think you ought to have 0 slope, and there are
 3      experts that think you ought to have 7 degree slope
 4      and that debate goes on.  And the debate is related
 5      to range of motion, primarily.
 6              And so since range of motion, just about
 7      with all the new implants is very good anymore,
 8      we're talking very minor differences in range of
 9      motion depending on what implant is used.  Most
10      implants have excellent motion.
11        Q.   But within that range that the experts
12      disagree, it's all within the standard of care for
13      an orthopedic surgeon?  I mean, the 0, 7 --
14        A.   0 to 7.
15        Q.   -- 7?
16        A.   Yeah.  I think you need --
17             THE COURT:  But it's 0 to 7 posterior?
18             THE WITNESS:  Posterior, correct.  I don't
19      think anybody -- nobody aims for anterior slope.
20      How common anterior slope is present after routine
21      total knee replacements, there's no literature on
22      that.  I don't know what the answer to that would
23      be.
24              Because we, again, we don't pay a lot of
25      attention to posterior slope, anterior slope,
```

Crisco v. United States of America
September 18, 2007                                    Case No. 3:03-cv-0011-HRH

                                                                Page 70

 1   neutral slope, on postoperative x-rays and patients

 2   are doing well.  So if somebody has a lot of

 3   problems with their knee replacement, then we start

 4   analyzing all these angles and so on, but that's --

 5   that's the unusual case, not the standard case.

 6   BY MR. POMEROY:

 7        Q.   So there are patients that would have

 8   anterior slope but be asymptomatic?

 9        A.   I'm sure -- I'm sure there are those out

10   there.

11             MR. POMEROY:  Those are all the questions

12   I have.

13             THE COURT:  Thank you, sir.  You may step

14   down.

15             Let's take a ten-minute recess.

16             THE CLERK:  All rise.  This matter is in

17   recess for ten minutes.

18                       *  *  *  *  *

19        (Excerpt concluded; Counter 10:29:32)

20

21

22

23

24

25

Page 71

1              TRANSCRIBER'S CERTIFICATE

2

3          I, KATHERINE L. NOVAK, RPR, Registered

4     Professional Reporter, hereby certify that the

5     foregoing transcript is a true, accurate, and

6     complete transcript of proceedings in Case No.

7     3:03-cv-0011-HRH, Crisco versus USA, transcribed by

8     me from a copy of the audiotaped recording to the

9     best of my ability.

10         Further, that I am a disinterested person

11    to said action.

12

13

                  _____

14                Date

15

16

                  _____

17                Katherine L. Novak, Transcriber

18

19

20

21

22

23

24

25