Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

JOHNNIE CRISCO and THE ESTATE )
OF ANNA CRISCO by HER PERSONAL )
REPRESENTATIVE, ROBIN BOOKER, )
                              )
        Plaintiffs,           )
                              )
    vs.                       )
                              )
UNITED STATES OF AMERICA,     )
                              )
        Defendant.            )
_____)
Case No. 3:03-cv-0011-HRH

TRANSCRIPT OF EXCERPT OF PROCEEDINGS

HELD BEFORE THE HONORABLE H. RUSSEL HOLLAND

Monday, September 17, 2007

Testimony of Dr. Hall and Dr. Bhagia

Pages 1 - 189, inclusive

Anchorage, Alaska

Page 2

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2   For Plaintiffs:

 3   KAPOLCHOK LAW OFFICES, LLC
     BY:  George M. Kapolchok, Esq.
 4   360 K Street, Suite 100
     Anchorage, Alaska 99501
 5   907/278-8850

 6

 7   For Defendant:

 8   OFFICE OF THE U.S. ATTORNEY
     BY:  Richard L. Pomeroy, Esq.
 9   222 West 7th Avenue, #9, Room 253
     Anchorage, Alaska 99501
10   907/271-5071

11

12

13   Transcribed By:

14   Katherine L. Novak, RPR
     Registered Professional Reporter
15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                          I-N-D-E-X

2

3    WITNESS:

4    ROBERT J. HALL

5    Direct Examination by Mr. Kapolchok................5
     Cross-Examination by Mr. Pomeroy..................90
6    Redirect Examination by Mr. Kapolchok.............97

7

8    UMESH T. BHAGIA

9    Direct Examination by Mr. Pomeroy................100
     Cross-Examination by Mr. Kapolchok...............153
10   Redirect Examination by Mr. Pomeroy..............186

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

September 17, 2007

Page 4

1      ANCHORAGE, ALASKA; MONDAY, SEPTEMBER 17, 2007

2                        -oOo-

3                      * * * * *

4      (Counter 09:06:37)

5           MR. KAPOLCHOK:  Your Honor, we'd call as

6  our first witness Dr. Robert Hall.

7           THE CLERK:  Dr. Hall, please stand up

8  before me so I can swear you in.

9           Please raise your right hand.

10      (Witness sworn.)

11          THE CLERK:  Thank you.  Please have a seat

12  in the witness box.

13          Please speak into the microphone at all

14  times.

15          Please state your full name, spelling your

16  last name, and a current address.

17          THE WITNESS:  My name is Robert J. Hall.

18  Was that spell the last name?  I'm sorry.

19          THE CLERK:  Yes, sir.

20          THE WITNESS:  H-A-L-L.  My address, home

21  address is 9875 Middle Rock Road, Anchorage, Alaska,

22  99507.

23          THE CLERK:  Thank you.

24          MR. KAPOLCHOK:  Thank you, Your Honor.

25  ///

Crisco v. United States of America

September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 5

```
 1                  DIRECT EXAMINATION
 2   BY MR. KAPOLCHOK:
 3        Q.   Good morning, Dr. Hall.
 4        A.   Good morning.
 5        Q.   As you can see, this is -- this courtroom
 6   is kind of oriented for you to speak to the jury;
 7   but in this case, as the judge said, he is the
 8   finder of fact.  I'm on your left; he's on your
 9   right.  I'll leave it to you to -- if you need to
10   explain something, to turn to him or -- I know it's
11   cumbersome, but it certainly should work out all
12   right.
13             To begin by introducing you, Dr. Hall,
14   what is your profession?
15        A.   An orthopedic surgeon.
16        Q.   And tell us about your practice.  And
17   let's start with your association with the group you
18   work with, what's their name?
19        A.   Our group is named is Orthopedic
20   Physicians of Anchorage.  I joined them in 2000.
21        Q.   In 2000?  And how many orthopedic surgeons
22   are in that group, sir?
23        A.   Currently we have seven.
24        Q.   Could you name them?
25        A.   Ed Voke, James Eule, Eugene Chang.
```

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 6

1    William Mills, Chris Manion, Mark Kornmesser.

2          Q.    Okay.  Is Dr. Voke still practicing?

3          A.    Part time.

4          Q.    Within that group, Doctor -- well, let me

5    back up.

6                Physically, where do you all practice?

7          A.    Our office is at 3801 Lake Otis.

8          Q.    Is that that recent new structure that's

9    been constructed on --

10         A.    Yes.

11         Q.    Within that practice, Doctor, do you as a

12   group tend to specialize or focus on certain areas

13   of orthopedics?

14         A.    We do.

15         Q.    And what is yours?

16         A.    My focus is in joint replacement.

17         Q.    Are you board certified, Doctor?

18         A.    Yes.

19         Q.    And when did you become board certified as

20   an orthopedic surgeon?

21         A.    Board certified in 1997.  I just completed

22   my re-certification this year for an additional ten

23   years.

24         Q.    And how long have you been licensed to

25   practice medicine in Alaska?

Crisco v. United States of America
September 17, 2007                                Case No. 3:03-cv-0011-HRH

Page 7

1        A.    Since 1995.

2        Q.    And, Doctor, are you a member of any

3    associations, such as the American Medical

4    Association?

5        A.    American Academy of Orthopedic Surgeons,

6    Anchorage Orthopedic Society, and Alaska State

7    Medical Association.

8        Q.    How long have you been in private

9    practice?

10        A.    Since January of 2000.

11        Q.    And prior to that, prior to being in

12    private practice, tell us what clinical experience

13    you have.

14        A.    My first position was a staff orthopedic

15    surgeon at Alaska Native Medical Center from, I

16    think it was, June of '95 until December of '99.

17        Q.    Roughly five years with ANMC?

18        A.    Correct.

19        Q.    Did that work with ANMC provide a lot of

20    surgical opportunities?

21        A.    Yes.

22        Q.    Was that five years of broad orthopedic

23    practice?

24        A.    Yeah, very broad.

25        Q.    Could you tell the judge what your

Crisco v. United States of America
September 17, 2007                               Case No. 3:03-cv-0011-HRH

Page 8

1    education was leading to becoming an orthopedic

2    surgeon.  Just outline it for us, if you could,

3    please.

4         A.    I did undergraduate work at Iowa State

5    University, had a BA in chemistry.  Then I went to

6    the University of Iowa medical school.  I did a

7    rotating internship at Sacrad Heart Medical Center

8    in Spokane, Washington.  And I did four years of

9    orthopedic residency at the San Francisco orthopedic

10   residency training program in San Francisco.

11        Q.    And then to Alaska?

12        A.    Correct.

13        Q.    Okay.  Dr. Hall, this case involves a

14   total knee replacement, correct?

15        A.    Correct.

16        Q.    When did you first get exposed or when

17   were you first trained to do that orthopedic

18   procedure?  When and where, is what I'm getting at.

19        A.    During residency.  Actually, my first year

20   of residency I had done total knee replacements

21   under supervision.

22        Q.    Under supervision?

23        A.    Yeah.

24        Q.    And how is a physician, an orthopedic

25   physician, instructed or instructed and taught to be

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 9

1    able to do that procedure on his own?

2         A.   Well, you're expected to read -- as a

3    resident, you're expected to read the manuals and

4    all that.  And then they're done -- they're done

5    under direct supervision of a supervising physician

6    when you're performing them as a resident.

7         Q.   Is there a period where you observe them

8    being done?

9         A.   Yes.

10        Q.   Is there a period where you assist them

11   being done?

12        A.   Yes.

13        Q.   And then eventually you're allowed to do

14   them under the supervision?

15        A.   Correct.

16        Q.   How many procedures were you either

17   observing, allowed to assist, or eventually allowed

18   to perform on your own under direct supervision

19   before you could go ahead and just Dr. Hall and his

20   assistant walk in and do the procedure?  Can you

21   estimate the number?

22        A.   During training, you mean, how many?

23        Q.   Yes.

24        A.   I was probably involved in a hundred of

25   them, knee replacements, I would imagine.

Crisco v. United States of America
September 17, 2007                        Case No. 3:03-cv-0011-HRH

Page 10

1        Q.   The -- let me ask you to do this.  Before

2   jumping into your treatment of Mr. Crisco, I'm

3   wondering if you could give us a real basic primer

4   on the anatomy and physiology --

5             THE CLERK:  Mr. Kapolchok, can I ask you

6   to please wear either the lapel mike or get closer

7   to a microphone.

8             MR. KAPOLCHOK:  Okay.  Thank you.

9   BY MR. KAPOLCHOK:

10       Q.   Dr. Hall, I'm going to hand you a model of

11  the knee.  And you brought the model of the knee

12  with you?

13       A.   It's a model of a knee with a knee

14  replacement on it.

15            MR. KAPOLCHOK:  I don't need to wear this

16  if I stand over here; is that all right?

17            THE CLERK:  That's fine.

18            MR. KAPOLCHOK:  Okay.  Thanks.

19  BY MR. KAPOLCHOK:

20       Q.   Doctor, could you identify for the court

21  the major components of the knee joint in bones.

22       A.   It's a pretty large topic.  You know, this

23  is the thighbone or femur bone, and the tibia or

24  shinbone, and the fibula, which is the bone on the

25  side.

Page 11

1          And then as far as arthritis is concerned,

2     one of the main things that -- concerned about is

3     the cartilage that covers the entire end of the

4     bone, which is called articular cartilage.  And that

5     covers the entire end of the femur bone and entire

6     top of the tibia bone, and then the back side of the

7     patella or kneecap.  And the wear of that is what

8     arthritis is, and that's what generally leads to

9     knee replacement.

10          And then other structures that are

11    important during the knee replacement are the

12    ligaments of the knee.  There are two on the sides

13    of the knee called collateral ligaments.  There is

14    one on this side called the lateral collateral.  One

15    on this side called the medial collateral.

16          And there is two in the middle underneath

17    the kneecap.  One called the ACL, or anterior

18    cruciate ligament.  Another one on the back called

19    the PCL, or posterior cruciate ligament.

20          And then I guess one other thing germane

21    to this case is the top of the tibia is not

22    perpendicular to the long axis of the shaft of the

23    tibia bone.  It's actually tipped back a little bit.

24    The terminology used for that is slope.  If you take

25    this long axis and make a perpendicular to that, if

Crisco v. United States of America
September 17, 2007                        Case No. 3:03-cv-0011-HRH

Page 12

1    it's tipped back that's the term posterior slope.

2    If it's tipped higher than the perpendicular, that's

3    considered anterior slope.

4        Q.   Are most of us built then with a normal or

5    natural posterior slope?

6        A.   Yes.

7        Q.   And how does that mechanically or in terms

8    of biomechanics --

9        A.   Well, the --

10       Q.   -- interacting with -- you know, I'll get

11   it out eventually, Doctor.  I know we talked about

12   this.

13            In interacting with the femoral component,

14   why is that so?

15       A.   Well, the end of the femur bone is not a

16   half circle.  It has this oblong shape which allows

17   more motion of the knee.  If it was perfectly round,

18   then you would only have 90 degrees of motion before

19   this came around and hit the back of the knee.  So

20   it allowed the motion it does have, it's got this

21   oblong contour.

22            And if it's not tipped this way, it has

23   trouble coming around -- the tibia bone can't come

24   around the corner of the femur, at least it has more

25   difficulty doing so.

Crisco v. United States of America

September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 13

1             THE COURT:  If it's not tipped back?

2             THE WITNESS:  If it's not tipping back.

3    If it's tipped this way, you can kind of get the

4    idea as it comes around it would be -- it would be

5    very tight here in the back as it came around this

6    way.

7    BY MR. KAPOLCHOK:

8        Q.   Now, in doing a knee replacement,

9    components are provided in sort of a kit or a

10   package?

11       A.   Well, there are various sizes available

12   and you make measurements and then you select from

13   the inventory that you have of sizes.

14       Q.   Now, you prefer a particular manufacturer

15   knee replacement?

16       A.   I do.

17       Q.   And what is that, Doctor?

18       A.   The brand is called Zimmer, or the

19   manufacturer is Zimmer.

20       Q.   That's Z-I-M-M-E-R?

21       A.   Yes.

22       Q.   All right.  And are the components

23   designed in the Zimmer were a particular slope?

24       A.   Yes, they are.

25       Q.   And do you know what that slope is?

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 14

 1        A.    7 degrees posterior slope.

 2        Q.    Posterior?

 3        A.    Uh-huh.

 4        Q.    Now, the knee that Mr. Crisco had, and I

 5   will get in and walk you through the records and

 6   your treatment of Mr. Chris, was a Profix knee?

 7        A.    Yes.

 8        Q.    All right.  And have you had any

 9   experience in installing Profix knees?

10        A.    No, I have not.

11        Q.    Other than you revised Mr. Crisco's knee,

12   other than his knee, have you revised any other

13   Profix knees that you can recall?

14        A.    Not that I can recall.

15        Q.    I'd like to go through your treatment of

16   Mr. Crisco, Doctor, and I'll hand you...

17             I'm looking for our original exhibits;

18   here they are.

19             Dr. Hall -- I'll not talk when I'm away

20   from this mike here, or try not to.

21             I handed you a notebook marked as

22   plaintiff's exhibits.  And if you'll notice, they

23   are divided into numerical bundles.  I'd like to

24   focus mainly on Exhibit 2, which are your Orthopedic

25   Physicians of Anchorage notes, and Exhibit 7, which

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

                                                              Page 15

 1   are Providence Hospital selected records, primarily

 2   your records created at the hospital.

 3          Have you had a chance to review those

 4   prior to this morning?

 5      A.   Yes, I have.

 6      Q.   Okay.  Before I go through them, could you

 7   give us kind of an overview or a summary, just

 8   hitting the high points, a summary of your meeting

 9   with Mr. Crisco, what you did, and the various

10   procedures that followed meeting Mr. Crisco.  Just

11   kind of an overview so we can then fit in the

12   details.

13      A.   I first saw Mr. Crisco in October 2001

14   that complained of, you know, the painful knee

15   arthroplasty.  And evaluated him with x-rays and a

16   bone scan.  He had had some previous workup done at

17   the VA, which he also had records of.

18          And as a result of that, felt that he had

19   a mechanical malalignment of his knee.  And offered

20   him a revision of that knee, which he elected to do

21   and subsequently did do.  And then that

22   unfortunately became infected.

23          And then we attempted to salvage that

24   knee.  And actually -- well, there's quite a few

25   surgeries.  But we first attempted to salvage and

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 16

1    retain his knee and that failed.  Then we had to

2    take everything out, all the metal components.  And

3    he ended up doing long-term IV antibiotics for a

4    period.

5           And then at that point it appeared the

6    infection was -- had been treated by lab work and

7    cultures, and we went back in and put in another

8    knee.  And unfortunately, that one became infected

9    as well.  And then tried to salvage that knee with

10   another surgery, and unfortunately that didn't work

11   either.

12          And then he had a chronic infected knee

13   that was treated for quite a while with suppressive

14   antibiotics.  And then he continued to have

15   significant pain, and so we offered him several

16   options, as far as surgery.

17          And he elected to have the amputation

18   surgery performed, which was then done.  And then

19   there was an additional surgery after the amputation

20   surgery to revise that again.

21      Q.   Okay.  Great.  Thank you very much.

22          Doctor, let's begin at the beginning with

23   Exhibit 2.  And the first page of Exhibit 2, if

24   you'll look in the bottom right-hand corner, lawyers

25   call these Bates numbers.  It would be CRI 5002.

Page 17

1          Okay.  Do you have that in front of you?

2     A.   Yes, I do.

3     Q.   All right.  Doctor, is that your first --

4  or your intake chart note, first contact with

5  Mr. Crisco?

6     A.   Yes, it is.

7     Q.   All right.

8          THE COURT:  Mr. Kapolchok, in connection

9  with smoothing this over, let's find out if we can

10 just admit Exhibit 2 as a binder of documents.

11         MR. POMEROY:  No objection, Your Honor.

12         THE COURT:  Exhibit 2 is admitted.

13    (Exhibit 2 admitted into evidence.)

14         MR. KAPOLCHOK:  Thank you, Your Honor,

15 very much.

16         May I also offer the excerpts that are

17 bundled as Exhibit 7?

18         THE COURT:  Any objection to 7?

19         MR. POMEROY:  No, Your Honor.

20         THE COURT:  Exhibit 7 is also admitted.

21         MR. KAPOLCHOK:  Great.  Thanks.

22    (Exhibit 7 admitted into evidence.)

23 BY MR. KAPOLCHOK:

24    Q.   All right.  Dr. Hall, tell us again why

25 Johnnie came to see you.

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 18

1      A.   Because of persistent knee pain after his

2  knee arthroplasty.

3      Q.   Were you provided, in addition to having

4  Mr. Crisco there, information from his prior

5  treatment from the VA?

6      A.   Yes.  Apparently I did have reports from

7  the VA.

8      Q.   Your note here says that you had x-rays

9  and laboratory studies provided to you?

10      A.   Correct.

11      Q.   And it states here there was no evidence

12  of loosening or infection.

13           Was that based on a review of the VA

14  materials?

15      A.   Yes.

16      Q.   Your report also mentions the possibility

17  of RSD; is that correct?

18      A.   That's correct.

19      Q.   What is RSD?

20      A.   It's a condition called reflex sympathetic

21  dystrophy, also known as complex regional pain

22  syndrome these days.  It's a problem with the

23  nervous system where there's a cross-connection

24  between the sympathetic nervous system and pain

25  system that gets in a feedback loop that doesn't

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 19

1    shut down.

2              THE COURT:  Doctor, that was a little fast

3    for me.  What does RSD stand for?

4              THE WITNESS:  Reflex sympathetic

5    dystrophy.

6              THE COURT:  Thank you.  Go ahead.

7    BY MR. KAPOLCHOK:

8         Q.   And you mentioned, Doctor, that reflex

9    sympathetic dystrophy has also been reclassified now

10   and has a new moniker; what is that new name?

11        A.   Complex regional pain syndrome.

12        Q.   Same thing?

13        A.   Same thing.

14        Q.   Doctor, you really talk fast.  And I don't

15   mean to offend you, but I'll probably interrupt you

16   to slow you down.  I take it you've always done

17   that.

18        A.   Well, this is a little talk that I've

19   given many times, so I guess I give it too fast.

20        Q.   Okay.  Is reflex sympathetic dystrophy,

21   that nerve disorder that you described, is that

22   something that you encounter in your practice as an

23   orthopedic surgeon?

24        A.   Yes.

25        Q.   Was that -- when Mr. Crisco presented

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 20

1    himself to you in his VA records, was that within

2    the -- what I call the differential diagnosis that

3    you were wrestling with at that time?

4         A.   Yes.

5         Q.   In fact, do you remember whether or not it

6    had actually been mentioned by the -- well, one of

7    the VA physicians?  Can you tell from your chart

8    note?  I know this is a long time ago.

9         A.   My note indicates, at least from the VA,

10   that the possibility of RSD had been mentioned.

11        Q.   All right.  You apparently did a physical

12   examination of Mr. Crisco on that first visit; is

13   that right?

14        A.   That's correct.

15        Q.   And am I fair to conclude that your effort

16   or your focus was to find out what was causing this

17   painful knee?

18        A.   Correct.

19        Q.   Did you find any problems with stability?

20        A.   No.

21        Q.   How do you test for that?

22        A.   Well, the patient basically is lying on

23   their back and you hold onto their tibia or shin and

24   move from side to side with their knee in flexion --

25   or full extension and various degrees of flexion to

Page 21

1    see if it opens up or has laxity.

2         Q.   It appears, Doctor, and correct me if I'm

3    wrong, that under x-rays you reviewed x-rays from

4    the VA.

5         A.   Correct.

6         Q.   Is that right?

7         A.   Yes.

8         Q.   And you state, right at the bottom of

9    Exhibit 5002, some mild notching of the anterior

10   cortex of the femur.

11             What is that?

12        A.   Can I use this model?

13        Q.   Certainly.

14        A.   When you're making the cut on the femur

15   bone, this cut is considered the anterior cut.  If

16   it's a little bit too deep, it will get into the

17   cortex of the femur bone, which is what's called

18   notching.  But also one part of the femur, it will

19   stick up farther than the other one, side of the

20   other.  So it's not always considered significant to

21   have notching if it's pretty mild.

22             THE COURT:  Is the notching a natural

23   occurrence or something that's a function of prior

24   procedures?

25             THE WITNESS:  It's from the bone cut made

Page 22

1    to implant the metal component.

2    BY MR. KAPOLCHOK:

3        Q.   Doctor, while you have that -- I asked you

4    to bring an example that you would use with a

5    patient to demonstrate what a knee replacement is.

6             Would you point to and describe the

7    femoral component, and then also the tibial

8    component, while -- since you already used that.

9        A.   Well, the femoral component is this cap

10   that covers the entire end of the femur bone.  And

11   then on the tibial side there's a metal base plate.

12   After that it's cut flush and that's placed on

13   there.  And then there is a plastic liner that snaps

14   into that base plate.  So when the motion occurs

15   it's between the metal of the femur and the plastic

16   of the tibial base plate.

17             THE COURT:  Is this model the make of --

18             THE WITNESS:  No.

19             THE COURT:  -- prosthesis that Mr. Crisco

20   had?

21             THE WITNESS:  No.  It's the not same

22   manufacturer.  It's a little different in the other

23   regard in that it -- this particular model takes

24   away both of those ligaments in the middle part of

25   the knee, those cruciate ligaments that we talked

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 23

 1    about earlier.  The knee had --

 2              THE COURT:  Is this a model of the one

 3    that you placed in Mr. Crisco?

 4              THE WITNESS:  Not specifically.  It's from

 5    the same manufacturer, but not...

 6    BY MR. KAPOLCHOK:

 7         Q.   Is it a Zimmer?

 8         A.   Yes.

 9         Q.   Is that model a Zimmer?

10         A.   Yes.

11         Q.   And it's a little different than the one

12    that you replaced?

13         A.   Yes.

14         Q.   In what way?  Or, I should ask, is it

15    significantly different?

16         A.   The main difference has to do with this is

17    a primary or first time around knee, and the

18    revision knee has extra components for -- to engage

19    more of the bone, basically what are called stems

20    that go up into the femoral canal and down into the

21    tibial canal, as well as a little bit different

22    tibial liner.

23              THE COURT:  Do all of them have that same

24    kind of base plate on the tibia?

25              THE WITNESS:  Yes.

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 24

1    BY MR. KAPOLCHOK:

2        Q.    To return to your medical chart note of

3    October 5th, 2001, Doctor.  You state that there's

4    no evidence of fracture, although alignment of the

5    femoral component appears good.

6              So that was one of your findings from,

7    again, the x-rays?

8        A.    Yes.

9        Q.    And you go on to state:  On the lateral

10   view there is the suggestion that the tibial plateau

11   is placed with an anterior slope rather than a

12   posterior slope.

13             Now, have you already explained to us why

14   the posterior slope is used?

15       A.    It would be the same reason in the

16   prosthetic knee as it occurs naturally in nature in

17   the human knee, because of the range of motion

18   requirements.

19       Q.    And by reviewing x-rays from the Veterans

20   Administration, you were able to see that the slope

21   was going in the other direction; is that fair?

22       A.    Yes.  There's that suggestion on that

23   x-ray.

24       Q.    Would it be helpful at this point, Doctor,

25   to review an x-ray to show to us what you're talking

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 25

1    about?

2         A.   Yes.

3         Q.   Doctor, I'm going to hand you a light

4    table and an x-ray.  And, for the record, the x-rays

5    have been catalogued and identified as Exhibit 6,

6    page 2 of Exhibit 6.

7              And the one I'm putting before you is --

8    could you read the number on that one?  Is it 3-A?

9         A.   It says Exhibit 1.

10        Q.   Well, that's from the deposition.

11        A.   3-A is correct.

12        Q.   3-A?  Okay.

13             THE COURT:  Is there an objection to

14   Exhibit 6, part 3-A?

15             MR. POMEROY:  I don't think so.

16             THE COURT:  Come take a look.

17             MR. POMEROY:  No, Your Honor.

18             THE COURT:  3-A of Exhibit 6 is admitted.

19        (Exhibit 3-A admitted into evidence.)

20             MR. KAPOLCHOK:  Thank you.

21   BY MR. KAPOLCHOK:

22        Q.   Would you demonstrate to the court --

23             MR. POMEROY:  Excuse me for a minute.  Is

24   there a way that that could be tilted so it's -- we

25   can see what Dr. Hall is demonstrating?

Summit Court Reporting, LLC
907/264-6776

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 26

1           THE COURT:  I'd rather if you came over

2    here, so that that is where it is and I can see it

3    head on.

4           You may get a better angle if you get over

5    behind me here.

6    BY MR. KAPOLCHOK:

7      Q.   Dr. Hall, I'm going to begin by kind of

8    asking you a compound question, and then I'm going

9    to move so you can talk.  And I don't have to be

10   shackled to this microphone.

11          The question is this.  Please describe the

12   type of view that this x-ray shows of Mr. Crisco's

13   knee, and please explain to us how that film

14   demonstrates the slope of the tibia tray.

15     A.   Well, this is a lateral view of the knee.

16   And the slope, as I mentioned earlier, is the

17   reference is a -- you take the long axis of the

18   tibia or the -- or use the anterior cortex, which is

19   this front part of the tibia, and then draw

20   perpendicular to that.  And then that's your

21   reference line.

22          And then you measure -- you're like doing

23   this one, somebody is drawing the line here on the

24   end, the top part of the tibia component, or you can

25   use the very bottom of the base plate.  And then the

Page 27

1   angle between those two is the slope.  And if this

2   back part is higher than your reference line, then

3   it's an anterior slope.

4              THE COURT:  How do you decide where to put

5   the reference line?

6              THE WITNESS:  This is the -- the key line

7   is the long axis of the tibia.

8              THE COURT:  Is it 90 degrees to the long

9   axis?

10             THE WITNESS:  Correct.

11             THE COURT:  The baseline is 90 degrees

12  from the long axis?

13             THE WITNESS:  Correct.

14             And then you measure the angle that the

15  tibia base plate makes with that reference angle --

16  or excuse me, reference line.

17             And if this is higher than the

18  reference -- if the back part is higher than the

19  reference line, then it's an anterior slope.  If the

20  back part of the base plate is lower than the

21  reference line, then it's a posterior slope, just by

22  convention.

23  BY MR. KAPOLCHOK:

24     Q.   Doctor, page 2 of your initial chart note,

25  you discuss laboratory studies.  And what did you

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 28

1    look at and what did you conclude from that --

2         A.    Well, the two tests --

3         Q.    What generally did you look at?

4         A.    The two tests I looked at were the

5    sedimentation rate and the white count, and those

6    were normal.

7         Q.    All right.

8         A.    And those would tend to rule against

9    infection as a cause.

10        Q.    I take it that an infected knee could be a

11   painful knee?

12        A.    Yes.  Right.

13        Q.    And upon examination of Mister -- to go

14   back a little bit -- examination of Mr. Crisco's

15   knee, did it exhibit any indications of infection?

16        A.    I didn't notice any significant swelling

17   about the knee or warmth, which are common signs

18   with infection.

19        Q.    And you just told us the lab results were

20   negative on infection?

21        A.    Correct.

22        Q.    Okay.  And I don't know if I've asked you

23   this, but -- and it's probably obvious, but an

24   infected knee is a painful knee?

25        A.    Yes.

Crisco v. United States of America
September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 29

1        Q.   Okay.  What was your conclusion and what
2    course of action did you next take?
3        A.   Well, at the end of the first visit I
4    didn't have a specific diagnosis yet.  I felt we
5    needed further testing.  And so we referred him for
6    a test called a bone scan to help try to narrow down
7    the possibilities.
8        Q.   All right.  And --
9             THE COURT:  What are looking for in the
10   bone scan?
11            THE WITNESS:  One of the possibilities, or
12   kind of the diagnostic possibilities were infection
13   or this RSD or loosening.  Say, with RSD, generally
14   on a bone scan the entire knee will show activity,
15   or what's commonly said is light up.  If it's
16   infection, it can be -- either the whole knee can
17   light up or just parts of it.  If it's loosening,
18   oftentimes you'll see activity just around the metal
19   parts.
20   BY MR. KAPOLCHOK:
21       Q.   Let me -- what is a bone scan, Doctor?
22   Tell us, how do they actually perform it?
23       A.   Well, the patient has an injection or IV
24   of a -- basically a radioactive tracer that attaches
25   itself to white blood cells, which is what the body

Summit Court Reporting, LLC
907/264-6776

Page 30

1    uses to fight infection, also uses for inflammation.

2          So after the injection, you come back

3    several hours later, and then they have a -- sort of

4    a camera or device that can see the radiation from

5    the tracer, and it can tell you where they're

6    accumulating or where there's an uptake of the

7    tracer.

8       Q.   Is this type of bone scan also referred to

9    as a, all capital letters, RNBI; is that the same

10   type of bone scan, or if you --

11      A.   I'm not familiar with that --

12      Q.   You're not familiar?

13      A.   -- acronym.

14          Okay.  Is the bone scan a diagnostic tool

15   frequently used to see if there is this RSD disease

16   going on?

17      A.   Yes.

18      Q.   Is it in fact, Doctor, the best diagnostic

19   tool to determine whether a person has RSD, to your

20   knowledge?

21      A.   Well, RSD is a difficult thing to

22   diagnose.  Short of imaging tests, a bone scan would

23   be considered the best test to try to make that

24   diagnosis.

25      Q.   In addition to the bone scan, Doctor, did

Crisco v. United States of America
September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 31

1    you order any other diagnostic tests?

2         A.    We probably did order another lateral view

3    of the patient's knee as he was trying to extend the

4    knee himself.

5         Q.    Okay.  So another x-ray?

6         A.    Correct.

7         Q.    Okay.  All right, Doctor.  Could you turn

8    to your next visit with Mr. Crisco, and we'll speed

9    this up a little and be able to move more

10   efficiently.  And that's document 5004.

11              Apparently Mr. Crisco was back on the 18th

12   of October; is that right?

13        A.    That's correct.

14        Q.    But you did not have the films at that

15   point; is that correct?

16        A.    That's correct.

17        Q.    All right.  The next visit, Doctor, 5005.

18              That's October 23rd; is that right?

19        A.    That's correct.

20        Q.    All right.  Do you review your own bone

21   scans?  I mean, bone scans you order?

22        A.    Yes.

23        Q.    All right.  Did you in this case?

24        A.    Yes.

25        Q.    All right.  You state, on the first page

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 32

1    of this chart note, you had reviewed it and there

2    was increased uptake around the component in the

3    tibia, as well as intense uptake within the patella.

4              Could you explain that to us in more

5    layman like terms.

6         A.   Okay.  Well, the --

7         Q.   Go ahead.

8         A.   The bone scan had shown that there was

9    accumulation of white blood cells essentially in

10   those areas.  That would be consistent with some

11   form of inflammation.

12        Q.   And what could cause that inflammation?

13        A.   It could be from infection.  It could be

14   from loosening.  It could be from overload or stress

15   or -- on the components, or on the patella itself.

16        Q.   So the possibilities are, where this

17   inflammation that the bone scan shows, are

18   loosening; is that one?

19        A.   Correct.

20        Q.   Infection is one?

21        A.   Correct.

22        Q.   Or stress caused by what?

23        A.   If the components are malaligned it can

24   put excess stress on different parts of the knee

25   more than the underlying bone can withstand without

Crisco v. United States of America
September 17, 2007                           Case No. 3:03-cv-0011-HRH

Page 33

1    reacting.

2           Q.   Okay.  Thank you.

3                THE COURT:  I take it the test tells you

4    that something is going on but doesn't make it

5    possible for you to differentiate between infection,

6    stress, RSD?

7                THE WITNESS:  Well, RSD you could rule out

8    on the basis of the bone scan, because it was -- but

9    the other three, as a stand-alone test, it could not

10   do that.

11   BY MR. KAPOLCHOK:

12          Q.   Now, a few minutes ago, Dr. Hall, you

13   mentioned that you had another x-ray of the knee in

14   full extension; is that correct?  I'm looking at

15   5005 under x-ray.

16          A.   Yes.

17          Q.   Okay.  And again, do you review your own

18   films?

19          A.   Yes.

20          Q.   And what was your conclusion from that

21   x-ray?

22          A.   It showed that the plastic liner did not

23   appear to be touching the femur, that the contact

24   was in the posterior or back part of the plastic

25   liner.  And that the knee also is not -- was not

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 34

1    achieving full extension.

2        Q.   You state, "It appears to be levering

3    out." Could You explain that to us?

4        A.   Well, as the knee comes around, normally

5    the plastic part will conform to the femur part.

6    But if it's levering it's coming around like this,

7    where only part of it is touching.

8            THE COURT:  Try that again.

9            THE WITNESS:  Sorry.

10           THE COURT:  I didn't really get the

11   difference.

12           THE WITNESS:  Normally you would see

13   something like this, they would come around from

14   flexion to extension, where there's contact between

15   the plastic liner and the femur along the whole

16   surface of the plastic.

17           THE COURT:  Okay.

18           THE WITNESS:  But with levering it will be

19   just the back part as it comes around when you're

20   doing that.  And you'll have that gap.

21           THE COURT:  You have this gap here.

22           THE WITNESS:  And also there between the

23   plastic and the --

24           THE COURT:  Okay.

25   ///

Crisco v. United States of America
September 17, 2007                        Case No. 3:03-cv-0011-HRH

Page 35

 1   BY MR. KAPOLCHOK:

 2        Q.   Could you summarize your conclusions for

 3   us, Doctor, after you reviewed the new x-ray and

 4   after you reviewed the bone scan that you would

 5   order?

 6             And you're free to either summarize or

 7   read your conclusions, or whatever you'd like to do.

 8        A.   My conclusion was I felt his pain was

 9   coming from the position of his tibia base plate.

10   That in combination with the fact that it was a

11   posterior cruciate retaining knee, which meant that

12   there is one other degree of restraint of the knee

13   that sort of accentuated the problem.

14             THE COURT:  I missed that one.

15             THE WITNESS:  One of the ligaments in the

16   middle part of the knee was one called the posterior

17   cruciate ligament.  With the type of knee that he

18   had in place, that ligament was still there.  And

19   that tends to tether or make it tighter as it comes

20   around.

21   BY MR. KAPOLCHOK:

22        Q.   Now, if you've got the anterior slope as

23   opposed to the posterior slope situation that you've

24   discussed, and you have that posterior cruciate

25   retaining ligament, does that make the mechanical

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 36

1  problem worse?

2      A.   The presence of the posterior cruciate

3  ligament?

4      Q.   That's what I'm trying to ask.

5      A.   Theoretically, yes.

6      Q.   Okay.

7           THE COURT:  Doctor, is the -- I think I

8  got this in the right order.  Is the anterior rather

9  than the posterior tilt approximately the same, or

10 appears to be approximately the same with your new

11 x-rays compared to the original one you were looking

12 at?

13          THE WITNESS:  I didn't specify degrees,

14 but just that it was anterior sloped in both x-rays,

15 that I saw.

16          THE COURT:  You didn't attempt to measure

17 it the second time?

18          THE WITNESS:  I don't see a notation of

19 that.

20 BY MR. KAPOLCHOK:

21     Q.   We'll get to some of your other records,

22 Doctor, that you actually put that in.

23          What was the plan, Doctor, after the

24 review of the bone scan and the new x-ray?

25     A.   We discussed the possibility of revision

Page 37

1    of the knee and he elected to do that.  So we

2    scheduled to have surgery.

3              THE COURT:  Before we move on, let me make

4    sure I understand one thing.

5              The bone scan suggested to you that there

6    could be a probable infection even before the new

7    revision was done?

8              THE WITNESS:  In concert with the physical

9    exam and the lab findings, I didn't think he had an

10   infection.

11             THE COURT:  All right.  Thank you, sir.

12   BY MR. KAPOLCHOK:

13       Q.   One follow-up on that, Doctor.  You would

14   not recommend a revision of the knee if you believed

15   or hadn't ruled out an infected knee, would you?

16       A.   Not a single stage revision, no.

17       Q.   All right.  Related to that concern of

18   infection and prior to the surgery, did you refer

19   Mr. Crisco to Dr. Makim for a preoperative work

20   up?

21       A.   Oh, Makin, yes.

22       Q.   Oh, is it Makin?

23       A.   Yes.

24       Q.   Okay.  What specialty is Dr. Makin in?

25       A.   Internal medicine.

Page 38

1      Q.    Okay.  And could you turn to Exhibit 7,

2   which is the tab on the back, Doctor.  And could you

3   find Exhibit 12840.

4      A.    I have that.

5      Q.    All right.  What is that medical chart,

6   12840?

7      A.    It's a preoperative medical clearance for

8   surgery by Dr. Makin.

9      Q.    Okay.  And what laboratory data did

10   Doctor -- and correct me if I keep saying Makim.

11   There is a Dr. Makim in town, isn't there?

12      A.    Not that I'm aware of, but there probably

13   is.

14      Q.    Okay.  It's Dr. Makin.  All right.  The

15   internal medicine doctor, Dr. Makin, what laboratory

16   data did he utilize to clear Mr. Crisco for surgery?

17   And I'm looking at 12841.

18      A.    He has the CBC, or complete blood count,

19   essentially normal.  Urinalysis, negative.

20   Metabolic panel, some very mild elevation of one of

21   the liver enzymes.  And the sedimentation rate was

22   normal.

23      Q.    Okay.  Now, the CBC is white blood cell?

24      A.    It's included in there, yes.

25      Q.    Lot more than that, just the white blood

Crisco v. United States of America
September 17, 2007                                      Case No. 3:03-cv-0011-HRH

Page 39

 1   cell count?

 2        A.    Yeah, there's quite a bit more than that,

 3   yeah.

 4        Q.    The sed rate, is that related to a lab

 5   test to determine whether there's infection?

 6        A.    It's one of them, yes.

 7        Q.    What about -- a urinalysis doesn't

 8   determine infection, does it?

 9        A.    Bladder infection, basically.

10        Q.    Okay.  And when Dr. Makin refers to a

11   comprehensive metabolic panel, what does that

12   involve?

13        A.    It's like electrolytes and kidney function

14   and liver function tests.

15        Q.    Would that address the question of whether

16   Mr. Crisco's knee was infected at all?

17        A.    Not on a metabolic panel.

18        Q.    Okay.  On page 12842, Dr. Makin clears

19   Mr. Crisco for surgery pending an electrocardiogram;

20   is that right?

21        A.    That's correct.

22        Q.    Now, were you comfortable then that based

23   on these lab tests that Mr. Crisco did not have an

24   infection going into the surgery?

25        A.    Correct.

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 40

```
 1        Q.   And to jump ahead, Doctor, and I'll go
 2   back to this.  During the revision surgery, cult --
 3   not cultures, but specimens were taken of
 4   Mr. Crisco's knee?
 5        A.   Yes, they were.
 6        Q.   And they were -- what do you do with
 7   those?  Do you have them cultured for infection?
 8        A.   Yes.  You take both swabs and tissue and
 9   send them to the lab, and then they send them to
10   micro to try to grow bacteria out of them,
11   basically, process them to.  Culture them, I guess
12   is the process.
13        Q.   Right.  Okay.  So swabs meaning fluids --
14        A.   Yes.
15        Q.   -- that are in the knees?
16        A.   Yes.
17        Q.   Like blood and whatever else is in
18   there?
19        A.   Just the fluid that's inside the knee when
20   you first open it up.
21        Q.   Right.  And then actual tissue samples?
22        A.   Yes.
23        Q.   And so those were taken from Mr. Crisco's
24   knee when you went in to replace the components,
25   right?
```

Page 41

1        A.    Correct.

2        Q.    And what did they show?

3        A.    There was no bacteria grow-outs and no

4   evidence of infection.

5        Q.    Okay.  No bacteria or no evidence of

6   infection; all right.

7             Is that done just as kind of a

8   confirmatory task, or is there another reason to do

9   that?

10       A.    Well, confirmatory also has -- if you were

11   to miss an infection like that, then it would -- you

12   potentially could salvage it still at that stage, as

13   opposed to letting it go for several weeks before it

14   became diagnosed.

15       Q.    So it would tip you off to take some sort

16   of immediate prophylactic action?

17       A.    Correct.

18       Q.    Okay.  Let's go to your operative note,

19   Doctor.  And maybe I can pick up the pace here a

20   little bit.  Exhibit 7, 12844 and 45.

21             Is that your operative note, Doctor?

22       A.    Yes, it is.

23       Q.    Okay.  And when was the surgery, the

24   revision surgery done?  What date?

25             Does it look -- at the bottom there --

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 42

1      A.   Oh.

2      Q.   -- does it look like it was 11/7 of '01?

3      A.   Yeah, it's cut off on this.  But it says

4    print 11/8.

5      Q.   Okay.

6      A.   Oh, dictated 11/7, so it would have been

7    11/7.  Sorry.

8      Q.   All right.  In the middle of your note,

9    Doctor, it refers to specimens.  Is that what I just

10   asked you about, the cultures taken for gram stains

11   and aerobic and anaerobic cultures?

12     A.   Correct.

13     Q.   Is that your standard practice in doing

14   knee surgery -- or knee replacement surgery, whether

15   it's the first knee or replacing the knee?

16     A.   Standard practice for revisions, not for

17   primary.

18     Q.   Okay.  I skipped over it and I guess I

19   shouldn't have.

20          Prior to the surgery, you had a meeting

21   with Mr. Crisco and discussed the risks of the

22   surgery; is that right?

23     A.   That's correct.

24     Q.   And was one of the risks infection?

25     A.   Yes.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 43

1      Q.   What is the risk of infection based on

2  evidence-based medicine and the studies that have

3  been done of a primary knee replacement, in terms of

4  percentages or however they express them?

5      A.   It's usually, for primary knee

6  replacements, depending upon other factors,

7  somewhere between 1.5 to 2 percent, or maybe a

8  little bit higher if they have other factors.

9      Q.   All right.  First time knee?

10     A.   First time.

11     Q.   Right.  Now, for a revision, is the risk

12  of infection greater?

13     A.   Yes.

14     Q.   Do we know, based on studies, how much

15  greater?

16     A.   The other study that I read is somewhere

17  between 3 to 5 percent infection rate on

18  revisions.

19     Q.   So twice as much or maybe a little more

20  than twice as much?

21     A.   In that neighborhood, yeah.

22     Q.   Right.  Do they know why, or do you have

23  an opinion as to why the infection rate is so much

24  greater on a revision?

25     A.   I think the presumed -- some of the

Page 44

1    presumed factors are you're operating through tissue

2    that's already been operated through once, so it

3    doesn't have the same blood supply, same capability

4    to heal and ward off infection.  And the surgeries

5    are generally longer.  Infection rates are tied to

6    length of surgery.  More exposure is required, so

7    there is more -- there is a larger wound opened for

8    a longer period.

9        Q.   Okay.  Returning to 12844, Dr. Hall, your

10   surgical note -- your operative note.  Would you

11   read what it says under "Indications"?

12       A.   It says, "This patient is a 63-year-old

13   male, about 11 months status post a left total knee

14   arthroplasty.  He has had significant pain ever

15   since the arthroplasty was performed.  X-ray showed

16   the tibia plate to be put in 70 degrees of anterior

17   slope rather than 70 degrees of posterior slope.

18   Lateral x-ray confirms levering off the tibial tray

19   anteriorly.  Bone scan shows increased activity

20   around the tibial tray and also the patella.  After

21   discussion of risk and benefits, the patient elected

22   to have the arthroplasty revised."

23       Q.   So based on your x-ray, you were able

24   to -- well, in fact the court, I think, asked you

25   whether or not you measured or estimated the

Page 45

1    deviation in slope.

2            At the time you conducted the revision

3    surgery, your analysis was 7 degrees anterior slope;

4    is that correct?

5        A.   That's correct.

6            THE COURT:  Now, is that new information

7    from the actual surgery, or are we still talking

8    about the x-rays?

9            THE WITNESS:  That would have been from

10   the preoperative x-rays.

11           THE COURT:  Okay.

12   BY MR. KAPOLCHOK:

13       Q.   Looking at your actual procedural note,

14   Doctor, on the next page, 12845.  Without reading it

15   or going through it step-by-step, I note that you

16   refer to trials during your procedure; is that

17   right?

18       A.   That's correct.

19       Q.   All right.  And is a trial another name

20   for trying it, see if it's right?

21       A.   Correct.  Before you implant the final

22   components.

23       Q.   Now, the trials are done a number of

24   times, aren't they?

25       A.   Yes.  Usually.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 46

1        Q.    In different stages?

2        A.    Yes.

3        Q.    Is that fair?

4        A.    Yes.

5        Q.    Take us or -- take us through the trials

6    that you perform and explain to the court a little

7    bit about the fact that these manufacturers give you

8    trial components that you try to fit, and then I

9    guess throw away, and then put the final ones in.

10   Could you just take us through that?

11       A.    Well, after you --

12       Q.    I know I simplified it too much, but...

13       A.    After removing the original components,

14   then you have to re-cut the bone to fit the new

15   components.  Then they have trial components, which

16   are metal as well, but they're not glued or cemented

17   in place; they're just what we call pressed or

18   basically pounded into place.

19            And then you could use -- then they have

20   plastic trial liners too that also go into the base

21   plate.  But again, they just lay in there, they're

22   not securely fastened.  They basically pop in and

23   out.

24            And then with those in place you see how

25   much range of motion you have, and then check the

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 47

1    stability both in various degrees of flexion and

2    extension to see if the collateral ligaments are

3    stable.

4              The type of revision components we were

5    using substitute for the collateral ligament.  So in

6    his case we wouldn't have expected to find much

7    collateral or laxity.  So we were checking for range

8    of motion, and in a primary situation you're

9    checking for stability.

10       Q.   Now, the patient is in what kind of

11   position when you're doing the surgery?

12       A.   They're on their back.

13       Q.   And do you actually then pick up the leg

14   and move the knee to like a 90 degree bend or

15   something to that nature?

16       A.   Basically, put their knee -- hold their

17   knee like this, or their leg like this, and then put

18   them through a range of motion.  And then try side

19   to side to check their ligaments for stability.

20       Q.   Do you have an opinion, Doctor, whether or

21   not in performing that trial -- it's like a trial

22   run, right?

23       A.   Correct.

24       Q.   -- that an orthopedic surgeon would be

25   able to see that, like in this case, you had a 7 --

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 48

1    what you determined to be a 7 degree anterior slope

2    as opposed to a 7 degree posterior slope; was that

3    something an orthopedic surgeon should pick up if he

4    tried the knee?

5         A.    It should be apparent during the trial.

6    As the knee goes from flexion into extension, the

7    force from the back tends to open up the front.  You

8    see either the tibial base plate coming off the bone

9    or else the liner coming off the tibial base

10   plate.

11             THE COURT:  If it's tilt the wrong way?

12             THE WITNESS:  Yes.

13   BY MR. KAPOLCHOK:

14        Q.    Are you comfortable, Doctor, in telling us

15   then, that in performing this revision, it was done

16   to correct this malposition?

17        A.    Based on the evidence I have, those are

18   the diagnosis and that's why we offered the surgery,

19   yes.

20        Q.    Was it also your opinion, then and now,

21   that Mr. Crisco did not have an infected knee at the

22   time you did the revision?

23        A.    That's correct.

24        Q.    And is it also your opinion that

25   Mr. Crisco did not exhibit reflex sympathy dystrophy

Crisco v. United States of America
September 17, 2007                        Case No. 3:03-cv-0011-HRH

Page 49

1    at the time you replaced his knee components?

2         A.    That's correct.

3         Q.    And is it also, Doctor, your opinion that

4    the malposition of 7 degree anterior slope as

5    opposed to 7 degree posterior slope, is beneath the

6    standard of care?

7         A.    Yes.

8         Q.    Now, the knee that you installed in

9    Mr. Crisco was -- you identify on this exhibit as

10   the Zimmer?

11        A.    Correct.

12        Q.    All right.  Did you install it with a

13   posterior slope?

14        A.    Yes.

15        Q.    Okay.  Is that built into the component,

16   or is that done by re-cutting the tibial tray --

17   excuse me, the tibia?

18        A.    It's done by cutting the tibia.  And I'm

19   trying to remember.  Zimmer has gone through

20   different iterations.  At one point they had a --

21   the base plate was perpendicular to the long axis,

22   and then the slope was built into the liner.

23             Now they're all -- it's -- the cut is 7

24   degrees, and so the liner is symmetric.  And at this

25   point in time I can't recall which way it was.

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 50

```
 1        Q.   To get the proper slope, does the
 2   manufacturer provide you, Doctor, any tools or
 3   equipment to help you get the right angle?
 4        A.   Yes.
 5        Q.   And describe for us what you use?
 6        A.   Well, for a primary or first time knee, we
 7   use a -- it's called an extramedullary, which is
 8   a -- basically a rod that clamps onto the leg, and
 9   you make sure that it's parallel to the front part
10   of the tibia, and then that's your reference line.
11   And then it has a jig that attaches to it that has a
12   slot in it that you make your cut through.
13        Q.   Is the jig also called a cutting block?
14        A.   Yes.
15        Q.   All right.  Okay.  And so this is a
16   hardware that you attach to the outside of the
17   leg?
18        A.   Yes.
19        Q.   Is there a different way to help you get
20   the proper angle cut to the tibia?
21        A.   The alternative way is to put a metal rod
22   down the shaft of the tibia far enough down to
23   engage the long axis, and then that becomes your
24   reference point.  And then the jig is attached to
25   that, and you can use that for primaries or
```

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 51

1    revisions.

2        Q.   How -- is the rod just pushed into the

3    bone, or is it drilled, or how is that done?

4        A.   You have to make a pilot hole for it first

5    with some sort of reamer, usually by hand.

6        Q.   What is your preference, or which type do

7    you use?

8        A.   Well, for primaries I use the external

9    alignment to guide the rod that clamps on, and then

10   for revisions usually intramedullary.

11       Q.   Okay.

12       A.   Which I think all systems require that for

13   revision.

14       Q.   So in this case you had to use the in --

15   repeat that for me.

16       A.   Intramedullary.

17       Q.   Intramedullary.  Is that what you had to

18   use in this case?

19       A.   Yes.  For the revision, yeah.

20       Q.   How did Mr. Crisco's revised knee go at

21   first?

22       A.   Well, initially he did very well and

23   actually left the hospital fairly quickly for a

24   revision knee.  But then shortly after being

25   discharged he came back in with swelling in his knee

Page 52

1    and it turned out to be infection.

2         Q.   You typically have an x-ray done right

3    after the knee implant is done, in this case a

4    revision, to check on alignment and whatnot?

5         A.   Yes.

6         Q.   And do you recall what the results were in

7    this case?

8         A.   I don't have a notation here, but I can --

9    I normally take the x-ray in the recovery room.

10   Unless there was a problem during the surgery, then

11   I'll take it in the operating room.  So it's

12   something I look at after the surgery, but I don't

13   seem to have a note here that indicates.

14        Q.   Okay.  Let me -- let me ask you to look at

15   Exhibit 7, Doctor.  Reference No. 12846.

16             Do you have that?

17        A.   Yes.

18        Q.   That indicates Johnnie was discharged the

19   11th of November; is that right?

20        A.   That's correct.

21        Q.   Okay.  There's a reference to the

22   intraoperative cultures.  Are those -- are those

23   repeated while he's in the hospital, or are those

24   just done during the replacement surgery?

25        A.   They're done during the surgery, but they

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 53

1    take several days to have a final result.

2        Q.    And you state, "The patient progressed

3    rapidly with physical therapy and by the time of

4    discharge was tolerating" -- what's the "OP pain

5    medications"?

6        A.    Oral pain medications rather than

7    intravenous.

8        Q.    Okay.  "Regular diet.  His wound looked

9    well and he was ambulating independently."  Meaning

10   what, he was walking without assistance?

11       A.    He was able to get in and out of bed by

12   himself, go up and down the stairs by himself, using

13   either a walker or crutches.

14       Q.    Okay.  Within four or five days?  Four

15   days?

16       A.    Yes.

17       Q.    Okay.  You go on to say, "The patient may

18   weight bear as tolerated.  And then start physical

19   therapy," right?

20       A.    Correct.

21       Q.    So, fair to say, Doctor, so far, so

22   good?

23       A.    Yes.

24       Q.    Were you pleased with the result?

25       A.    Like I said, to go home four days after a

Page 54

1    revision surgery is very quick, it's pretty

2    remarkable.

3              MR. KAPOLCHOK:  Your Honor, would it be

4    acceptable at times for me to excuse Mr. Crisco?

5    He's taking some medications that kind of --

6              THE COURT:  Not a problem.  Whatever he

7    needs to --

8              MR. KAPOLCHOK:  -- result in kind of a,

9    you know, a need to go to the restroom.

10             THE COURT:  Not a problem.

11             MR. KAPOLCHOK:  All right.  Thank you very

12   much.

13   BY MR. KAPOLCHOK:

14        Q.   Doctor, could you look next at Exhibit 7,

15   12847.

16             Do you have that?

17        A.   Yes.

18        Q.   What's going on now?  It's about a week

19   later, not even that much later.  What's happening

20   with Johnnie Crisco?

21        A.   He's being readmitted to the hospital on

22   the 15th of November, because he had been his doing

23   physical therapy, felt a pop in his knee and had

24   increased pain and swelling.

25        Q.   Okay.

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 55

1        A.    So he presented to the emergency room.

2        Q.    What do the labs tell us, Dr. Hall?

3        A.    Well, he's got a white count of 22,000,

4   which post-surgery for several weeks usually is --

5   can be fairly normal, because the stress of the

6   surgery can elevate your white count, but it can

7   also be elevated from an infection.

8              And then we took some fluid off his knee

9   for gram staining, which is basically just an

10  examination for bacteria and then a culture where

11  they try to physically grow them.

12       Q.    Okay.  Let me ask you to turn to the next

13  in line exhibit, Exhibit 7, 12850.

14             Is that the -- I notice the physician is

15  John E. Hall.  That's a different doctor, emergency

16  room doctor?

17       A.    That's correct.

18       Q.    All right.  And Doctor -- that Dr. Hall

19  indicated that Mr. Crisco had a low grade fever; do

20  you see that?  Review of systems.

21       A.    Yes.

22       Q.    And in addition to the CBC rate of 22,000,

23  there's some indicate -- or some numbers attached to

24  a hemoglobin and a hematocrit rate, 13.6 and 31.2.

25             What significance is that, if you know?

Crisco v. United States of America
September 17, 2007                                  Case No. 3:03-cv-0011-HRH

Page 56

1        A.    Well, hemoglobin is the oxygen carrying
2    part of the blood, and basically that's checking for
3    anemia.  After a large surgery oftentimes the
4    hemoglobin will go down significantly.  13.6
5    actually is probably within the normal range.  And
6    for somebody who just had a revision surgery, or a
7    large surgery, that would be a pretty good
8    hemoglobin.
9        Q.    Okay.  Now, Dr. Hall, do you remember that
10   you called in right away to see him?
11       A.    Yes.
12       Q.    Okay.  And what was your concern?
13       A.    Well, one of the concerns was infection.
14       Q.    Okay.  And as a result of that, what did
15   you do, in terms of consulting, or what did you
16   do?
17       A.    Well, we got the -- you know, aspirated
18   the knee or took fluid off and sent it off to the
19   laboratory and it did show bacteria.  So I got an
20   infectious disease consultation from Dr. Bundtzen.
21       Q.    Okay.  Robert Bundtzen?
22       A.    Correct.
23       Q.    And his specialty is infectious disease?
24       A.    Correct.
25       Q.    In terms of treatment for the infection

Page 57

1    then, did Dr. Bundtzen essentially kind of take over

2    that aspect of the treatment?

3         A.   More the antibiotic selection and the

4    route, whether it was going to be oral or

5    intravenous and for what length.

6         Q.   Okay.  Now, was there some surgical

7    intervention that immediately conjoined or joined up

8    with Dr. Bundtzen's antibiotic treatment?

9         A.   Once we had evidence of infection on the

10   labs and he was -- we did a surgery to try to

11   salvage his knee by washing it out and exchanging

12   the plastic liner for a new plastic liner.

13        Q.   Okay.  Looking at Exhibit 7, 12852, which

14   looks like a note, chart note from Dr. Bundtzen,

15   isn't it?

16        A.   It is.

17             THE COURT:  I'm sorry, that was 58?

18             MR. KAPOLCHOK:  12852, judge.

19             THE COURT:  52.

20   BY MR. KAPOLCHOK:

21        Q.   And Dr. Bundtzen writes, "The patient says

22   that his knee felt great for the first day or two

23   after he went home, after the procedure, but then an

24   aspiration revealed an infection."

25             That's what you were talking about, the

Crisco v. United States of America
September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 58

1  cultures?

2       A.   Yes.

3       Q.   And it says, "Today he had an irrigation

4  and debridement in polyethylene line exchange."

5            Is that something you did, Doctor?

6       A.   Yes.

7       Q.   It says, "Cultures are growing staph

8  aureus."

9            I guess it's kind of common knowledge to

10 hear about staph infections.  Is this a particular

11 type of staph infection, or what is staph aureus?

12      A.   Staphylococcus is the type of bacteria,

13 and then there is subgroups within that, and staph

14 aureus is one of them.  And it's one of the more

15 common infecting organisms of joint replacements.

16      Q.   Okay.  Dr. Bundtzen on the next page of

17 his note says, "Johnnie now has a temperature of 101

18 degrees."

19           Do you see that?

20      A.   Yes.

21      Q.   Okay.  Dr. Hall, would you take a look at

22 Exhibit 12854.  And my question is this:  Is this

23 chart note of yours, does that kind of fully

24 describe what you've talked about a few minutes ago,

25 in terms of debridement, liner exchange, and that

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 59

1    sort of thing?

2        A.   Yes.

3        Q.   Okay.  What's the thinking behind removing

4    and replacing the polyethylene liner?

5        A.   Well, part of the procedure, you're

6    washing things out with basically a fancy water

7    pick, which is a high pressure pulsing water.  And

8    there is a space between the plastic and the metal

9    base plates.  And unless you take that out, you

10   can't really get access in there to clean it out

11   real well.

12            So you take the plastic out so that you

13   can wash that surface along with everything else,

14   and then put a new one in at the end of the

15   procedure.

16       Q.   Let me ask you to go back to Exhibit 2,

17   Doctor, which are your office notes.  And if we

18   could look at 5007.

19            We're in now to December.  Actually, the

20   day after Christmas.  Do you see that --

21       A.   Yes.

22       Q.    -- note?

23       A.   Yes.

24       Q.   And you write, "The patient is 63-year-old

25   male seen in follow-up of removal of an infected

Page 60

 1    left total knee.  Date of surgery was the send of

 2    November."

 3             Now, is that different than what we were

 4    discussing of the removal of the -- of the

 5    polyethylene liner?

 6        A.   Yes.

 7        Q.   Tell the judge what actually transpired in

 8    November.

 9        A.   Well, the original surgery was in attempt

10    to try to salvage the knee that he had in place.  If

11    you can get rid of the infection, then that would be

12    his last surgery.  Unfortunately, his infection

13    continued to get worse even with the antibiotics,

14    and that surgery and his pain got worse.

15             And so at that point we decided that that

16    approach had failed.  And so the next step is to

17    remove all the metal components, and then place a

18    block of cement in the gap that's created and a

19    block of bone cement that has antibiotics in it.

20    And then go through another period of IV antibiotics

21    to try to eradicate the infection.

22        Q.   How was Johnnie's leg immobilized while

23    you do that?  Is it put in a cast or --

24        A.   Either a cast or a brace.  In this case we

25    used a cast.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 61

```
 1       Q.   So am I correct in visualizing that you
 2   take out the knee components and you actually pack
 3   antibiotics in that area?
 4       A.   Well, you take the cement and basically
 5   just physically form a block outside of the knee.
 6       Q.   Right.
 7       A.   And once that's hardened, then you put it
 8   in the gap where the metal components used to be, so
 9   it doesn't all just scar down.
10       Q.   Oh, okay.
11       A.   So that when you come back later you have
12   space to work with to put a new knee in as opposed
13   to everything being scarred down.
14       Q.   Without going through all of the chart
15   notes, do you have a -- based on your review,
16   Doctor, do you have a recollection on how Mr. Crisco
17   responded to that antibiotic surgical approach?
18       A.   At least in combination with his
19   laboratories, those -- the ones that we were using
20   to track his infection returned to normal.  And then
21   we did re-aspirate the knee at the end of this
22   antibiotic course, and those cultures were negative.
23       Q.   Okay.
24       A.   So all the evidence we had is that we had
25   eradicated the infection at that point.
```

Crisco v. United States of America
September 17, 2007                    Case No. 3:03-cv-0011-HRH

Page 62

```
 1        Q.    Okay.  Looking -- if you're still on 5007,
 2   Dr. Hall, if you go to 5008, we are now into January
 3   of '02.
 4              It looks like Mr. Crisco's antibiotics
 5   have been discontinued; is that right?
 6        A.    That's correct.
 7        Q.    And your physical exam shows no warmth or
 8   edema.  That's -- edema is swelling?
 9        A.    Yes.
10        Q.    All right.  So that's good, I take it?
11        A.    Yes.
12        Q.    All right.  And you were talking about the
13   knee was aspirated.
14              Is that what you just told us, to run
15   another culture to see what -- whether there was
16   evidence of infection?
17        A.    As a final check before proceeding with
18   the next surgery, yes.
19        Q.    Okay.  And that came back negative?
20        A.    Correct.
21        Q.    All right.  So I take it everyone's hopes
22   were pretty high?
23        A.    Yes.
24        Q.    As of the 8th of January?
25        A.    Yes.
```

Page 63

```
 1        Q.   All right.  What followed that then?  Did
 2   you put another knee in?
 3        A.   Yes, we did.
 4        Q.   Okay.  Same type of -- or same component,
 5   the Zimmer?
 6        A.   Yes.
 7        Q.   Now, Mr. Crisco had had a higher risk of
 8   infection when you replaced the Profix knee.  He is
 9   now having a re-revision; is that proper English,
10   medical English?
11        A.   Yes, I guess you could say that.  Or a
12   second revision, I guess.
13        Q.   A second revision.
14        A.   Yeah.
15        Q.   All right.  Do you know -- and I don't
16   know if there are any studies on this.  But do you
17   know whether his risk of infection now is even
18   greater because of the revision?
19        A.   Well, the first revision was not for
20   infection, so the literature would say this
21   two-stage protocol that he went through with
22   removing everything and putting the antibiotics for
23   infection usually has a success rate in the
24   neighborhood of 90 percent.
25        Q.   And has that been your experience?
```

Crisco v. United States of America
September 17, 2007                                Case No. 3:03-cv-0011-HRH

Page 64

1        A.    Yes.

2        Q.    If you would look at Exhibit 7, Doctor,

3    12858.

4              Again, is that a clearance by Dr. Bundtzen

5    to proceed with this second revision, or am I

6    reading that wrong?

7        A.    No, that's correct.  It's a preoperative

8    medical clearance.

9        Q.    Okay.  Is it your practice to have either

10   an internal medicine doctor or, in this case, since

11   it's an infection issue, to get a preoperative

12   clearance from a doctor with those subspecialties?

13       A.    It depends upon the -- basically the

14   complexity of the surgery and also the health of the

15   patient, so --

16       Q.    Okay.

17       A.    -- for a revision surgery, generally we'll

18   get an internist or somebody to do a preoperative

19   medical clearance.

20       Q.    All right.  12861, Doctor; do you have

21   that?

22             Is that the operative note for this second

23   revision?

24       A.    Yes.

25       Q.    And does that indicate, again, that you

Page 65

1    took fluids and tissue samples to see if

2    Mr. Crisco's knee was free of infection?

3        A.    Yes.

4        Q.    And how did they come out; do you recall?

5    Or is it documented here?

6        A.    Well, the gram stain is something that the

7    laboratory does within half an hour, so you have

8    that information available during the surgery.  And

9    that was -- they didn't see bacteria on the fluid

10   when they looked at it under the microscope.

11       Q.    The next page, Doctor, 12863, says, "All

12   cultures from the time of surgery remain negative at

13   the time of discharge."

14            This is five days after your second

15   revision?

16       A.    That's correct.

17       Q.    Okay.  So you had all the results by

18   then?

19       A.    The -- one subset of cultures, which is

20   called anaerobic, can take up to six days.  The

21   original bacteria they have as staph aureus shows up

22   on the other type of culture, which are called

23   aerobic cultures, so we had that information by that

24   point.

25       Q.    Okay.  Good.  And so now Mr. Crisco is out

Crisco v. United States of America
September 17, 2007                                          Case No. 3:03-cv-0011-HRH

Page 66

 1    on the 30th with his new knee?

 2        A.   Correct.

 3        Q.   And again you write, "He is ambulating

 4    independent."

 5             So again, that's a fairly quick recovery

 6    and discharge for a second revision?

 7        A.   Yes.  Especially considering that he

 8    basically had been functioning without a knee at all

 9    for two months.

10        Q.   Two months; okay.

11             All right.  If I could refer you back to

12    Exhibit 2, Doctor, document 5012, to establish kind

13    of a time line here.

14             That's your office chart note dated

15    February 7th, 2002; is that correct?

16        A.   That's correct.

17        Q.   All right.  What's happening now?

18        A.   He's beginning to have some drainage from

19    his wound.

20        Q.   Okay.  The next document, Doctor, 5013.

21    Again, your chart note dated February 11th of '02.

22    You state, Mr. Crisco's pain is improved.  He's only

23    taking Percocet occasionally.  And he's referred to

24    physical therapy; is that right?

25        A.   That's correct.

Page 67

1      Q.   All right.  So into the first part of
2  February, things are going pretty well; is that
3  fair?
4      A.   That's fair.
5      Q.   All right.  And he's progressing towards
6  full weight bearing.
7      A.   Correct.
8      Q.   If Mr. Crisco had reflex sympathy
9  dystrophy prior to your first revision back in
10  November when you put the new knee in, which
11  eventually became infected, would that -- let me
12  back up.
13           You don't treat RSD with surgery, do
14  you?
15      A.   In general, you try not to.
16      Q.   Based on your experience and your medical
17  training, if Mr. Crisco had RSD when you did the
18  first revision and corrected the slope, would you
19  expect the RSD to disappear after your revision
20  surgery?
21      A.   Unless specific steps are taken to try to
22  prevent that, it will flare up and get worse.
23      Q.   It would flare up and get worse, that
24  would be your --
25      A.   Yes.

Crisco v. United States of America
September 17, 2007                            Case No. 3:03-cv-0011-HRH

Page 68

```
 1       Q.    -- take on it.
 2             Thank you.
 3             MR. KAPOLCHOK:  Your Honor, would this be
 4   a convenient time to take a short break?
 5             THE COURT:  We'll be in recess for ten
 6   minutes.
 7             MR. KAPOLCHOK:  Thank you.
 8             THE CLERK:  All rise.
 9             Matter stands in recess for ten minutes.
10       (Off record.)
11             THE CLERK:  All rise.
12             His Honor the Court, this United States
13   District Court is again in session.
14             Please be seated.
15             MR. KAPOLCHOK:  Thank you, Your Honor.
16   BY MR. KAPOLCHOK:
17       Q.    Dr. Hall, to continue our journey
18   post-second revision, Plaintiff's Exhibit 2, page
19   5016, do you have that, your office --
20       A.    Yes.
21       Q.    -- chart note?
22       A.    Yes.
23       Q.    All right.  What's going on with Johnnie
24   at the end of February 2002?
25       A.    It looks like his wound was doing better,
```

Page 69

1    with some minimal drainage, and his laboratories

2    were looking better.

3         Q.   Okay.  Was he able to walk?  It says he's

4    ambulating.

5         A.   Yes.

6         Q.   Do you see that?

7         A.   Uh-huh.

8         Q.   All right.  And his labs are looking

9    better?

10        A.   Correct.

11        Q.   All right.  Again, is it fair to state

12   that you were encouraged?

13        A.   Yes.

14        Q.   Could you turn to Exhibit 7 now, and I'm

15   sorry about the flipping back and forth, but about a

16   week later.  It will be Exhibit 7, 12866.

17        A.   I have that.

18        Q.   Okay.  What is that, Doctor?

19        A.   It's an operative report.

20        Q.   Okay.  What's going on?

21        A.   It has been re-infected and we've tried

22   another attempt at salvage of his knee.

23        Q.   What did you do?

24        A.   The same sort of operation as previous,

25   where we opened the knee up, take the plastic liner

Page 70

1   out, strip out the lining of the knee, wash

2   everything out with that fancy water pick, and then

3   put in a new plastic liner.

4        Q.   Okay.  Was this the result of the return

5   of the staph infection?

6        A.   Yes.

7        Q.   There's reference in a following document,

8   Dr. Hall.  Apparently Mister -- it's document

9   number, again part of Exhibit 7, document number

10  12868.

11            It looks like Mr. Crisco was in the

12  hospital from the 28th of February to March 5th.  Am

13  I reading that right?  At the top.

14       A.   That's correct.

15       Q.   Okay.  12868; do you have that?  Okay.

16  Thank you.

17            It talks about the exchange of the tibial

18  liner and the cultures of staph aureus under

19  hospital course; do you see that?

20       A.   Yes.

21       Q.   And apparently Dr. Janis is involved.

22            Is that a partner of Dr. Makin?

23       A.   No, he's another --

24       Q.   I mean, Bundtzen?

25       A.   He's an infectious disease specialist in

Crisco v. United States of America
September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 71

1    town, and Dr. Bundtzen was out of town for a few

2    weeks.  So they all are independent, but they cover

3    for each other.

4         Q.   And this reference under hospital course,

5    Dr. Hall, to a Dr. Marbarger.

6              Now, Dr. Marbarger is a surgeon, is he

7    not?

8         A.   Correct.

9         Q.   All right.  What was his involvement in

10   the treating of Mr. Crisco's flare-up or re --

11   problem with this staph aureus infection?

12        A.   He placed the Groshong catheter, or the IV

13   access, that was going to be used for the long-term

14   IV antibiotics.

15        Q.   Okay.  And under discharge medications, it

16   seems that Mr. Crisco was fitted with an infusion

17   pump.

18             Is that related to the catheter you just

19   told us about?

20        A.   That's what's used to deliver the

21   antibiotics intravenously through that catheter.

22        Q.   So Mr. Crisco can basically get IV

23   antibiotics at home?

24        A.   Correct.

25        Q.   Could you look, Doctor, at Exhibit 2,

Page 72

1   5020.  I'm sorry.  5021.

2        A.   I have that.

3        Q.   Okay.  We're flying along into March now.

4   We were back in February; this is the middle of

5   March.

6             Could you summarize for us how Mr. Crisco

7   is doing now?

8        A.   He's doing better.  His wound looks -- is

9   healing.  His laboratories were improving again.  It

10  looks like he's responding to the IV antibiotics.

11       Q.   Would it be fair to characterize Johnnie

12  Crisco's course in dealing with this infection as

13  really cyclical?

14       A.   Yes.

15       Q.   In general, Dr. Hall, in terms of your

16  interaction with Mr. Crisco -- and you were

17  monitoring or involved, to some degree, in dealing

18  with all these ups and downs of infection.

19       A.   Uh-huh.

20       Q.   Was Mr. Crisco a -- I guess the term of

21  art, or the term you hear a lot, is a compliant or a

22  cooperative patient?

23       A.   I always felt he was compliant with what

24  we had asked.

25       Q.   Had there been any problems with

Crisco v. United States of America
September 17, 2007                                          Case No. 3:03-cv-0011-HRH

Page 73

1    Mr. Crisco not following your advices or not doing

2    what he was told to do?

3          A.    Not that I recall.

4          Q.    Would you turn to the next document,

5    Doctor; 5022.  It looks like we're in the second

6    week of April now.  And he's -- Mr. Crisco's in to

7    see you.  And you write, "The patient has had

8    improvement with his knee.  He is no longer

9    ambulating with use of a cane."

10               So he's walking without either a cane or

11   crutches or anything?

12         A.    That's correct.

13         Q.    All right.  And he's scheduled to stop his

14   antibiotics.

15               Is that what you write here?

16         A.    Yes.

17         Q.    Okay.

18         A.    The IV antibiotics.

19         Q.    Right.  That's regulated and controlled by

20   either Dr. Janis or Dr. Bundtzen, though, isn't it?

21         A.    Correct.

22         Q.    They make those decisions?

23         A.    Yes.

24         Q.    All right.  So once again now, April 11th,

25   Mr. Crisco was looking hopeful?

Page 74

 1      A.    Yes.

 2      Q.    Okay.  If we could skip ahead to August of

 3   '02, Doctor; 5029.

 4      A.    Okay.

 5      Q.    What's going on now?  We're -- I went

 6   ahead about four months.

 7      A.    He did in fact have persistence of his

 8   infection.  And one option was to just keep him on

 9   suppressive antibiotics for the rest of his life,

10   which wouldn't eradicate the infection, but at least

11   hopefully hold it at a level that he could tolerate

12   the symptoms.

13      Q.    Okay.  Your conclusion then is adjusting

14   antibiotics or another surgery.  And it says, "The

15   patient would very much like to avoid any further

16   surgery."

17            So this in late -- not in late, in early

18   August...

19            Would you look at 5030, which -- we're in

20   February of '03 now; okay?

21      A.    Uh-huh.

22      Q.    What's going on with Mr. Crisco?

23      A.    At that point he developed some lumbar

24   spine problems and had seen several providers or

25   doctors for that.  But because of the infection in

Page 75

1    his leg his treatment options were limited for

2    that.

3         Q.   Okay.  Definitely no surgery; is that

4    fair?

5         A.   That's fair to say, yeah.

6         Q.   Okay.  Is the source of his infection

7    thought to be -- or not thought to be.  Is the

8    source of infection his knee?

9         A.   Yes.

10        Q.   Okay.  And if you would look at 5031.

11   We're into April of '03 now.

12             Why don't you review your conclusions with

13   us, Doctor, as they appear or as you recall them.

14        A.   Well, basically, he had, you know, the

15   persistent pain in his knee.  And we talked about

16   his -- he basically had four options, you know,

17   either to continue as he was with the oral

18   antibiotics for the rest of his life, or else have a

19   surgery to try to relieve his pain.

20             And the surgical options were either an

21   amputation, removing the components and fusing the

22   bones together.  Or else another attempt at the

23   two-stage protocol to try to implant a knee that is

24   not infected.

25        Q.   Okay.  Now, that -- all of those options,

Crisco v. United States of America
September 17, 2007                                Case No. 3:03-cv-0011-HRH

Page 76

1    other than the amputation had been tried; is that

2    fair?

3         A.   The fusion had not been tried.

4         Q.   Oh, the fusion.

5         A.   Yeah.

6         Q.   Describe that for us.  What is -- what's

7    involved in the knee fusion?

8         A.   Well, you remove all the knee components.

9    And then either use a long metal rod that stands

10   from the femur bone all the way down to the tibia

11   bone and pack bone grafter at the interface, or the

12   idea is to get the two bones to grow and together

13   become one bone, one really long bone, essentially.

14   Or else you could use metal plates to do the same

15   thing, or in addition to the rod.  It's to basically

16   eliminate the knee joint.

17        Q.   Now, if the source of the infection and

18   the pain, as you refer to in here, it says, "Due to

19   his increased pain in his left knee," I can

20   understand how removing the components would help

21   eliminate the infection, or eliminate the infection,

22   but how would a fusion do that?  Would the

23   components come out?

24        A.   The components would come out, assuming

25   that it's a successful fusion, which means the bones

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 77

1    grow together, then there's no more motion at that

2    point.  And then, assuming it doesn't get infected,

3    then you can just leave the hardware in forever.

4         Q.   Of the options or choices that you

5    discussed in that -- or in your note, which would

6    have the highest likelihood of reducing the

7    infection that Mr. Crisco has been battling now for

8    a year and a half?

9         A.   The amputation.

10        Q.   Okay.  Ultimately, Doctor -- and if you

11   need to refer to the notes, you know, we can do

12   that.  But ultimately, I take it, you had a number

13   of conversations with Mr. Crisco about trying to

14   make a decision about these options?

15        A.   Yes.

16        Q.   And ultimately he agreed to or selected

17   the amputation?

18        A.   Yes.

19        Q.   And it was an option that you offered

20   him?

21        A.   Correct.

22        Q.   And do you professionally feel that it was

23   a reasonable, or even a good choice, that Mr. Crisco

24   made?

25        A.   Well, if I felt it wasn't reasonable, I

Page 78

 1    wouldn't have offered it.  And from the notes,

 2    his -- what he stated to me at the time was he

 3    wanted to have the operation of giving him the best

 4    chance of success with just one more surgery to try

 5    to minimize, and I think that was -- that would have

 6    been the amputation.

 7         Q.   Just to put some dates on this, Doctor.

 8    If you could briefly look at 5034, part of

 9    Exhibit 2.  It looks like we're in to December 16th

10    of '03.

11              And you write, "Mr. Crisco is leaning

12    towards having the above-knee amputation."  Then

13    there's discussion of options.  And you write, "I

14    think the above-knee amputation would be his best

15    choice to have one last surgery without having to

16    worry about future surgeries on that leg."

17              That's basically just what you said --

18         A.   That's correct.

19         Q.    -- a few minutes?

20         A.   Uh-huh.

21         Q.   Okay.  And then surgery was scheduled for

22    the end of February --

23         A.   That's correct.

24         Q.    -- is that right?

25         A.   Yes.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 79

1        Q.   Is there a reason -- it seems to be

2   significantly out there, a couple of months out

3   there.  Did it have something to do with your

4   schedule, or do you remember?

5        A.   I don't recall.

6        Q.   Okay.

7        A.   But in -- you know, he had the chronic

8   infection for quite a long time at that point, so a

9   few months either way, I don't think, made any

10  difference.

11       Q.   Right.  Okay.  Could we go to Exhibit 7,

12  12888.  12888.

13            What is that, Doctor?

14       A.   It's a discharge summary from his hospital

15  stay for the amputation surgery.

16       Q.   Okay.  Actually, I handed you the page 2.

17  It would be one, two...

18            I've got the wrong one here.

19            Yeah, that's what I was looking at.

20            So Mr. Crisco went in on the point in

21  time, the 25th of February of '04, correct?

22       A.   Correct.

23       Q.   And then was discharged three days

24  later?

25       A.   Correct.

Crisco v. United States of America
September 17, 2007                         Case No. 3:03-cv-0011-HRH

Page 80

1       Q.    Okay.  And, I don't know, is -- any

2  complications or problems with that surgery?

3       A.    Not immediately.

4       Q.    All right.  Were there some complications

5  or problems?

6       A.    Yes.  He came back later with a problem

7  with the soft tissue coverage over the femur of the

8  stump.

9       Q.    Is that discussed in Exhibit 7, 12995?  It

10  talks about a revision of the left knee.

11       A.    Yes.

12       Q.    Okay.  All right.  We do need to cover

13  this a little bit.

14             Do you have that one?  12995.

15             Okay.  This is now in September of '04; is

16  that correct?

17       A.    That's correct.

18       Q.    All right.  So it's about six-and-a-half

19  months after the amputation?

20       A.    Correct.

21       Q.    All right.  Why is Mr. Crisco in seeing

22  you; what happened to him and what help did you

23  provide for him?

24       A.    He was involved in an accident where

25  the -- his -- end of his residual leg -- I think it

Page 81

1    was an automobile accident -- was struck, and the

2    soft tissue coverage on the end of the femur got

3    torn free.

4           Normally, we like to have muscle covering

5    the end of the femur, so you've got some padding

6    between the skin and the bone.  And, unfortunately,

7    that tore free, leaving his skin directly underneath

8    the -- or, excuse me.  The femur bone directly

9    underneath the skin, causing him problems with his

10   prosthesis wear and with pain.

11        Q.   So a jamming injury in an auto accident?

12        A.   Yes.

13        Q.   Doctor, Mr. Crisco was attempting to use a

14   prosthesis or an artificial limb?

15        A.   Yes.

16        Q.   Do you get involved in either the fitting

17   or the -- not the manufacturing, but the fitting and

18   the education that's required to use that?

19        A.   Usually not.  It's handled by the

20   prosthetist.

21        Q.   Okay.  And in this case, Mr. Crisco needed

22   some surgical help because of an injury to the -- I

23   don't know the medical term for it, but the stump of

24   his leg?

25        A.   Yes.

Crisco v. United States of America
September 17, 2007                                        Case No. 3:03-cv-0011-HRH

Page 82

1      Q.   Okay.  Was this pretty close to your last

2   involvement with Johnnie Crisco medically?  I know

3   my documents might have ended there, but do you have

4   a recollection of any further medical involvement

5   with Johnnie?

6      A.   No further surgeries.  I think I had seen

7   him as a patient a few months after that, and then

8   that was the last time I had seen him.

9      Q.   Okay.  Doctor, I'm just about done.  I'd

10  like to ask you about two other -- two other

11  documents.

12          One is Defendant's Exhibit D-1.  I'll hand

13  that to you.

14          Do you have enough light to read?

15     A.   Yeah.

16     Q.   Okay.  Doctor, before I ask you about

17  that, I forgot one thing, and it's addressed in the

18  medical records.

19          What is phantom pain?

20     A.   After an amputation, sometimes patients

21  will have a sensation of pain in the amputated part,

22  which can persist indefinitely.

23     Q.   Is it -- is it a very unusual phenomenon,

24  or is it --

25     A.   Not uncommon after amputation surgery.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 83

1        Q.   In fact, there's some protocol that
2    doctors use to try to avoid that, isn't there?
3        A.   Yes.  There is things you can do.
4        Q.   Right.  And there is something that you
5    tried in Mr. Crisco's case, wasn't there?
6        A.   Well, in general, there is some things you
7    can do during surgery, such as injection or blocking
8    the nerves before you section them.
9        Q.   Right.
10        A.   And then afterwards -- or during the
11    surgery have them have a specific type of anesthesia
12    called an epidural and leave that in for several
13    days afterwards to try to prevent that from -- cycle
14    sort of starting.
15        Q.   Doctor, I've handed you defendant's D-1,
16    which appears to be a note from a Dr. Schumacher or
17    Maker.
18             Do you have that?
19        A.   Yes.
20        Q.   Do you recall -- what is the date of that
21    note?
22        A.   May 8, 2001.
23        Q.   All right.  So that was before Johnnie
24    Crisco saw you for the analysis of why his left knee
25    was painful?

Page 84

1        A.    Yes.

2        Q.    Do you remember, one way or the other,

3    whether this was part of the records that Mr. Crisco

4    presented to you from the Veterans Administration?

5        A.    I don't recall.  And I just mentioned VA

6    notes in my chart notes, so I don't know.

7        Q.    Okay.  Do you know a Dr. Schumacher?

8        A.    Yes.

9        Q.    How well do you know him?

10        A.    Just very peripherally through

11    professional meetings in town.

12        Q.    I'd like to compare his findings of May

13    8th, 2001, with yours, when Johnnie came in to see

14    you and you did the bone scan and you did the

15    additional x-rays.  Okay?

16            The complaint to Dr. Schumacher was of the

17    same painful left knee, Doctor?

18        A.    Yes.

19        Q.    He's only four months post-surgery.

20    Mr. Crisco complained of pain with weight-bearing.

21    Is that essentially what he told you also when he

22    came to see you?

23        A.    I believe so, yes.

24        Q.    He had no complaint of significant back

25    pain; that's consistent with the way he presented to

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 85

 1   you?

 2        A.   Yes.

 3        Q.   Pain is not radicular in nature.  What

 4   does that mean?

 5        A.   The distribution of pain, if it's --

 6   radicular means from a nerve in the spine.  And that

 7   usually follows the skin distribution that that

 8   nerve covers.

 9             And so if it's radicular, it's usually a

10   long, narrow swath, like the side of the leg or the

11   side of the calf.  If it's focal, just at the knee,

12   that's usually not radicular.

13        Q.   Okay.  So it wasn't radicular with

14   Dr. Schumacher, nor was it radicular when he

15   presented to you?

16        A.   No.

17        Q.   No hip pain with motion.  Do you recall

18   Mr. Crisco complaining of hip pain when he saw

19   you?

20        A.   No.

21        Q.   Okay.  No fever or chills; same results

22   when he saw you?

23        A.   Correct.

24        Q.   Dr. Schumacher notes the range of motion

25   on his examination, and he talks about mild

Page 86

1  effusion.  What is that?

2      A.   Effusion is fluid in the knee.  So there

3  was a small amount of fluid in the knee at that

4  point.

5      Q.   Okay.  Do you recall whether Mr. Crisco

6  had any small amounts of fluid in his knee when he

7  saw you back in -- later on in October?

8      A.   My initial chart note is that I didn't see

9  it or appreciate an effusion.

10     Q.   Okay.  And then the test that

11 Dr. Schumacher did included -- included what?

12     A.   Looks like he aspirated the knee.  And did

13 a cell count on the fluid and also sent it for

14 culture.  And he did other laboratories, including a

15 sedimentation rate, which is basically a marker for

16 inflammation, which is -- a CRP is a C-reactive

17 protein, which is also just a marker for

18 inflammation, and then the white blood count.

19     Q.   And Dr. Schumacher concluded, did he not,

20 that he believes the pain Mr. Crisco is suffering

21 was coming from his knee, correct?

22     A.   That's his impression, yeah.

23     Q.   Right.  And his impression was that there

24 was no infection?

25     A.   That's correct.

Page 87

```
 1        Q.   All right.  And in fact, Doctor, when you

 2   reviewed several months later all of the labs from

 3   the government, from the veterans, none of them

 4   showed an infected knee, did they?

 5        A.   No evidence of that, no.

 6        Q.   All right.  Doctor, could you look at

 7   Exhibit 1?

 8             THE COURT:  This is Plaintiff's 1?

 9             MR. KAPOLCHOK:  Plaintiff's 1, yes, Your

10   Honor.

11   BY MR. KAPOLCHOK:

12        Q.   Could you identify that for the court?

13   It's a two-part document.  It's a letter dated

14   April 4, 2002, and then a letter dated April 2,

15   2002.

16             Could you just tell us what it is?

17        A.   Well, the one dated April 4, 2002, is my

18   response to Thomas Williams regarding some questions

19   about Mr. Crisco's medical case.

20        Q.   Okay.

21             MR. KAPOLCHOK:  I move the admission of

22   Plaintiff's 1.

23             THE COURT:  Is there objection?

24             MR. POMEROY:  I'd object if it's being

25   offered for the truth of it is -- of the document
```

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 88

1    itself.  I mean, he's -- as far as his testimony as

2    to his opinion, he's testified to it.  If it's being

3    offered for some other purpose, I don't think I

4    would object.

5              THE COURT:  What does this tell us that we

6    don't already know?

7              MR. KAPOLCHOK:  Only that Dr. Hall held

8    these opinions back -- back in April 4th of 2002,

9    before even the amputation.  And that was my main

10   purpose in offering the paper.

11             THE COURT:  Any further thoughts,

12   Mr. Pomeroy?

13             MR. POMEROY:  If it's just for the timing

14   purpose, then I would not object.

15             THE COURT:  I would admit for the purpose

16   of reflecting the timing of the formation of

17   Dr. Hall's opinions.

18             MR. KAPOLCHOK:  Thank you.

19        (Plaintiff's Exhibit 1 admitted into evidence.)

20   BY MR. KAPOLCHOK:

21        Q.   Dr. Hall, the last thing I'd like to do is

22   ask you if there's a typo on that letter, on page --

23   well, the second page.

24             The second page begins, "Of the increased

25   activity"; do you see that?

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 89

 1       A.    Yes.

 2       Q.    Okay.  And then it goes down and it says,

 3   "Related to mild position of the tibial component,"

 4   then it goes on to say, "This type of malposition."

 5            Should that "mild position" be

 6   "malposition"?

 7       A.    Yes.

 8       Q.    All right.  Could you change -- since

 9   you've got the original exhibit, would you change it

10   yourself?

11       A.    Is that acceptable?

12       Q.    Thank you, Dr. Hall.

13            MR. KAPOLCHOK:  If I might have just 20

14   seconds, Your Honor, to consult?

15            THE COURT:  Certainly.

16            MR. KAPOLCHOK:  Dr. Hall, thank you for

17   your patience, especially going through these

18   medical records in kind of a stumbling fashion, but

19   I didn't know any other way to do it.

20            THE COURT:  Mr. Pomeroy, you may

21   cross-examine.

22            MR. POMEROY:  Yes, Your Honor.

23            Which button do we push to turn the lights

24   back on?

25            Thank you.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 90

1                    CROSS-EXAMINATION

2   BY MR. POMEROY:

3       Q.   Good morning, Dr. Hall.

4            If I understand your testimony correct,

5   you have -- other than your experience with

6   Mr. Crisco, you've not used the Profix knee

7   replacement that's manufactured by Smith & Nephew?

8       A.   Not that I recall.  I used some Smith &

9   Nephew when I was in residency, but I don't think

10  Profix was around back then.

11      Q.   Okay.  And do you know offhand how many

12  manufacturers of knee replacements there are?

13      A.   It's a pretty large number.  Just for use

14  in the United States, I would say there may be even

15  as much as 40 or 50.

16      Q.   What would denote a normal range of motion

17  for a knee that's not affected arthritic, I mean,

18  some -- just a regular normal healthy person, what

19  would that individual's range of motion likely be?

20      A.   Usually from full extension to flexion,

21  anywhere from 135 degrees to maybe 140, 145.

22      Q.   Okay.  Would the starting range be zero?

23      A.   Yes.

24      Q.   To 135 or 140?

25      A.   Yeah.

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 91

1       Q.    Okay.  The 0 degrees measuring

2    extension?

3       A.    Correct.

4       Q.    And the second number being the flexion?

5       A.    Correct.

6       Q.    Good.  And what -- after a total knee

7    replacement, an acceptable range of motion would be

8    0 to 90 degrees or better?

9       A.    Yes.

10       Q.    You would not have the same degree of

11    flexion with a knee replacement as you would with a

12    healthy knee --

13       A.    No.

14       Q.    -- correct?

15             And when you examined Mr. Crisco in

16    October, as I think you used the first document in

17    Plaintiff's Exhibit 2, you indicated that his range

18    of motion was 0 to 110 degrees?

19       A.    Correct.

20       Q.    And that's a good range of motion for an

21    individual with a knee replacement; isn't that

22    true?

23       A.    Yes.

24       Q.    And you testified that you believe that

25    he -- Mr. Crisco's initial surgery was with an

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 92

1    anterior slope?

2          A.    Correct.

3          Q.    And you showed the x-ray from March 12th,

4    2001, to demonstrate that point to the court?

5          A.    Correct.

6          Q.    Now, you have before you a model with a

7    knee replacement?

8          A.    Yes.

9          Q.    And now, if you had an anterior slope,

10   isn't it true that you would not expect in physical

11   finding to have flexion of 110 degrees?

12         A.    You can.  It just depends upon where the

13   knee is loose.  If it's loose in extension, you can

14   still get that degree of flexion.

15         Q.    Well, my understanding is that on your

16   examination you did not find any loosening of the

17   knee joint, because that was one of the things you

18   were looking for and you said there wasn't any

19   loosening.

20         A.    That was with collateral ligaments.  The

21   ligaments on the side.

22         Q.    Right.

23         A.    That's a different part of the exam.

24         Q.    So your testimony is that with an anterior

25   slope you would still get normal flexion?

Page 93

```
 1        A.    You could, yeah.

 2        Q.    Now, you showed the x-ray that you

 3   examined -- I mean, demonstrated to the judge, that

 4   was not a full-leg x-ray of the tibia, was it?

 5        A.    No.

 6        Q.    It showed about a quarter of the tibia, or

 7   maybe less?

 8        A.    Maybe, I don't know, a third.

 9        Q.    A third to a quarter?

10        A.    Yeah.

11        Q.    Would you agree that the best way to

12   measure the long axis -- axis, A-X-I-S -- would be

13   to take a full-leg x-ray and measure that axis from

14   the ankle to the knee?

15        A.    Probably, yes.

16        Q.    Because anything less -- there is a range

17   for misinterpretation, depending upon the

18   individual's tibia, correct?

19        A.    If they've had a previous deformity that

20   you're not seeing on your x-ray.  Otherwise, then,

21   the anterior part of the tibia is sufficient.

22        Q.    I mean, not every -- not every tibia is

23   identical?

24        A.    Correct.

25              THE COURT:  I'm sorry, I didn't catch the
```

Crisco v. United States of America
September 17, 2007                               Case No. 3:03-cv-0011-HRH

Page 94

1   first answer.  Was your answer that it is better to

2   have a full-leg x-ray?

3            THE WITNESS:  If you suspect that they've

4   got some deformity like that where their tibia is

5   abnormal.

6            THE COURT:  Any reason to suspect that

7   Mr. Crisco had such a deformity?

8            THE WITNESS:  No, he's a pretty thin

9   individual, and I thought I could see it pretty

10  well.

11  BY MR. POMEROY:

12       Q.   But you did not order a full-leg x-ray

13  too?

14       A.   No, I did not.

15       Q.   And in all the x-rays that you've seen,

16  there's -- there isn't a full-leg x-ray that you've

17  seen?

18       A.   Not that I've seen.

19       Q.   Because if you did, then we'd have the

20  Perry Mason moment.

21            After you saw initially Mr. Crisco in

22  October 2001, you didn't contact any of the doctors

23  at the VA to talk to them about his care or medical

24  records, correct?

25       A.   Correct.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 95

1      Q.    Did you request any additional medical

2    records from the VA?

3      A.    No.

4      Q.    The only records that you were presented

5    was what Mr. Crisco brought to you?

6      A.    Correct.

7      Q.    And you testified that the bone scan that

8    you took was to show uptake in white blood cells?

9      A.    Yes.

10      Q.    And for a -- for a bone scan now, if you

11    took a bone scan, such as the one you took of the

12    patient one month after a total knee construction,

13    you would expect to see an uptake in the region of

14    the surgery; is that correct?

15      A.    That's correct.

16      Q.    And isn't it true that you see -- I mean,

17    depending, again, variance from patient to patient,

18    because not everyone is identical.  But isn't it

19    true that you can see hot spots in a bone scan for a

20    long period of time after surgery?

21      A.    Yes.

22      Q.    And isn't it true that you can actually

23    have hot spots up to a year after that total knee

24    surgery?

25      A.    Yes.

Crisco v. United States of America
September 17, 2007                           Case No. 3:03-cv-0011-HRH

Page 96

1       Q.   And Mr. Kapolchok did not draw your
2  attention to what had been Plaintiff's Exhibit 6.
3  So I guess -- I'll move for admission of Plaintiff's
4  Exhibit 6.
5            MR. KAPOLCHOK:  That's fine.  Sure.  No
6  objection.
7            THE COURT:  Any objections, Mr. Kapolchok?
8            MR. KAPOLCHOK:  No, sir.
9            THE COURT:  Plaintiff's 6 is admitted.
10      (Plaintiff's Exhibit 6 admitted into evidence.)
11  BY MR. POMEROY:
12      Q.   Can you identify that document for us?
13      A.   It's a bone scan report from Providence
14  Alaska Medical Center.
15      Q.   And that's the test that you had ordered,
16  correct?
17      A.   Correct.
18      Q.   And is there anything in the document or
19  the findings or impressions of the radiologist that
20  read this that indicated uptake in the patella
21  region?
22      A.   He doesn't mention the regions.
23      Q.   Okay.  But he did state that it's
24  consistent with recent prosthesis placement?
25      A.   Correct.

Page 97

 1          MR. POMEROY:  Just a moment, Your Honor.

 2          I think those are the only questions I

 3   had, Your Honor.  Thank you.

 4          THE COURT:  Anything further,

 5   Mr. Kapolchok?

 6          MR. KAPOLCHOK:  Very briefly, Your Honor.

 7                REDIRECT EXAMINATION

 8   BY MR. KAPOLCHOK:

 9       Q.   The bone scan, Dr. Hall, you ordered, was

10   one of the reasons to address the suspicion or

11   possible RSD?

12       A.   Yes.

13       Q.   And was another reason to examine the

14   consequences of what you saw from the government's

15   x-rays of what we call malposition?

16       A.   Yes.

17       Q.   And, in your opinion, is the bone scan the

18   best diagnostic tool that was available to help you

19   make a diagnosis with respect to these two

20   conditions?

21       A.   Yes.  If it's malposition, you would

22   expect to see stress along the tibia and then also

23   on the patella, and that's what I saw.  So that, to

24   me, fit with the previous concern about the

25   malposition.

Crisco v. United States of America
September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 98

1       Q.   And, in general, you were asked about the

2  radiologist reading of the bone scan.   And

3  radiologists read x-rays when you order x-rays too,

4  don't they?

5       A.   Yes.

6       Q.   And do you always read the films

7  yourself?

8       A.   Yes, I do.   I often have difference of

9  opinion from the radiologists.   As a specialist, I

10  just have to know one small area of radiology, just

11  orthopedics; they have to know everything, so

12  oftentimes, like I said, we have difference of

13  opinion.

14            MR. KAPOLCHOK:   All right.   Thank you.

15  That's all I have.

16            THE COURT:   Doctor, before you go away.

17  With respect to that exhibit, that x-ray that we

18  were looking at, it's part 3-A of 6.

19            Is there -- do you have any reason at all

20  to believe that that x-ray did not accurately

21  reflect the angle that you were measuring?

22            THE WITNESS:   No.

23            THE COURT:   Okay.   Thank you.

24            Did that lead to questions from anybody

25  else?

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 99

    1            MR. POMEROY:  No, Your Honor.

    2            MR. KAPOLCHOK:  No.

    3            THE COURT:  Doctor, thank you very much

    4    for being a witness here.

    5            May we excuse the doctor?

    6            MR. POMEROY:  Yes, Your Honor.

    7            THE COURT:  Thank you, sir.  You're

    8    excused.

    9        (Counter 11:24:45.)

   10                        *  *  *  *  *

   11        (Counter 01:44:20)

   12            THE CLERK:  If you'd stand before me so I

   13    can swear you in.

   14            Please raise your right hand.

   15        (Witness sworn.)

   16            THE CLERK:  Thank you.  Please have a seat

   17    in the witness box.

   18            Please speak into the microphone at all

   19    times.

   20            Please state your full name, spelling your

   21    last name and a current address.

   22            THE WITNESS:  My name is Umesh T. Bhagia

   23    spelled B-H-A-G-I-A.  Address is 24676 Calle Largo,

   24    C-A-L-L-E, L-A-R-G-O.  That's Calabasas,

   25    C-A-L-A-B-A-S-A-S, California, 91302.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 100

1              THE CLERK:  Thank you.

2              THE COURT:  You may inquire.

3                    DIRECT EXAMINATION

4     BY MR. POMEROY:

5         Q.    What's your profession?

6         A.    I'm an orthopedic surgeon.

7         Q.    And where are you currently practicing?

8         A.    I'm in West Hills, California.

9         Q.    And how long have you been practicing

10    there?

11        A.    One year.

12        Q.    And, Doctor, where did you get your

13    medical education?

14        A.    I started in India with my medical

15    education.

16        Q.    And that's the nation -- that's where you

17    were born, correct?

18        A.    That's where I was born.

19        Q.    And where did you go to college and

20    medical school?

21        A.    I was born in Baroda and I went to medical

22    school in Baroda Medical College.

23              I also did an orthopedic residency there

24    at the Baroda Medical College.

25        Q.    When did you get your medical degree?

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 101

1        A.    That was in 1986.

2        Q.    And then you immediately went into a

3    residency program?

4        A.    That's correct.

5        Q.    And what was that residency program in?

6        A.    That's orthopedic surgery.

7        Q.    And how long was that residency program?

8        A.    That was four years.  It was a three-year

9    program and a fourth year option of chief residency

10   that some of us are invited to do if we want to

11   continue further, so I did my fourth year.

12             And then pretty much immediately after

13   that I came to the U.S.

14       Q.    And when you came to the United States,

15   did you have to get -- I mean, what additional

16   education or such did you need to obtain in order to

17   practice in the States?

18       A.    Here they do not recognize the residency,

19   but they do recognize medical school.  If you are

20   able to clear the ECFMG, or what's now called the

21   National Boards.  So I cleared the National Boards

22   and had to start again at the residency level.

23       Q.    And where did you do your residency in

24   the -- well, first of all, did you -- you did an

25   internship?

Page 102

 1        A.    Yeah, I -- you know, I wanted to do
 2   orthopedics, because I was an orthopedic surgeon
 3   already in India.  It's very difficult to get in, so
 4   I went through a couple of years of internship and
 5   kept applying until I matched into a spot in
 6   Georgia.
 7        Q.    And where did you do your internship?
 8        A.    That was in New Haven, Connecticut, as
 9   part of Yale University.
10        Q.    And was that internship specialized in any
11   way?
12        A.    It was a general surgery, general
13   internship, yeah.
14        Q.    And then, I believe, you stated in 1993
15   you were accepted into a residency program?
16        A.    Yes.  From '93 to '98 I was in Augusta,
17   Georgia, doing an orthopedic residency.
18        Q.    And within a residency program, are there
19   areas of subspecialization or...
20        A.    The residency is five years of
21   orthopedics.  You know, you go through different
22   rotations.  The rotations are set up with
23   different -- what we call attendings.  In other
24   words, they are professors who specialize in
25   different things.

Page 103

```
 1              And you do three or four months with each.

 2    And you go through the different years as -- and you

 3    are given more and more responsibility as you

 4    advance through the residency.

 5         Q.   And was that similar to the residency

 6    program in India?

 7         A.   Very similar.  You know, it's more

 8    technologically advanced here, but the patient care

 9    and caring for people is the same.

10         Q.   And what did you do after the completion

11    of your residency?

12         A.   After the residency, I had a little -- I

13    had a payback to do to the U.S. Government as part

14    of them allowing me to train and taking part in my

15    training.  So I came to work for the VA and Air

16    Force Base here in Anchorage.  That was in October

17    '98.

18         Q.   And how long were you at the Veterans

19    Administration here in Anchorage?

20         A.   I left in January of 2003.  So a little

21    over four, four-and-a-half years.

22         Q.   And why did you leave?

23         A.   Mostly for being close to the family.

24    Family is all in California, so that's where my wife

25    wanted to move.
```

Page 104

1       Q.    Your wife's family is in California?

2       A.    My wife's family -- my in-laws are in

3  California.

4       Q.    I think most people understand that.

5             When you moved to California, where did

6  you -- did you move to West Hills or --

7       A.    No.  I first went to Vasilias, which is a

8  smaller town.  You know, I felt that the transition

9  from Alaska to LA would be too dramatic for me.  So

10 I went to a small town and practiced, but

11 immediately realized that, you know, my interest was

12 joint replacement, I wasn't doing enough of that

13 work, type of work I wanted to do.

14            So a couple of years into it I decided

15 that I needed to move on and look at a bigger

16 place.

17      Q.    And did you immediately go to the current

18 practice in West Hills?

19      A.    No.  I took a year out of my practice and

20 went and did a fellowship in joint replacement at

21 the Mayo Clinic down in Scottsdale.

22      Q.    And what was the focus of that

23 fellowship?

24      A.    It was hip and knee replacement.  And

25 mostly, you know, Mayo Clinic is a referral place,

Page 105

 1   so it's complicated joint replacement and large

 2   volume.

 3       Q.   And what's the nature of your practice

 4   currently in West Hills?

 5       A.   It's about 75 percent total joint

 6   replacement and 25 percent trauma and other things.

 7   So most of it is joints, hips and knees.

 8       Q.   And you're board certified in orthopedic

 9   surgery?

10       A.   Yes.

11       Q.   And what's the certifying entity?

12       A.   It's the American Academy of Orthopedic

13   Surgeons.

14       Q.   And any other professional associations or

15   memberships?

16       A.   We are all members of the local, like

17   California Orthopedic Society.  In fact, I'm still a

18   member of the Anchorage Orthopedic Society.

19       Q.   And in which states are you licensed to

20   practice medicine?

21       A.   Currently in Arizona and California.  I

22   gave up my Georgia license this year, because I

23   don't anticipate going back there.

24       Q.   And you never did have an Alaska license,

25   correct?

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 106

1       A.    No.   That is correct, I did not have
2    Alaska license.
3       Q.    And why is that?
4       A.    The VA allows you to practice as long as
5    you have any state license.  And I had my Georgia
6    license current when I came here.  And since I was
7    not going to practice outside the U.S. Government
8    entities, which are the VA and the Air Force Base, I
9    didn't need it.
10      Q.    It's similar with lawyers.  Several of my
11   colleagues are not members of the Alaska Bar.
12            Obviously we're here because of the joint
13   replacement that you performed for Mr. Crisco.  One
14   thing I'd like to sort of set the -- a little bit of
15   background of how the orthopedic clinic at the VA
16   was set up and operating in the fall of 2000 when
17   Mr. Crisco first came to inquire into getting his
18   left leg replaced.
19            What was the staffing at the VA then?
20      A.    There were two orthopedic surgeons,
21   Dr. Paton and I.  And Ben Hull was the physician's
22   assistant, although he probably had been in
23   orthopedics longer than either of us.  He was the --
24   all three of us would see the patients when they
25   came.  And each of us could independently see

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 107

1    patients and make decisions.

2            But there was quite a bit of discussion

3    between the three of us, especially if someone was

4    about to have an operation or surgery was

5    recommended.  Then Mr. Hull would bring us the

6    x-rays and go over the appropriateness of the

7    procedure.

8            And once that was done, we would then see

9    the patient, either at the time of what's called a

10   preoperative visit where we get consent and go over

11   a few things, or an extra visit in between to

12   clarify things.

13        Q.   How many years of experience did Mr. Hull

14   have in orthopedics, if you recall?

15        A.   I recall him being an orthopedic PA for 18

16   or 20 years.

17        Q.   And how long has Doctor -- is it Paton or

18   Paton?

19        A.   Paton.

20        Q.   Okay.  P-A-T-O-N?

21        A.   Yes.

22        Q.   When did he leave the VA?

23        A.   I cannot recall, but it was -- I think it

24   was 2001 or 2000.  It's -- you know, it just seems,

25   as I recollect, that Dr. Hall left ANMC.  That

Page 108

1   created an opening, and Dr. Paton went to ANMC.

2   This is just what I seem to remember.  I'm not

3   sure.

4        Q.   Dr. Paton was not with the VA at the time

5   of Mr. Crisco's surgery?

6        A.   I couldn't tell you.  It was very close to

7   that time, so he might have just left or been about

8   to leave.

9        Q.   Okay.  When Mr. Crisco came in in November

10  of 2000 to ask for the knee replacement, did you see

11  him?

12       A.   I saw him -- in November, no, I don't

13  think I saw him.  I think Mr. Hull saw him.

14       Q.   Okay.  And that would be standard

15  operating procedure for the clinic?

16       A.   Yes.  He did show me the x-rays at that

17  time, and we went over the films and said yes, you

18  know, this is someone who may be a reasonable

19  candidate for replacing the knee.

20            MR. POMEROY:  Okay.  And with the court's

21  indulgence, I'll sort of wait to do the x-rays all

22  at once rather than bouncing --

23            THE COURT:  That's fine.

24            MR. POMEROY:  -- back and forth.

25  ///

Page 109

 1   BY MR. POMEROY:

 2        Q.   So when did you first meet Mr. Crisco?

 3        A.   I believe it was in January of 2001.

 4        Q.   And that would have been in conjunction

 5   for what?

 6        A.   That was a preoperative visit, where we go

 7   over the risks and benefits involved with surgery

 8   and make sure that, you know, there were no other

 9   issues that may prevent us from going ahead with

10   that, with the operation.

11        Q.   And what's the general preoperative

12   workup?

13        A.   The general workup is lab work, x-rays.  A

14   discussion of the risks and benefits.  And the

15   history and physical exam, which, you know, is

16   variously done either by an internist or in our case

17   Mr. Hull used to do the physical exam.  I would go

18   over labs and cardiogram, chest x-ray and all that,

19   to make sure that everything's okay.

20        Q.   And then would you meet with Mr. Crisco to

21   explain to him the risks and --

22        A.   Yes.

23        Q.   -- I guess, pluses and minuses of

24   potential --

25        A.   Yeah, the pros and cons -- excuse me.  The

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 110

1   pros and cons of the surgery.  Also go over

2   examination, you know, one more time to see if

3   there's any instabilities, deformities that need to

4   be corrected.  Look at the x-rays again to see what

5   exactly -- we call it templating the x-rays, or

6   measuring out the bones to see approximate type of

7   implant or the size of implant that will be needed.

8        Q.   And what were the risks associated with

9   this kind of surgery?

10       A.   The risks, you know, pretty much are

11  standard for all knee replacements with little

12  change in the frequency of percentage based on what

13  you've had before.  And, you know, because of

14  previous operations, the risks of infection would be

15  slightly higher.  And the risk of stiffness,

16  actually, would be higher.  And some risks of

17  persistent pain would be higher based on previous

18  surgery.

19       Q.   And Mr. Crisco had previous surgery on his

20  left knee?

21       A.   He had -- yes.  Because there was staples.

22  Staples meaning, you know, these metal clips in the

23  tibia, which we see on an x-ray, that had been

24  placed from an osteotomy that was done a long time

25  ago.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 111

1      Q.   And what is an osteotomy?

2      A.   An osteotomy is cutting of the bone to

3   realign it.  And then it's just fixed with the

4   staples.  It can be fixed with plates or other

5   things, but it works for a while.

6      Q.   And what kind of osteotomy had Mr. Crisco

7   had performed?

8      A.   This one is called a high tibial

9   osteotomy, so it's in the upper portion of the

10  tibia, or the leg bone.

11     Q.   And actually, would it help if -- sort of

12  with the little knee demonstration to show sort of

13  what would have been --

14     A.   Sure.

15     Q.   -- done?  I'm just -- (indiscernible).

16     A.   So the osteotomy that is done is in the

17  upper portion.  And what frequently happens is the

18  knee wears out more on one side than the other,

19  which causes a change in the alignment.

20          And to realign it, we take a wedge of bone

21  out from the proportion, and then close it here so

22  that the leg becomes realigned and the

23  weight-bearing axis is improved.

24     Q.   And I think the records show this had been

25  done several years before.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 112

1        A.    That is correct.

2        Q.    But you can still -- there's still

3    evidence of that osteotomy on the x-rays that --

4        A.    Yes.

5        Q.    -- or at least the preoperative x-rays?

6        A.    Yes.

7        Q.    And was Mr. Crisco a good candidate for a

8    knee replacement surgery?

9        A.    Yes.  Based on both the complaints of

10   progressive pain and difficulty with activities, as

11   well as loss of joint space on the x-rays, and spur

12   formation, he would be considered a good

13   candidate.

14       Q.    And you obtained Mr. Crisco's consent for

15   the operation?

16       A.    Yes.

17       Q.    And would you please describe the

18   operation that you performed.

19       A.    Yes.  The operation is performed in the

20   supine position with the patient on the back.

21   Anesthesia is given, which is either spinal or

22   general.  I do not recollect which it was.

23            The leg is then elevated.  It's prepped

24   with some antiseptic solution.  The leg is elevated

25   to get the blood out of the leg and a tourniquet is

Page 113

1    applied, which is a big cup that is applied to a

2    proportion of the leg to prevent bleeding at the

3    time of surgery.

4            After that, an incision is made on the

5    front of the knee.  It's a straight up and down

6    incision, which is anywhere from 5 to 6 inches long.

7    Once you are inside the skin and the tissue, the

8    tendons are visible.

9            We make an opening around the kneecap

10   along these tendons.  And then the kneecap is

11   shifted to the side.  And oftentimes it's what we

12   call everted, so it is flipped over.  Then we can

13   get inside the knee.  And we are looking at it

14   something like this.

15       Q.    And that's -- it's -- you have the

16   knee then --

17       A.    The knee is bent.

18       Q.    -- bent?

19       A.    Yes.  The knee is bent so we can look

20   inside.  And then the remnants of the cartilage or

21   the ligaments are removed.

22            In Mr. Crisco's case, one of the

23   ligaments, which is the anterior cruciate ligament,

24   was removed.  The one on the back side was

25   retained.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 114

1       Q.    And why did you -- do you normally retain
2   the posterior cruciate ligament?
3       A.    It's -- both are very acceptable ways of
4   doing it.  At that time I was retaining the
5   posterior cruciate ligament.  And it seemed to work
6   well with that system that I was using, which was
7   the Profix knee.
8             After this we drilled the bone and go into
9   the canal of the femur, and that's for placing an
10  intramedullary alignment guide.  So the length of
11  the bone is then used as an alignment, because the
12  rod is sitting in the center of the bone.
13            After that we measure the bone.  We size
14  it, so to say.  And they come in different sizes
15  three millimeters apart.  So we label it -- in this
16  particular system they are called C, D, E, F, G
17  sizes.
18            We measure their size, and then that size
19  cutting block, which is a jig or a block which has
20  slots in it, is then placed on the end of the femur.
21  This is placed in a specific amount of rotation and
22  angulation.  Again, there's a slight variation in
23  how different people do it.
24            With that system, I was using five degrees
25  of valgus, which is this alignment.  Because that's

Crisco v. United States of America
September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 115

1   sort of how the angle of the femur is.  And 3

2   degrees of external rotation, which is this way.

3   That's what seems to be the best alignment on the

4   femur.

5          Once that block is placed we make five

6   cuts, which are called anterior, which is this one;

7   posterior, which is that one; chamfer cuts, which

8   are angled; and a distal cut which cuts here.

9          And all of these are about -- when you

10  look at the bone, about 8 or 10 millimeters of bone

11  is removed.  And then the end of the bone is shaped

12  in a five-faceted shape, which conforms exactly to

13  the size of the implant you're going to use.

14         Once that is done, we can actually clean

15  out the back side of the femur as well.  We clean

16  out more -- more cleaning of the spurs and all that

17  is done.

18         Then we go over to the tibia.  The

19  tibia -- in those days I was using an intramedullary

20  alignment, so we drill a hole into the tibia

21  straight down into the canal.  And the rod is

22  sticking out here.  You put the cutting guide or jig

23  in front.

24     Q.   And for the Profix knee that you were

25  using, what kind of tibial cutting jig was used?

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 116

1        A.    Two jigs are available.  There's a 0

2   degree jig, which cuts at 90 degrees to the long

3   axis of the tibia.  And there's 4 degree jig

4   available, which cuts a 4 degree posterior slope

5   into the tibia.  And I was doing a 0 degree.

6            Typically I would do 0 degrees for someone

7   who had really good bending or flexion of the knee

8   before surgery.  And if they had trouble with

9   bending, we wanted to take more bone off from the

10  back, so we would do a 4 degree cut.  And --

11       Q.    And how was Mr. Crisco's range of

12  motion?

13       A.    As I recall, he had very good bending of

14  his knee.  I think it was 120 or 125 even before the

15  surgery.  So, you know, there was plenty of bending

16  and I felt that it would be more stable to do a 0

17  degree cut.

18           Interestingly, this knee system has a 3

19  degree slope built into the polyethylene component.

20  So if you're cutting at 0, you're actually giving a

21  3 degree posterior slope to the patient.

22       Q.    So that the metal component would look

23  at -- would appear to be at 0?

24       A.    The metal would look like it's at 0

25  degrees, or what would be 90 degrees to the long

Crisco v. United States of America
September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 117

1    axis or length of the bone.  And yet, because the

2    plastic is shaped in a certain way, you have a 3

3    degree posterior slope.

4              So the principle of that slope is built

5    into the plastic.

6         Q.   Now, let me interrupt you for just a

7    minute.

8              Now, Dr. Hall this morning testified that

9    he uses a Zimmer knee?

10        A.   Yes, that is correct.

11        Q.   Are you familiar with the Zimmer knee?

12        A.   I'm very familiar with the Zimmer knee.

13        Q.   Okay.

14        A.   That's what I'm using now.

15        Q.   And let me -- why are you using the Zimmer

16   knee now?

17        A.   That has to do with institutional support

18   and, you know, how the knees are brought in by

19   the -- what's called the implant representative or

20   company representative.

21             And each region has some implant company

22   that is relatively dominant or that service the

23   hospital well.  And so here it just so happened the

24   Smith & Nephew was -- the rep was very available and

25   knowledgeable, so we use that.

Crisco v. United States of America
September 17, 2007                                Case No. 3:03-cv-0011-HRH

Page 118

1              And when I moved here, you know, the

2      Zimmer rep was really the one who was there all the

3      time and taking care of us, as far as bringing the

4      right implants and being there, so I had no trouble

5      switching.  Any of the Smith & Nephew rep is hardly

6      ever seen, so I don't want to be in a situation

7      where you are doing a case and parts are missing or,

8      you know, the rep is not available, so...

9              But during my training I was basically

10     exposed to more than one type of implant.  And I

11     happen to do many hundreds of Smith & Nephew

12     implants and Wright medical implants and Zimmer and

13     DePuy.

14             So, to me, it was all equal based on how

15     good the support is for the institution.

16        Q.   Okay.  And for the Zimmer knee, for the

17     tibial cutting block, is that different than from

18     the Smith & Nephew?

19        A.   That is also available in different

20     angles.  You can use a 7 degree block.  You can use

21     a 3 degree block, which is also available.  And,

22     interestingly, the external alignment that we use,

23     the way this alignment rod works, is you're able to

24     change the slope, you know, even despite the fact

25     that you have a 7 degree block, you can actually cut

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 119

1    it 3 or 4 or 5 degrees by changing a few things on

2    the jig.  And most people do that based on how much

3    flexion there is or what stability they want.

4         Q.   So anyway, going back to Mr. Crisco's

5    surgery --

6         A.   Yes.

7         Q.   -- you're making --

8         A.   So the tibial rod is inserted, the tibial

9    cut is made.  I made a 0 degree cut, which is

10   perpendicular to the long axis of the tibia, which

11   would be -- the long axis is here, and that is cut

12   right across, which would be horizontal to the

13   ground.  And then all of that bone is removed.

14            Then we do look at -- then we do a

15   trialing, you know, which is insert the trial

16   components.  The femur and the tibia.  And a plastic

17   component, the height of which again is variable.

18   It depends on how much you have cut or how much

19   looseness there is in the ligaments.  So we have

20   different sizes.  They are two millimeters apart.

21   Put that in.  You check the balance of the knee,

22   which is how stable it is in different degrees of

23   flexion.  And how much flexion you get.

24            At that time, you know, I was -- I was not

25   replacing all the kneecaps, the back side of the

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 120

1   kneecap, depending on how it looked.  I would assess

2   it.  And if it looked good and the tracking, which

3   means it was tracking centrally in the groove in the

4   femur, I would leave it alone.

5           In fact, that was -- I have abandoned that

6   now that I'm mostly treating people who work in an

7   office.  And it's just interesting how folks up here

8   in Alaska do so much better with the kneecap not

9   replaced, because they're into the hunting and the

10  crawling, fishing, kneeling and all that that we do.

11  If you cut the back side of the kneecap and thin it

12  out, you are at risk for a fracture or other things.

13  So that's sort of customization for each patient.

14      Q.   But in Los Angeles, people are more

15  sedentary?

16      A.   Yes.  Definitely.

17      Q.   And so I think the term that's used a

18  little bit is patellar button?

19      A.   Yes.  The patellar button was not placed.

20  So after the trial is done and we are satisfied that

21  there's good range of motion, then we go ahead and

22  place those same size implants, and those are

23  cemented in place.

24      Q.   You use one set to test or do the

25  trials?

Crisco v. United States of America

September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 121

1        A.    That is correct.

2        Q.    And then it's a separate set --

3        A.    Yes.

4        Q.    -- that is then placed?

5        A.    Those come in separate packs, and they're

6    only opened once you have decided which ones to use.

7             And at the time of the trialing there's

8    another opportunity to change things a little,

9    release a few more ligament or cut the bone a little

10   more here or there, depending on how the stability

11   and balance and the range of motion is.

12            And, you know, there was 120 degrees of

13   flexion at the time of surgery with no instability.

14   Without any sign of the lift-off of the tibial

15   component or any sign of pinching on the back side,

16   which would suggest a problem with the slope.

17       Q.    And when you say lift-off of the tibial

18   component, what do you mean?

19       A.    What happens is, you know, as has been

20   suggested, if there was truly a tibial slope problem

21   and this part of the component was up in the back,

22   as you bend the knee it would pinch this component

23   and tend to lift the front part of it off, because

24   it's pinching.  And you would not be able to bend it

25   too far.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 122

1          And if it lifts off, we then step back and

2    say, okay, is the PCL too tight, or the posterior

3    cruciate ligament, which is that ligament, do I have

4    to release that to make it a little loose, or is the

5    slope not enough and I have to re-cut it into a

6    higher degree of slope.

7          And since it was a good amount of flexion,

8    good stability, well-balanced knee, no lift-off, it

9    was felt to be good.

10      Q.   So there was no -- sorry.  There's no

11   lifting off when you were doing the trials for

12   Mr. Crisco's knee?

13      A.   That is correct.

14      Q.   Okay.  So that there was no additional

15   cuts that you felt were necessary to be made?

16      A.   That is correct.

17      Q.   And after you then tested the knee, what's

18   the next step?

19      A.   After that, the real components are

20   cemented in place.  The knee is then washed out,

21   which is just saline and irrigation.  The tourniquet

22   is then released.  If there's any bleeding, that is

23   controlled and the knee is then closed.  Closing

24   each layer that was opened in separate layers.

25   Dressing is applied, and you go back to the recovery

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 123

1    room and get an x-ray.

2        Q.   Okay.  And then, for Mr. Crisco's

3    operation, is everything -- I mean, is postoperative

4    recovery care fairly normal?

5        A.   Immediate postop, fairly normal, yes.

6        Q.   Okay.  Without going through all the

7    records, I mean, the key problem with Mr. Crisco's

8    operation was, as he has testified, and his friends

9    have testified, as Dr. Hall I think touched upon, is

10   that he had complaints of pain after the surgery.

11   And from the time in January to the surgery until he

12   kind of left the VA care and went to Dr. Hall, you

13   were his primary physician for that care, correct?

14       A.   Yes.

15       Q.   Okay.  So what did you do to try to get

16   down to the root of what was causing his pain?

17       A.   Yes, I did.  And, you know, the recovery

18   after a knee, especially if you've had previous

19   surgery, is -- it can be a little rough.  And, you

20   know, the first few weeks we expect pain and

21   swelling.  You're trying to get active, you can have

22   pain and swelling.

23           After that, once two or three months go

24   by, it becomes concerning.  You know, there should

25   not be -- persistent pain is one thing, but if it is

Crisco v. United States of America
September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 124

1    progressive, or if it is -- just doesn't seem to be

2    improving, we all worry, you know.  And the number

3    one worry that we all have with knees is infection.

4              The second worry is, is there early

5    loosening of the implants, or something -- something

6    like a hematoma or something that's causing the

7    pain.

8         Q.   And loosening, what would that entail?  I

9    mean, just that the cement didn't take or --

10        A.   Yeah.  You know, I mean, this is -- it's

11   an unusual thing for an implant to come loose that

12   early, but we have seen it, you know, it's been

13   observed.  And it's -- you're right.  Either the

14   cement loosens from the bone or the implant loosens

15   within the cement.  And that is sometimes observed.

16             So those are -- the main worry, of course,

17   for persistent pain is infection.  And so, you know,

18   we -- we put those possibilities up and we got some

19   lab work, which is typically what you would do.  An

20   ESR, or erythrocyte sedimentation rate, and

21   C-reaction protein blood count, you know, those are

22   the labs you would do, and they were fairly normalSo

23   the possibility of infection was then considered

24   low.

25             Also, the fact that somewhere between two

Summit Court Reporting, LLC
907/264-6776

Crisco v. United States of America
September 17, 2007                        Case No. 3:03-cv-0011-HRH

Page 125

1    and three months the range of motion was quite good.

2    And there were times when --

3        Q.    Immediately postop you would not expect to

4    have tremendous range of motion, would you?  I mean,

5    I'm talking the first, like, two weeks to a month?

6        A.    No.  The first -- it's quite variable.

7    But, yeah, the first couple of weeks you don't

8    expect more than 90 degrees, but certainly by six

9    weeks you expect, you know, 100, 105 degrees.  By

10   three months you expect 110, 115, or more.  You

11   would expect that.

12           What I had -- what I observed was, you

13   know, that there were times when -- and I think I

14   saw Mr. Crisco quite a few times over that course.

15   My routine was to see folks at two weeks, six weeks,

16   three months, and six months.  You know, but

17   besides, I think, because of the persistent pain.

18   And a couple of times I think because of a fall, you

19   know, we worry that something came loose, or if

20   there's a fracture we want to check it.  So those

21   are the times when we checked it.

22           And there were times when the knee looked

23   very good.  Barely any swelling and good range of

24   motion.  There were times when it looked swollen and

25   irritated and tender, still with good range of

Crisco v. United States of America
September 17, 2007                           Case No. 3:03-cv-0011-HRH

Page 126

 1    motion, but just not what we call a happy-looking

 2    knee.

 3         Q.   And what would the characteristics of a

 4    not-happy-looking knee be?

 5         A.   Well, mainly it's just complaints of pain

 6    and then swelling.  So my concern always was

 7    infection, is there some infection going on that is

 8    subtle that may need a knee aspiration.

 9              And oftentimes, you know, in cases where

10    we cannot clearly find a cause or an infection, we

11    will then send people for a second opinion, or at

12    least have another set of eyes or hands feel it and

13    see if we are missing something.

14         Q.   And I think you testified like, and I

15    think the records that we're about to -- at least

16    twice Mr. Crisco came in reporting that he had

17    fallen.

18              And what -- after a patient, I mean,

19    Mr. Crisco or anybody, reports that they've fallen,

20    you -- what do you do?

21         A.   Examine the knee and get an x-ray, you

22    know, make sure that nothing's out of place or

23    nothing's fractured or came loose.

24              But my impression was, you know, that

25    there was significant quadriceps atrophy, which is

September 17, 2007

 1    the muscle up in the thigh.  And once -- when you

 2    have that, you can have a knee that keeps giving

 3    out.  Especially up and down stairs or on uneven

 4    ground.  And so --

 5         Q.   And what do you do to improve that?

 6         A.   Physical therapy.

 7         Q.   And I think you said that also you sought

 8    second opinions from other orthopedic surgeons as to

 9    Mr. Crisco's condition?

10         A.   Yes.

11         Q.   And what -- how do you -- how do you go

12    about doing that?

13         A.   Usually we send out a note asking for an

14    opinion.  You know, both Elmendorf and the Seattle

15    VA were considered our next level.  You know, if we

16    wanted to get a second opinion, we would send people

17    to either Elmendorf Air Force Base or to the Seattle

18    VA.

19         Q.   And did you do that on sort of a normal

20    basis?

21         A.   Yes.  It was, you know, mostly for -- for

22    cases that were unusual or -- yeah, they're mostly

23    for reasons like, you know, a back operation that

24    someone has had three times and now you don't know

25    what's going on, that sort of thing.

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 128

1              In this case there was enough confusion, I

2    just wasn't convinced that we should be doing

3    anything aggressive, because it was relatively early

4    on in the recovery period.

5         Q.   And I think you testified about sort of

6    like a normal recovery period for a knee

7    replacement, but is there a range, sort of within

8    normal?

9         A.   Even today in the world of minimally

10   invasive and high tech, we think of most of the

11   recovery happening in about three months.  But full

12   recovery taking about a year.  That's the -- that's

13   considered the norm.

14        Q.   Okay.  I'd like to, at this point, sort of

15   run through some of the x-rays that were taken

16   before Dr. Hall's care.

17        A.   If I may say something.  I believe that

18   the overhead will show the x-rays quite well.  If

19   you want to do it that way, if it's okay.  Do you

20   want to try that?

21        Q.   We can see.  They're kind of -- they're

22   kind of small.  It's...

23             THE COURT:  Because we can't see the whole

24   x-ray, it would be helpful if you would be sure to

25   let me know which x-ray I'm looking at.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 129

```
 1              MR. POMEROY:  I think I'd rather just --
 2              THE WITNESS:  Okay.
 3              MR. POMEROY:  -- do the light.
 4              THE COURT:  I thought it was pretty good,
 5     actually, but however you want to do it is okay with
 6     me.
 7              MR. POMEROY:  (Indiscernible).
 8              MR. KAPOLCHOK:  Judge, may I move?
 9              Thank you.
10     BY MR. POMEROY:
11        Q.   Now, the first set of x-rays --
12              THE CLERK:  Mr. Pomeroy, could you put on
13     the lapel or turn the mike --
14              MR. POMEROY:  Okay.
15              THE CLERK:  Because --
16              MR. POMEROY:  How is that?
17              THE CLERK:  That's fine.  And then when
18     Dr. Bhagia speaks, he needs to be able to speak into
19     the microphone as well.
20              MR. POMEROY:  Okay.
21     BY MR. POMEROY:
22        Q.   The x-rays have been sort of grouped or
23     have been sorted out and marked by -- into groups
24     based upon the date that the x-rays were taken.
25              So these first set of x-rays would have
```

Page 130

1    been those that were ordered prior to his surgery, I

2    think -- I think the date's November 2000.

3         A.    The date on this is 10/17/2000.

4         Q.    And can you describe what the x-rays show

5    and why they were ordered?

6         A.    The x-rays were ordered for complaints of

7    knee pain that was progressive.  The x-ray shows --

8    on the right side is a knee replacement that just is

9    noted, by the way, and seems to be well-fixed.  On

10   the left side you see a complete loss of joint

11   space.

12         On the medial side, or inner side of the

13   knee, compared to the outer side.  The outer side

14   still seems to have some space.  There's also metal

15   clips; we call these staples.  These were used to

16   fix an osteotomy, which is cutting the bone, that

17   you can sort of see here.

18         That is the front view of AP view.  This

19   one here is a skyline view or Merchant's view, it

20   shows where the kneecap tracks on the end of the

21   femur.  Once again, you see spurs showing that

22   arthritis is not only present in the medial side,

23   but also in the patella femoral joint, which is that

24   joint between the kneecap and the femur.

25         THE CLERK:  Mr. Pomeroy, what exhibit

Crisco v. United States of America
September 17, 2007                           Case No. 3:03-cv-0011-HRH

Page 131

1    number is that, please?

2              MR. POMEROY:  D-8 and D-9.

3              THE CLERK:  Thank you.

4              THE WITNESS:  These are lateral views of

5    the left and right knee.  Lateral meaning from the

6    side.  The right knee again shows a knee

7    replacement.  The left shows evidence of arthritis,

8    spur formation, and also a change in the shape of

9    the upper tibia, proximal tibia, from the previous

10   operation.

11             An interesting or important point to note

12   on these when you are planning out an operation is

13   that the height of the knee joint, where it sits

14   relative to what we consider normal knee, this joint

15   is lower.  And the patellar tendon, which is the

16   distance between the end of the kneecap to the

17   tibia, which is that tendon, is shortened compared

18   to this tendon.  You can see quite a bit of

19   difference there.  And that usually is, again,

20   something which can cause knee pain, especially

21   behind the kneecap, and problems later on.

22             Again, you know, even to an average

23   person, if it's pointed out that the top of this

24   fibula, which is that bone, is actually at the level

25   of the knee joint or above, which means that joint

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 132

1    is lower compared to this, where even after

2    replacement and cutting the bone that bone is still

3    below the level of the joint.

4              So, you know, there's quite a bit of loss

5    of height in that knee.  Shortening of the kneecap.

6    All factors which will cause mechanics of that knee

7    to be abnormal.

8    BY MR. POMEROY:

9        Q.   And that's --

10             THE COURT:  Where does the stuff go that

11   would otherwise make this left knee look right?

12             THE WITNESS:  What happens is, you know,

13   this -- an actual wedge of bone is removed at the

14   time of the osteotomy.  And depending on how much

15   deformity you correct.  Now, we think of one

16   millimeter as correcting one degree.  So if there's

17   a 10 degree deformity that you are trying to

18   correct, you will remove ten millimeters of bone.

19   That's a lot of bone that is removed.

20             THE COURT:  Okay.  Thank you.  That's what

21   I was asking you.

22   BY MR. POMEROY:

23       Q.   And so this would be, you know, described

24   as osteoarthritis?

25       A.   This is osteoarthritis.  Along with the

Page 133

```
 1   previous osteotomy.  And what is called the patella

 2   baja, or low patella or shortened patellar tendon.

 3   So, you know, those are just things that we would be

 4   noting as part of the preoperative planning.

 5        Q.   And that was D-12 that you were just

 6   referring to?

 7        A.   Yes.

 8        Q.   Which was -- which was of the left knee?

 9        A.   Right.  D-11 is another view that is -- I

10   consider it's an extra view.  It's with the knee

11   slightly bent and looking at it, it just shows the

12   spurs a little better, but we don't truly really

13   need that to plan out an operation.

14             THE COURT:  That also shows, though, a

15   considerable narrowing of the gap on the left -- the

16   left knee as opposed to the right?

17             THE WITNESS:  Yes.  This is narrowed

18   compared to that.  Also, interestingly, where the

19   knee sits, and if someone is standing both the knees

20   should be about at the same level.  It just doesn't

21   look like -- you know, it looks like that knee is

22   higher.

23             So there's -- there's some change in the

24   mechanics there.

25             MR. POMEROY:  That was D-11.
```

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 134

 1          THE CLERK:  Thank you.

 2   BY MR. POMEROY:

 3      Q.   The next set of x-rays were taken on --

 4   after your surgery, correct?

 5      A.   That is correct.  This is dated 1/28/2001.

 6   This is an AP, or front view and lateral view.  And,

 7   you know, the implants appear to be well-fixed.

 8      Q.   What would you be looking for to determine

 9   that they're well-fixed?

10      A.   Any space between the implant and the bone

11   would be considered a sign of loosening.  There is

12   really no space that's very good.  We call it the

13   interface between the bone and the metal is very

14   quiet.  We shouldn't see any loose -- or sort of a

15   space or gap there.

16          So, you know, that space is the plastic --

17   in fact, you can see an outline of the plastic liner

18   where it's taller in the front and narrower in the

19   back giving you that sort of in-built 3 degree

20   slope.

21      Q.   And you're pointing to the x-ray at D --

22      A.   16.

23      Q.   16.

24      A.   So that's -- and then these were just --

25          THE COURT:  What were those two numbers?

Page 135

```
 1            THE WITNESS:  D-16.

 2   BY MR. POMEROY:

 3        Q.   And then this view is D --

 4        A.   D-13.

 5        Q.   -- 13.

 6        A.   These are two more views on the same day.

 7   There was -- you know, we don't -- we don't -- now I

 8   don't get four views; I get two views.  AP and

 9   lateral.  But at that time we used to get four views

10   and obliques.  Especially when someone had a

11   deformity of the tibia like that, to make sure that

12   we look at it in all different ways.  And those two

13   look -- look okay, as far as fixation and

14   everything.

15        Q.   One thing that Dr. Hall had mentioned when

16   he was describing surgery, he said in his

17   description of his replacement surgery, he described

18   like a femoral notch this morning?

19        A.   Yes.  You might see that on a lateral

20   view, which is that side view.

21            THE CLERK:  I'm sorry, what exhibit number

22   is that?

23            THE WITNESS:  You can see it from the

24   front here --

25            MR. POMEROY:  That's D-16?
```

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 136

1               THE WITNESS:  Yes.

2               MR. POMEROY:  Yes.

3               THE CLERK:  Okay.

4               THE WITNESS:  You see it up in the front

5    here where the -- where the anterior cut of the knee

6    is made and if it runs into the -- into the bone.  I

7    cannot see it on this view.  I'm sure that if you

8    were to get -- because, you know, the two sides are

9    not level.  The outer side is higher than the other

10   side of the knee.  When you -- when you cut it on

11   one side, it runs flush with the front of the bone.

12   The other side, it's a little off, a little

13   different.  And you might see that.  I don't see it

14   here, but I don't know if he was looking at these

15   x-rays.  Unless I'm looking at the last ones that

16   were done before Mr. Crisco went to him.

17               So, again, on this -- you know, at this

18   point I would bet, since there is all this

19   discussion about the slope, you know, since we don't

20   have full-length x-rays, we don't know what

21   references to use.  And if we use the front cortex

22   or anterior cortex like was suggested, relative to

23   the bottom of the implant, you know, that -- that is

24   at 90 degrees.  I would need a ruler for that.

25               But one of the rough ways is since --

Page 137

1    since this is 90 degrees, that angle, if you put

2    this along that angle -- sorry.  You know, along the

3    anterior cortex, you will see that that is 90

4    degrees.  Unfortunately, every view that is short is

5    inadequate to tell true alignment.

6              So I really wouldn't -- wouldn't try to

7    comment.

8    BY MR. POMEROY:

9         Q.   Now, the next set of x-rays.

10        A.   This is now March 12, 2001.

11        Q.   And I think the medical records will show

12   this was -- these were ordered shortly after

13   Mr. Crisco reported falling on the ice in either

14   early -- end of February or early March.

15        A.   So these are D-17, 18, 19 and 20.  And,

16   once again, four views of the knee that do not show

17   any fractures or dislodgement or loosening of the

18   implant after the fall, which is the critical part

19   you'd be looking at.

20             Now, here's -- here's a place where I will

21   point out to you what might be considered a notch.

22   You see that little --

23        Q.   Divot?

24        A.   -- little --

25             THE COURT:  I see what you're pointing at.

Crisco v. United States of America

September 17, 2007                     Case No. 3:03-cv-0011-HRH

Page 138

 1         THE WITNESS:  Yes.  So the little dip

 2    here.  And if you -- and --

 3    BY MR. POMEROY:

 4         Q.  Is that normal?

 5         A.  Is it normal?  You know, we -- the

 6    notching of the femur is -- is one of those things

 7    where you say, is it never acceptable?  We try not

 8    to notch the femur.  And if the bone appears to be

 9    between sizes.  In other words, if I was to put a

10    bigger implant, right, like I mentioned, the

11    implants come in three-millimeter increments.  And

12    if I put a bigger implant, now the knee is going to

13    be too tight.  I'd much rather use a one-millimeter

14    notch and do the right size implant than use a

15    bigger implant to avoid the notch.

16         So that's sort of -- you know, when

17    they're in between sizes we have to pick.  I

18    wouldn't go and notch it, but you're four

19    millimeters or five, because then you're weakening

20    the bone.  But a millimeter notch is what it looks

21    like.  And, you know, that's -- that's between the

22    implants.

23         So here's another lateral view.  Once

24    again, you measure from the anterior cortex.  To me

25    that looks very much like it.  And then the

Page 139

1    polyethylene really shows the slope here.  That to

2    me looks very good.  Nice and tall in the front,

3    short in the back.  That 3 or 4 degree slope is

4    built in.

5           If you were to measure from here, the

6    slope on the poly compared to the tibia, that's a

7    good slope.  You can see that here.

8           You know, all the -- all manufacturers are

9    different.  Zimmer does not have -- Zimmer poly, if

10   you -- I wish we would have thought of this.

11          But, you know, if you hold the Zimmer

12   polyethylene and the Smith & Nephew polyethylene in

13   your hands, you will see that the Zimmer

14   polyethylene is flat, better.  And it's the same

15   polyethylene used for the right and left knee.  They

16   don't differentiate between the two sides, whereas

17   this knee would make a right-sided and a left-sided

18   poly based on the different shape of the bone on the

19   two sides.  Because when you look at the top of the

20   tibia -- if I can please have the model, I'll point

21   that out.

22       Q.   Sure.

23       A.   Thank you.

24          When you look at the top of the tibia, you

25   realize that the medial side of the tibia is bigger

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 140

1    than the lateral side.  And so when you make the

2    polyethylene, if you make both sides the same, you

3    can use it for right or left.  There's less

4    inventory issues, less problems with everything.

5    And then you just adjust it from the bone cuts.

6            Whereas this one, Profix knee actually

7    made polyethylene that looked like this.  It was

8    bigger on the medial side, it was taller in the

9    front, it had a slope built into it.  So completely

10   different mechanics and principles of implanting

11   the -- that one.  Compared to what I do now, I do

12   the Zimmer now and it's quite different.

13       Q.   So this shadow here is part of the

14   polyethylene?

15       A.   Yes.  That shadow is the polyethylene.

16       Q.   And that -- we're pointing at D-18.

17       A.   So that's the model.

18            This is May 8th, 2001.  D-21, 22, and

19   23.

20       Q.   So about four months post-surgery?

21       A.   About four months.  And of course, you

22   know, the reason for all the x-rays was still the

23   concern.  It's important to know that, you know, we

24   had a lot of compassion and, you know, this concern

25   about why this knee is painful, and, you know, we're

Crisco v. United States of America
September 17, 2007                               Case No. 3:03-cv-0011-HRH

Page 141

1    always trying to look for it.  And patellar

2    tracking, which is how it sits in that groove.  Dent

3    of the bone.

4              Another potential cause of knee pain where

5    the tracking is off or the kneecap is tilted on one

6    side, again, was not present.  You know, this looked

7    very good right in the center.

8              Once again, views with the implants.

9    Well-fixed with no gaps that are seen anywhere.  And

10   again, you can see the shadow of the polyethylene,

11   which is that light color.  The soft tissue appears

12   gray, and the plastic is completely dark because

13   it's translucent.  And so it -- you can actually see

14   how it is built up in the front relative to the

15   back.

16        Q.   And so structurally you look at these

17   x-rays which were D --

18        A.   D-21, 22, 23.

19        Q.   And --

20        A.   Look at the x-rays and -- and become

21   confused.  Because everything --

22        Q.   Can you explain what --

23        A.    -- everything looks good here.  The knee

24   range of motion is good, but it is painful.  So, you

25   know, you try and explain that, you try and get

Crisco v. United States of America

September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 142

1    opinions and you list the possibilities.

2              And with knees, since the recovery time

3    oftentimes is one year, especially given all the

4    factors, such as previous operations, we tend to be

5    a little more conservative and we wait a little.  We

6    wait and majority of the times things improve.  One

7    year, 15 months, a year and a half, things will

8    improve with physical therapy, building up muscles,

9    and they -- you know, patients become a lot more

10   functional.

11        Q.   Now, what's the date on the next set of

12   x-rays?

13        A.   This is 6/11/01.  And -- yeah, 6/11/01.

14   And again, no significant change that I would say

15   relative to previous x-rays.

16              So I think by this time we had decided to

17   go to Seattle for an opinion.  And I think

18   Dr. Schumacher had already seen Mr. Crisco by this

19   time.

20        Q.   In May.

21        A.   So here's a magnified image, you know,

22   once again trying to see if there's any separation.

23   Sometimes you have to magnify the picture or, you

24   know, if you're looking for subtle changes.  And I

25   don't see anything.  You can again see the outline

Page 143

 1   of the poly.  All of that tracking is good.

 2            Then we have D-28 and 29 from 7/18 of '01.

 3   Once again, I would say no significant change.  No

 4   sign of loosening, the tracking is still good.

 5            D-30 and 31 from 10/1/01.  I think these

 6   are all from October 1, 2001.

 7       Q.   Yes.

 8       A.   And it continues to show good tracking and

 9   no sign of loosening.

10       Q.   And this is D-30 --

11       A.   32 and 33.  From October 1, 2001.  I think

12   after this I was unable to see Mr. Crisco.

13       Q.   I think Dr. Hall testified that he saw

14   Mr. Crisco about a week later.

15            MR. KAPOLCHOK:  May I ask the last exhibit

16   number?

17            MR. POMEROY:  D-32 --

18            THE WITNESS:  32 and 33.

19            MR. KAPOLCHOK:  Thank you.

20            MR. POMEROY:  I'd move for the admission

21   of the x-rays.

22            MR. KAPOLCHOK:  No objection.

23            THE COURT:  Do you have a complete rundown

24   of the ones that we're admitting?  I ask that

25   because there is some gaps, I think, in the numbers.

Crisco v. United States of America
September 17, 2007                    Case No. 3:03-cv-0011-HRH

Page 144

```
 1            MR. POMEROY:  There is one.  I know that

 2   there is some duplicate x-rays on a CD-ROM that

 3   we're not going to be admitting.  And there might

 4   be -- I talked with Mr. Kapolchok earlier, there

 5   might be some duplication between the x-rays that

 6   he's offered and the ones that we have.

 7            I'd offer that when the evidence --

 8            THE COURT:  Let's do this, because I don't

 9   think there's going to be any kind of issue about

10   this.

11            Somewhere along the way, if you would give

12   us a complete list of the x-rays that we should have

13   as the final exhibits.

14            MR. POMEROY:  Yes, Your Honor.

15   BY MR. POMEROY:

16       Q.   I think a good place to sort of pick up is

17   when -- in the summer Mr. Crisco already having seen

18   Dr. Schumacher, whose deposition has been taken and

19   his exam notes been introduced.

20            Mr. Crisco is referred down to Seattle to

21   see Dr. Chansky; is that correct?

22       A.   That's correct.

23       Q.   And who is Dr. Chansky?

24       A.   Dr. Chansky was one of the consultants, or

25   joint replacement surgeons at Seattle VA.  He was
```

Page 145

1    actually, I think, head of department at that time;

2    I don't know what he is now.

3        Q.    And did you give any like instructions or

4    talk to Dr. Chansky before he saw Mr. Crisco?

5        A.    No.  We send a consult asking for an

6    opinion.  We don't want to bias them in any way, so

7    we basically send the records.  I think there was

8    some problem with the records getting there.  But we

9    don't tend to call or bias their opinions.

10       Q.    Did you speak with Dr. Chansky after he

11   examined --

12       A.    Yes.

13       Q.    -- Mr. Crisco?

14       A.    Yes.  Because he called and advised me

15   that, you know, he had seen Mr. Crisco.  He was

16   waiting for some of the records.  And that his

17   feeling was that there were a couple of

18   possibilities.  One of those being -- once again,

19   I'll say that, RSD, or complex regional pain

20   syndrome.  But it wasn't definitive.  You know, the

21   feeling was that it was the better part of -- or it

22   was prudent to wait, do physical therapy, and give

23   it some time and then reassess at a later date.

24       Q.    And Mr. Crisco was on pain medication

25   during your period -- or time of treatment of him?

Crisco v. United States of America
September 17, 2007                                        Case No. 3:03-cv-0011-HRH

Page 146

1        A.    Yes.  I was -- I was making sure that we

2     were at least providing the pain medication and the

3     relief.

4        Q.    And was there ever a consult to like a

5     pain specialist?

6        A.    Yeah, I think so.  You know, we -- the

7     pain management consult was also requested.  It's

8     done for different reasons, in case there was

9     something else like, you know, the back problems

10     that might be contributing, if there was anything

11     needed, as far as epidural injections.  That's

12     another way of treating RSD as well, is injections

13     in the back or sympathetic blocks.  We wanted to see

14     if that was a consideration.

15        Q.    Do you know if that was ever followed

16     through on?

17        A.    I do not know.

18        Q.    But that was within the universe of

19     treatment modalities that you were considering?

20        A.    Yes.

21        Q.    And then after Mr. Crisco returned from

22     Seattle, from his two trips to the VA there, what

23     was the treatment plan at that time?

24        A.    At that time was basically pain

25     management, physical therapy, and keep following,

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 147

1    wait, at least until about a year is up, so we know

2    that, you know, the natural course of healing is

3    done.  And if there was still a persistent problem,

4    then to look at some other possibilities, you know.

5           One of the -- one of the pieces in this

6    puzzle was that he had a patella that was not

7    resurfaced.  And sometimes that can be a source of

8    pain.  And if it is persistent, you could go back in

9    and revise the patella alone and it can take care of

10   the problem, you know, so that's -- those were

11   things on our mind, although I don't think we

12   discussed that.  But, you know, I think it was

13   early.

14        Q.   And at some time during your treatment of

15   Mr. Crisco, did he express a desire to have a

16   revision surgery performed?

17        A.   Yes.  And, you know, that's something that

18   we see from time to time.  You know, when the knee's

19   not recovering like expected, the patient will

20   oftentimes ask to have it redone or revised or

21   removed.  And, you know, we have to discuss and make

22   that call.

23        Q.   But that wasn't within the range of

24   options you were considering in September, October

25   for Mr. Crisco?

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 148

1      A.   No, I would -- I would wait a long time

2    before -- because the redo's are big operations.

3    You know, even now when I do the revisions, I think

4    a lot before redoing a knee that is painful and

5    well-fixed.  A loose knee, an infected knee, that

6    has to be redone.

7            But a knee that's well-fixed and has pain,

8    you know, you -- you really have to be quite sure

9    that your intervention would take care of the pain.

10   Or that you know that this is the cause of the pain

11   that you're going after and that you will fix it.

12   It's not good enough to do a big operation and the

13   odds are a flip of a coin.  You know, that's really

14   not -- I guess I believe that that's not how surgery

15   should be.  You know, we like good odds.

16      Q.   Now, you have mentioned several times here

17   that Mr. Crisco had good range of motion.  And I

18   think you testified as to after-knee revisions -- or

19   knee replacement surgery, a range of motion that you

20   would be, you know, hoping for would be 0 to 120 or

21   125 --

22      A.   Yes.

23      Q.   -- is that correct?

24           If you had a tibial component that had an

25   anterior slope, would you expect to see a

Crisco v. United States of America
September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 149

1    manifestation of that in the range of motion?

2        A.    Yes.

3        Q.    And how would it manifest itself?

4        A.    Limited flexion or bending of the knee.

5    And it is quite -- quite consistent that if you have

6    a significant anterior slope instead of the

7    posterior slope, the bending is going to be limited,

8    oftentimes less than 90 degrees.

9        Q.    So that if there was an anterior slope to

10   the tibial component, you know, that should be --

11   you should be able to confirm that by the range of

12   motion for the knee?

13       A.    That is correct.  And note that I'm saying

14   significant anterior slope.  Because there is --

15   even though we have jigs and you're making all these

16   cuts believing that you're doing a 7 degree cut, you

17   know, it's not always 7 degrees.  There's a wide

18   variation in the implantation of knees.  It's

19   well-documented.  Very experienced, high volume

20   surgeons who do a high volume of knee surgery, when

21   you look at their x-rays and you do a CT scan

22   analysis, which is the best way to check alignment

23   is a CAT scan, they found that only 90 percent of

24   the times can they get the knee aligned 0 plus or

25   minus 3 degrees.  So 10 percent of the knees are

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 150

 1    outside that 6 degree range, which is considered

 2    ideal.

 3            So, you know -- and then you have to say:

 4    what is a significant slope, what is a significant

 5    alignment or malalignment.  And so what I'm saying

 6    is a malalignment or slope of significance would

 7    limit the range of motion of flexion.  And even then

 8    I do not know if it would cause pain.

 9        Q.    Would an insignificant malalignment or

10    malposition -- I think we've been using

11    malposition -- would that cause pain?

12        A.    No.

13        Q.    And the last time that you saw Mr. Crisco

14    was roughly in the beginning of October 2001?

15        A.    Yes.  Either late September or very early

16    October of 2001.

17        Q.    And after that you went to Dr. Hall, as I

18    understand?

19        A.    Yes.  I do remember bumping into him in

20    the hallway and talking about things.  I never like

21    to let my patients go, as in abandon them in any

22    way, you know.  Especially hard-working regular

23    guys, you know.  But I was advised not to see him.

24        Q.    And who were you advised by?

25        A.    By the administration.

Crisco v. United States of America
September 17, 2007                               Case No. 3:03-cv-0011-HRH

Page 151

1      Q.   Okay.  And finally, Mr. Crisco during his

2   testimony said that when you saw him roughly towards

3   the middle or end of February 2001 when he had the

4   infected stitch, that you said something to the

5   effect that -- or said to him and his wife, that you

6   don't fix your mistakes.

7           Do you recall that testimony this

8   morning?

9      A.   I recall the testimony.  I did not say

10  that I -- if -- I will challenge you to ask every

11  single person on earth who knows me, and they will

12  tell you that that's not my -- I don't talk like

13  that.

14     Q.   Okay.  So you have no recollection of what

15  conversation Mr. Crisco may be --

16     A.   No.  It was a stitch abscess.  The stitch

17  needed to come out.

18     Q.   You do recall the stitch abscess?

19     A.   Yes.

20     Q.   Okay.  And I think, as maybe Mr. Crisco

21  testified, that once that was taken out the

22  infection cleared up?

23     A.   Yes.  That is fair.  It's not a deep --

24  it's not an infection of the knee joint.  It is a

25  superficial, right around one stitch.  Because these

Summit Court Reporting, LLC
907/264-6776

Crisco v. United States of America
September 17, 2007                                Case No. 3:03-cv-0011-HRH

Page 152

1    stitches we use are sometimes -- they are dissolving

2    stitches.  As they dissolve, the protein from that

3    can cause a reaction and what we call a stitch

4    abscess.  As soon as the offending stitch is

5    removed, it goes away.

6              MR. POMEROY:  Okay.  Those are all the

7    questions I have.

8              THE COURT:  Doctor, did I understand you

9    to say that a malalignment of that artificial knee

10   would not cause pain?

11             THE WITNESS:  What we were talking about

12   is a significant malalignment.  You know, the

13   correlation between alignment of the knee implants

14   and pain is extremely poor.  We have all seen knees

15   that are 15 degrees malaligned.  And they are 20

16   years out from their knee replacement and doing

17   perfectly fine.  And we look at an x-ray and get

18   alarmed that it looks like it's sloping or slanting,

19   and the patient is extremely happy.

20             So, you know, the correlation between what

21   the picture shows and the clinical is so poor, that

22   we don't think of simply looking at an x-ray and

23   saying: this is a source of pain.  It has to be

24   correlated with range of motion and how the patient

25   is doing, what are the other possible causes.

Crisco v. United States of America
September 17, 2007                            Case No. 3:03-cv-0011-HRH

Page 153

1          So that -- you know, to say that a certain

2    angulation of an implant is the cause of pain, that

3    is not the case.

4               THE COURT:  Thank you, sir.

5               Mr. Kapolchok.

6               MR. KAPOLCHOK:  Thank you, Your Honor.

7                    CROSS-EXAMINATION

8    BY MR. KAPOLCHOK:

9        Q.   Good afternoon, Doctor.

10       A.   Good afternoon.

11       Q.   Do you recall I took your deposition when

12   you were still working for the Visalia Clinic --

13       A.   Yes.

14       Q.   -- several years ago?

15          Okay.  I want to jump around a little bit,

16   because of the order of the testimony.

17          I'm looking at Dr. Chansky's note of his

18   one visit with Mr. Crisco, dated August 27th, 2001;

19   are you familiar with that?

20       A.   I have read it in the past.

21               MR. KAPOLCHOK:  Okay.  Can we have

22   Exhibit D-5 for the witness, please.

23               MR. POMEROY:  Sure.

24               MR. KAPOLCHOK:  Thank you.

25          I move the admission of Defendant's D-5,

Crisco v. United States of America
September 17, 2007                              Case No. 3:03-cv-0011-HRH

Page 154

1    Your Honor, so we can discuss it.

2              MR. POMEROY:  No objection.

3              THE COURT:  Exhibit D-5 is admitted.

4         (Exhibit No. D-5 admitted into evidence.)

5    BY MR. KAPOLCHOK:

6         Q.   Do you need a moment to review it,

7    Doctor?

8         A.   Yes.  Please.

9              Okay.

10        Q.   All right.  Do you see where Dr. Chansky,

11   after visiting with Mr. Crisco on the 27th -- and

12   not having any records and not having any x-rays of

13   any sort -- said, "still my impression is that he

14   has a reflex sympathetic dystrophy-like syndrome

15   that would be best treated in Alaska by

16   rehabilitation medicine, perhaps anesthesiology."

17             Were you made aware of this note at some

18   time?

19        A.   Yes.

20        Q.   All right.  Now, today you're telling --

21   you told us that you recall a telephone call with

22   Dr. Chansky?

23        A.   Yes.

24        Q.   All right.  You actually recall a

25   telephone call with him about Mr. Crisco?

Page 155

```
 1       A.   Yes.
 2       Q.   And there's nothing in the medical
 3  records; you made no entry in the medical records
 4  about a consult with a consulting physician in
 5  Seattle, no record whatsoever?
 6       A.   I will tell you that he did not call me
 7  specifically to talk about Mr. Crisco, but I had
 8  called him about another patient.  And at that time
 9  he mentioned that he had seen Mr. Crisco and we
10  discussed the case.
11       Q.   And you remember, seven years later,
12  without making any note or annotation in the
13  records, any medical chart, that Dr. Chansky changed
14  his opinion and it's not RSD anymore, it's "you
15  should wait and see what happens"; that's what his
16  opinion was?  Isn't that what you told us a few
17  minutes ago?
18            MR. POMEROY:  Object to
19  mischaracterizing --
20            THE WITNESS:  No, that's not what I said.
21  BY MR. KAPOLCHOK:
22       Q.   Okay.  Tell me what Dr. Chansky told you
23  that you remember.
24       A.   No, I'm saying that's not what I said.
25  What he -- what I said we discussed was that a
```

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 156

1   physical therapy regimen, which is exactly what's

2   written in the note, would be appropriate, which is

3   a rehabilitation regimen.  And that as far as

4   anything regarding redoing the knee, it is best to

5   wait.  Not that it is best to wait with any

6   treatment.

7        Q.   Okay.  A few minutes ago, Doctor, you told

8   the court that there is a well-documented high

9   variation in alignment.

10           Now, do you mean alignment of the knee

11  looking straight on, or do you mean alignment --

12  this is the foot -- of the knee in this position?

13  Knee replacements.

14       A.   I do not understand the question.  There

15  is a documented -- there are -- it's well-documented

16  that alignment of the knee, when you measure from

17  the center of the hip to the center of the ankle,

18  when you draw a straight line, the line does not

19  pass through the center of the knee.

20           When it passes through the center of the

21  knee, that's called a neutral alignment, or 0

22  degrees.  And 3 degrees on either side is considered

23  ideal alignment.  And if it is more than 3 degrees

24  off, that's what I was talking about.

25       Q.   You weren't talking about the slope of the

Page 157

```
 1   tibial tray on a knee replacement, were you?
 2        A.   No.  There's very little documented about
 3   the tibial slope.
 4        Q.   Okay.  Now, when I -- I would like to
 5   establish what the level of your experience was when
 6   you did Mr. Crisco's knee replacement, January 1,
 7   2001 -- or January 10, I believe, 2001.
 8             When did you take your -- you took a year
 9   off and did a fellowship at Mayo in Arizona?
10        A.   Yes.
11        Q.   When was that, sir?
12        A.   Last year.
13        Q.   Okay.  And since that time, that -- excuse
14   me.  That was after leaving the Visalia Medical
15   Clinic?
16        A.   Yes.  So it would be, you know, starting
17   about two years ago until last year.  So August of
18   '05 to July of '06.
19        Q.   And now what situation you're working in,
20   you're not back to Visalia, you're in Los Angeles?
21        A.   Yes, it's -- West Hills is about 20 miles
22   west of Los Angeles.
23        Q.   To work my way to January 10th, 2001 --
24   let me go back and understand your education.
25             In India you go from high school to
```

Crisco v. United States of America
September 17, 2007                        Case No. 3:03-cv-0011-HRH

Page 158

1    medical school; is that correct?

2         A.   That's correct.

3         Q.   So you're 17, 18, when you're in medical

4    school?

5         A.   Uh-huh.  18.

6         Q.   18.  And then that's four years?

7         A.   Yes.

8         Q.   Okay.  And then after that there is an

9    internship?

10        A.   Yes.  It's three levels of what we call

11   MBBS, which is the medical degree.  Each year is

12   about -- each MBBS is about a year and a half, so

13   about four-and-a-half of medical school.  And

14   there's an internship, which is one year after that.

15   And that is a rotating internship, much like we do

16   here.  We rotate through different specialties.

17        Q.   All right.  And then in 1989, after that,

18   you left Bombay and came to the United States,

19   correct?

20        A.   Yes.

21        Q.   And what occasioned that, sir?  Why did

22   you want to come to the United States in 1989?

23        A.   Most of my wife's family was here, and so

24   we sort of made that move.

25        Q.   So your wife's family, they're also from

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 159

1   India?

2       A.    Yes.

3       Q.    And they had moved to the United States?

4       A.    A long time ago, yes.

5       Q.    Okay.  So you wanted to join them?

6       A.    Yes, we did.

7       Q.    Okay.  All right.  And in order to stay in

8   the United States, you entered into an agreement

9   with the government to provide medical services, but

10  you had to complete an acceptable medical education;

11  is that fair?  One that they accepted; I didn't mean

12  to pass judgment on you.

13      A.    Yeah.  I don't know if that's how you

14  would put it.  You know, I myself don't know how to

15  put it.  It's called a J-1 visa.  The J-1 visa is

16  basically called an exchange visitor visa.

17      Q.    Right.

18      A.    And the premise of that is that they would

19  allow you to train here with either the intent that

20  you would go back to your home country, exchange

21  visitor, go back to your home country for at least

22  two years after you were done, and then you would be

23  eligible to come back.  Or, instead of going back

24  for two years, you could serve an underserved area

25  or U.S. Government entity for -- it has all -- it

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 160

1    has changed.  Used to be three years.  I think now

2    it's five years.

3         Q.    Okay.  All right.  And my understanding

4    from your testimony then is that you began -- is it

5    the Hospital of St. Raphael in Connecticut?

6         A.    St. Raphael's Hospital, yes.

7         Q.    In Connecticut.  Now, is that -- did you

8    tell us that was part of the Yale University Medical

9    School?

10        A.    That's the Yale affiliate, yes.

11        Q.    All right.  Now, that wasn't orthopedic

12   work of any sort; was it general surgery?

13        A.    There were two years there.

14        Q.    Right.

15        A.    The first one is called a transitional

16   internship.

17        Q.    Right.

18        A.    Which is again rotating internship,

19   different things.  You do electives and internal

20   medicine.  And I think I did a couple months of

21   orthopedics there as an elective.

22             And the second year there was general

23   surgery.  Which is, again, you know, it incorporates

24   some orthopedics and some surgical training.

25        Q.    No knee replacements there?

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 161

 1        A.   As part of the orthopedic rotations I
 2   would participate in knee replacements.
 3        Q.   In what way?
 4        A.   As an assistant.
 5        Q.   As an assistant; okay.
 6             And then you went to the medical college
 7   of Georgia; is that right?
 8        A.   That is correct.
 9        Q.   All right.  And completed their program.
10   And they give you a certificate of graduation,
11   correct?
12        A.   Yes.
13        Q.   And you were exposed to some orthopedic --
14   strike that.  I apologize, I made a mistake.
15             You were exposed to some total knee
16   replacements while at the medical college of
17   Georgia?
18        A.   It wasn't some, it was quite a bit.
19        Q.   Okay.  But at no time did you perform one
20   on your own without either a supervisor or you
21   assisted in it or you observed, but at no time did
22   you perform a total knee replacement by yourself,
23   unsupervised, while at the medical college of
24   Georgia; is that correct?
25        A.   I would qualify that, if you wouldn't

Crisco v. United States of America
September 17, 2007                                     Case No. 3:03-cv-0011-HRH

Page 162

```
 1   mind.  When you say "by yourself" and "under

 2   supervision," those can both be correct.  Because

 3   under supervision means that someone is watching

 4   you, they're not holding your hand.  So yes, I did

 5   do knee replacements on my own, but my attending,

 6   who is the surgeon who is always there, you know,

 7   but he's not telling me what to do or how to do it.

 8   That happens in the first three years of your

 9   residency.  And each residency is different and each

10   resident is different in how much responsibility

11   they are given.  And you advance according to your

12   abilities.

13        Q.   At any rate, not to debate this to the Nth

14   degree, but at all times there was a senior

15   orthopedic experienced surgeon observing you at a

16   minimum, correct?

17        A.   Yes.

18        Q.   Right.  And he would tell you if he saw

19   something wrong?

20        A.   Absolutely.

21        Q.   All right.  Thank you.

22             Now, in late '98 you came to Alaska?

23        A.   That is correct.

24        Q.   And you began work essentially at the

25   beginning of '99; agree with that?
```

Page 163

1        A.    October 1, '98.

2        Q.    Is when you arrived?

3        A.    Yes.  That's when I started.

4        Q.    All right.  And when you arrived with the

5   VA, there was one other orthopedic surgeon with the

6   VA, Dr. Paton?

7        A.    Yes.

8        Q.    And when you did Johnnie's surgery a year

9   and two months later, Dr. Paton had long left the

10  premises, hadn't he?

11       A.    Yeah.  Once again, I'm not very clear on

12  exactly when he left.

13       Q.    And Dr. Paton then was the only other

14  orthopedic surgeon for a short period of time, and

15  then on January 10th of 2001, you were the only

16  orthopedic surgeon employed by the VA here in

17  Anchorage?

18       A.    That is correct.

19       Q.    And at that time you were not licensed in

20  Alaska, and you explained that you didn't need to

21  be --

22       A.    Yes.

23       Q.    -- is that correct?

24             And you didn't obtain a license because

25  you did not intend to stay; that's correct?

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 164

1       A.   Yes.   I -- I don't know if I was clear on

2    that, by that time, but sometime later it became

3    clear that we would be moving.

4       Q.   Right.   And you were not board certified

5    at that time; that's correct, isn't it?

6       A.   That's correct.

7       Q.   All right.   And that you only had done on

8    your own, unassisted, or unattended by a senior

9    surgeon, you had only done a very few knee

10   replacements; that's correct, isn't it?

11      A.   Few as in 50?

12      Q.   What's your recall, sir?

13      A.   I would have to pull the records.   But my

14   recollection is that it was about 25 to 50 joints a

15   year when I pulled the averages at the end of my

16   tenure.

17      Q.   Well, you arrived in October of '98.

18   October of '99, January, that would be what, 14

19   months?   16 months?

20      A.   So October '98 to October '99 is one year.

21   October '99 to 2000, October, is two years.   And

22   three more months.   So three years and three

23   months.

24      Q.   Okay.   Now, do you understand my question

25   to mean all joints, or just total knee

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 165

1    replacements?

2        A.   Even total knee replacements is what --

3    that's why I'm asking, what is a few.  And, once

4    again, we can go into the statistics of what -- you

5    know, what low-volume surgery or high-volume surgery

6    means.

7             But I think I would say -- you know, if I

8    was to pull the records, I would say it would be

9    about 50.

10       Q.   About 50?

11       A.   Yeah.

12       Q.   All right.

13            THE COURT:  Is that 50 a year or 50 in

14   that 27 months?

15            THE WITNESS:  No.  50 in that 27 months.

16   BY MR. KAPOLCHOK:

17       Q.   Knees?

18       A.   Yes.

19       Q.   Total knee replacements?

20       A.   That's correct.

21       Q.   In your deposition you told me 40, a

22   couple years ago.

23       A.   Okay.  So, close.

24       Q.   Close.

25            Now, you'd agree with me that an improper

Crisco v. United States of America
September 17, 2007                                   Case No. 3:03-cv-0011-HRH

Page 166

1   or a malposition of a tibial tray to create an

2   anterior slope, would you agree with me that's a

3   failure in surgical technique, or it's something

4   that can be controlled by surgical technique?  Let's

5   take out the failure.

6       A.   Yes.  Anterior slope can be controlled

7   with surgical technique.

8       Q.   Okay.  And your testimony today, I

9   believe, is that you used an -- and correct me if I

10  mispronounce this -- intramedullary post or shaft or

11  pin to place the cutting block on the tibial tray;

12  is that correct?

13      A.   Yes.

14      Q.   And if that is the tibia, this is the top

15  of the tibia, Dr. Hall said that if you used the

16  intramedullary manner, you take a drill and you

17  drill a hole in the bone.

18      A.   Uh-huh.

19      Q.   Is that right?

20      A.   That's correct.

21      Q.   In the center, more or less?

22      A.   More towards the front.

23      Q.   Okay.  And then you use a rod that's

24  prepared by Profix to put into that hole?

25      A.   That's correct.

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 167

1      Q.   And then you put the cutting block on the

2   rod?

3      A.   Yes.

4      Q.   All right.  Now, the Profix system

5   provides a cutting block with a 4 degree angle in

6   it, doesn't it?

7      A.   Yes.

8      Q.   And the Profix knee system also has a 3

9   degree built-in angle or slope in it, doesn't it?

10     A.   Yes.

11     Q.   And if both are used, you end up with a 7

12  degree posterior slope?

13     A.   That is correct.

14     Q.   And the Zimmer knees that you use now

15  after your fellowship, are designed for a 7 degree

16  posterior slope, correct?

17     A.   That is incorrect.

18     Q.   It's not correct?  Okay.

19          Would you agree with me, Doctor, that

20  if -- what is this alignment guide, rod, or

21  whatever, that's used?  Is it called an alignment

22  guide?

23     A.   Yes.  It's the intramedullary alignment

24  guide.

25     Q.   Would you agree with me if that is off,

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 168

1    then your cutting block is going to be in error?

2        A.    See, the cutting block is not just one.

3    You have the option of using a 0 or a 4 degree, just

4    like in a Zimmer you have the option of using a 3 or

5    a 7 degree.  And you pick the one that seems to work

6    the best for that patient.

7              And, yes, it is true that if the alignment

8    rod is inserted, depending on where it is inserted

9    on the surface of the tibia, you can change that

10   alignment by a couple of degrees.  I don't think you

11   can change it a whole lot.

12             But it is also true that you can then

13   adjust the cutting block to -- to have a couple

14   degrees of adjustment.  Even though it says 0 or 4,

15   it doesn't have to be 0 or 4.  Because when you put

16   the guide on that, you pin it.  And the position you

17   pin it in is the final position on that block.

18       Q.    Is it your testimony here today that it

19   was your intent to make a 90 degree cut across the

20   tibia; in other words, a 0 degree slope?

21       A.    That's correct.

22       Q.    Do you recall that?

23       A.    Yes.

24       Q.    Did you document that?

25       A.    I don't think I dictated that, but that's

Page 169

1   what I was doing in most knees that had good flexion

2   at that time.

3        Q.   Doesn't the Proform (sic) manufacturer's

4   material, doesn't it recommend a 4 degree posterior

5   slope for a number of reasons?

6        A.   It has -- I haven't read it recently.  But

7   I would imagine that it has the option of both using

8   0 and 4 degrees.

9        Q.   Well, it may provide the option.  But my

10  question, Doctor, is, doesn't the Profix material

11  recommend a 4 degree posterior slope as beneficial

12  for a number of reasons?

13       A.   I would have to look at it.

14       Q.   Okay.  Isn't one of those -- well, would

15  one of those reasons be that you can use a larger

16  femoral component by having a posterior slope?

17       A.   I -- no.

18       Q.   You don't believe so?  All right.

19       A.   You know, I mean, this is -- this is such

20  a limited way to look at a knee.  You know, the --

21       Q.   It may be, but I thought my question --

22  I'm trying to make it narrow.

23            By using a 4 degree cut and increasing the

24  posterior slope to 7 degrees, isn't one of the

25  benefits of that to the doctor, and the patient, is

Crisco v. United States of America
September 17, 2007                         Case No. 3:03-cv-0011-HRH

Page 170

1    to allow you to use a larger femoral component?

2         A.    No.

3         Q.    Okay.

4         A.    That is not the case.

5         Q.    All right.  The notching you did, was that

6    to use a large -- the notching you did in the femur,

7    was that to use a larger femoral component or a

8    smaller one?

9         A.    Smaller one.

10        Q.    Okay.  Do you recall telling me in your

11   deposition -- let me pass that.

12             You were present during Dr. Hall's

13   testimony?

14        A.    Today?

15        Q.    Yes.

16        A.    Yes.

17        Q.    And you heard that Dr. Hall thought that

18   if you had a 7 degree anterior slope, as opposed to

19   a posterior slope, you would be able to recognize

20   that when you trialed the knee after you put the

21   final components in?

22        A.    That's correct.

23        Q.    Do you agree with that?

24        A.    Yes.

25        Q.    The x-ray I had Dr. Hall look at...

Page 171

1            Could you identify that x-ray for us,

2   please?

3        A.   It is an x-ray, a lateral view of the

4   knee, from 10/12/2000.

5        Q.   Isn't that one of the lateral views that

6   you examined under testimony with the government's

7   lawyer?

8        A.   Yes.

9        Q.   Okay.

10        A.   Or you would have to check that, because

11   it's not the same size, so probably a little

12   difference.

13        Q.   Can you read the date?

14        A.   It's 10/12/2000.

15        Q.   Okay.  Do you see the lines that have been

16   drawn on that x-ray to show degree of slope?

17        A.   Yes, I see the lines.

18        Q.   Do you disagree that the tibial tray on

19   that knee, you disagree that it has 5 to 7 degrees

20   of anterior slope?

21        A.   You cannot tell slope on a short x-ray.

22        Q.   That x-ray, in your view, Doctor, is too

23   short to do an accurate slope measurement?

24        A.   Yes.  There are two ways of checking

25   alignment.  One is a full length x-ray, and the

Page 172

```
 1   second is a CT scan.  Those are the most accurate.
 2            These are limited views.  And, you know,
 3   you can -- you can actually put up all the x-rays,
 4   lateral views, and you'll measure a different slope
 5   on different x-rays.
 6            THE COURT:  Even though you're looking at
 7   the same --
 8            THE WITNESS:  Same knee.
 9            THE COURT:  -- knee?
10            THE WITNESS:  Yes, sir.
11   BY MR. KAPOLCHOK:
12       Q.   All right.  When Dr. Chansky suggested
13   that RSD was within the differential diagnosis, can
14   you tell me why you, as Mr. Crisco's primary
15   orthopedic doctor, did not order a bone scan?
16       A.   A bone scan would be positive eight months
17   after a knee replacement.  It will show higher
18   uptake.
19       Q.   All right.  So it's your opinion that the
20   bone scan, taken by Dr. Hall in October after your
21   knee replacement, would not be diagnostic of hot
22   spots on the knee for mechanical problems, or
23   diagnostic for RSD, because it's too close to the
24   original implants?  It's too close chronologically;
25   is that your testimony?
```

Crisco v. United States of America
September 17, 2007                           Case No. 3:03-cv-0011-HRH

Page 173

1       A.   A bone scan is a nonspecific test.  It

2   only shows increased uptake when there is some

3   inflammation.  Or one interesting thing is that the

4   bone scan, as was mentioned in that testimony, it

5   has -- it is not to do with white cells, it has to

6   do with bone cells.  I would want you to correct

7   that.  Because it has to do with bone turnover.

8            And when you do a bone scan, the third

9   phase of the bone scan shows bone uptake.  And

10  because we have done an operation and there is

11  increased turnover of bone cells, it's going to show

12  an increased uptake related to the operation.

13           And that turnover, because we say healing

14  of the total knee takes more than a year, that bone

15  scan or bone turnover remains high for at least a

16  year.  That's why the bone scan stays positive for a

17  year or a little longer.

18           And so, you know, if we do a test, we

19  should be able to draw conclusions from the test.

20  And, you know, if I order a test that is

21  nonspecific, it only confuses the issue more.

22           And so, you know, for RSD, the first thing

23  is to do a rehabilitation program.  The second step

24  would be to see if some injections or epidurals or

25  sympathetic blocks work.  And then, if all of that

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 174

1    is not working, then perhaps -- and if it's been

2    more than a year, then a bone scan would be

3    helpful.

4         Q.   So according to your testimony, Doctor, a

5    bone scan will not be helpful unless it's done after

6    one year, with respect to a knee replacement?

7         A.   Yes.  That is correct.

8         Q.   All right.  And what is the diagnostic

9    tool of choice for dealing with RSD, in your view,

10   Doctor?  For trying to determine whether there's

11   RSD.  Is it the bone scan?

12        A.   That can be one of the -- that can be one

13   of the tools, yes.  You know, unfortunately, that is

14   why RSD or what's called complex regional pain

15   syndrome now is a diagnosis of exclusion.  Because

16   if we had one test which you could do and prove that

17   this is what it is, everyone would be doing it.  It

18   wouldn't be such a big sort of diagnosis.  And the

19   other is called a diagnosis of exclusion.

20             So once you have ruled everything out, as

21   far as infection and loosening, that's when you call

22   it RSD.  And that's why I don't think we had labeled

23   him as an RSD at that point.  Even though we had an

24   opinion from Dr. Chansky, I don't think we had for

25   sure said this is what it is and it's nothing

Crisco v. United States of America
September 17, 2007                                Case No. 3:03-cv-0011-HRH

Page 175

 1    else.

 2         Q.    Have you read your expert's opinion in

 3    this case, Dr. Vigeland?

 4         A.    No.

 5         Q.    You have not looked at it?

 6         A.    No.

 7         Q.    Would you be surprised to learn that he's

 8    going to offer an opinion that Mr. Crisco either had

 9    RSD or an infection?

10         A.    I would not be surprised.

11         Q.    Do you think Mr. Crisco had an infection

12    while he was under your care?

13         A.    No.

14         Q.    Do you think he had an infection when he

15    was seen by Dr. Ross in October of 2001, just before

16    he saw Dr. Hall?

17         A.    No.  Although, I'll tell you that because

18    the implications of infection are so bad, we always

19    think of that as a possibility.  Do I think he had

20    it?  No.  But if you -- if you look at every note I

21    wrote, I will always write in there "persistent

22    pain; is it an infection," you know.

23         Q.    With regard -- I'm sorry.  Did I

24    interrupt?

25         A.    No, I'm fine.

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 176

1        Q.   Doctor, with regard to your record
2    keeping, let me ask you a few things.
3             Normally, in planting a Profix knee -- oh,
4    let me ask you.  Of that 40 or 50 that you did, were
5    those Profix components?
6        A.   Yes.
7        Q.   Normally, in a normal implant of Profix
8    components, since you came to Alaska and started
9    doing them on your own, would you normally end up
10   with a 7 degree posterior slope?
11       A.   No.
12       Q.   You would not?
13       A.   Vast majority of them I was cutting at 0
14   degrees or neutral.
15       Q.   Then you would end up with a 3 degree
16   posterior slope --
17       A.   Yes.
18       Q.   -- correct?  All right.
19            At a minimum?
20       A.   Yes.
21            Excuse me.  Can we take this one down?
22       Q.   Oh, sure.  Sorry.
23       A.   Because I'm hanging on to it because it
24   might fall.
25       Q.   Thank you.

Crisco v. United States of America
September 17, 2007                          Case No. 3:03-cv-0011-HRH

Page 177

```
 1        A.    Thank you.

 2        Q.    Doctor, do you have an opinion one way or

 3   the other, given what you know about Mr. Crisco, as

 4   to whether or not he had reflex sympathy dystrophy

 5   prior to surgery by Dr. Hall?  And you have three

 6   choices.  You don't have to have an opinion.

 7        A.    No, I -- I don't feel strongly one way or

 8   another.

 9        Q.    Okay.  I'm not sure what that means.  You

10   don't have an opinion?

11        A.    I do not have an opinion.

12        Q.    Okay.  Would you agree with me that your

13   operative report on Mr. Crisco does not document

14   that you trialed the final components?

15        A.    I did -- I think I mentioned a trial in

16   there.

17        Q.    I take it you have read your operative

18   report recently?

19        A.    I have read it recently, but I would

20   probably want to look at it if -- I believe that I

21   mentioned in there that I did a trial of the knee

22   components.

23        Q.    After the installation of the final

24   components?  After they were cemented in?

25        A.    After they were cemented in, that's not a
```

Page 178

```
 1   trial, that's the final knee.
 2        Q.   But you try it to see if everything glued
 3   together right, don't you?
 4        A.   Yes.  We test -- we test the final knee
 5   for stability and tracking.
 6        Q.   Now, tracking is a different problem than
 7   what we're talking about, isn't it?
 8        A.   Yes.
 9        Q.   Tracking is the patella going up and
10   down?
11        A.   Yes.  No, what I'm saying is -- now I
12   understand what you're asking.
13             When we say trial, we talk about trial
14   components, which are not the final components.
15   Once the final components are put in, we just check
16   the knee for stability and tracking and balance is
17   what we call it.  In other words, it's balanced
18   well, front to back and side to side.  And I don't
19   know if I have mentioned it in there.
20        Q.   Okay.  But you would agree with me that a
21   trial after the final components -- let me back up.
22             The trial components are discarded, the
23   final components are selected and cemented, and then
24   there is a trial of the knee as it is reformed or --
25        A.   Yes.
```

Page 179

 1      Q.   -- put together?

 2      A.   Yes.

 3      Q.   And that's the standard of care; you have

 4   to do that?

 5      A.   Yes.

 6           THE COURT:  I take it you don't usually

 7   call that last step a trial.

 8           THE WITNESS:  No, we don't call it a

 9   trial, because the final components are in.

10           THE COURT:  It's already done.

11           THE WITNESS:  And it's all done.  And

12   unless there is some circumstance where you just

13   can't bend it or it's blocked, I don't see that you

14   would take everything out.  If there was a problem,

15   yes, you might, you know, as in if it was severely

16   stiff or malformed or the alignment was changed,

17   then you might do something with it.

18           MR. KAPOLCHOK:  Thank you, Your Honor.

19   BY MR. KAPOLCHOK:

20      Q.   I think I'm confused now, because I -- in

21   talking to Dr. Hall and looking at his operative

22   report, he talks about a trial of the final

23   components.  Is that not what you write in?

24      A.   No.  A trial of the -- a trial of

25   components is always a trial of the different -- the

Page 180

```
 1   trial components are not the final components.  Once
 2   the final components are opened, you've completed
 3   the trial, you've made your adjustments, you've done
 4   the releases and the cuts, whatever needs to be
 5   adjusted, and you -- once you decide this is what
 6   you are going to put in, that's what is opened and
 7   that's what is put in.  You bought it.  That's what
 8   you accept.
 9        Q.   Okay.  Dr. Bhagia, for the first time,
10   since this case has been going on for years and
11   years and years, I hear now a discussion of the high
12   tibial osteotomy.
13             The x-rays you showed showed that
14   Mr. Crisco had some bone removed to help what, do
15   you remember what -- I know you didn't do it, but do
16   you remember what it was for?
17        A.   I can only tell you what a high tibial
18   osteotomy is done for, and I assume that would be
19   the reason to do it.  And that is to realign the leg
20   for arthritis when it is worn out more on one side
21   than the other.
22        Q.   Right.  To level it?
23        A.   To level it.
24        Q.   Do you know how much bone was taken out of
25   Mister -- did you review that operative report?
```

Page 181

1      A.    No.  I do not know how much bone was taken

2   out.

3      Q.    Are you now saying that that surgery that

4   Mr. Crisco had -- do you know when it was?

5      A.    I believe it was in the '80s.

6      Q.    In the '80s.

7            Are you now saying that that had some

8   bearing on whether or not Mr. Crisco's knee was put

9   in with anterior slope or posterior slope?

10     A.    No, that is not what I am saying.

11     Q.    Okay.

12     A.    What I am saying is that previous

13  operations, such as a high tibial osteotomy, have a

14  bearing on persistence of pain or the rate of

15  recovery after a knee replacement.

16     Q.    Okay.  When you diagnosed Mr. Crisco as an

17  appropriate candidate for a total knee replacement,

18  one of the reasons he was in there was because of

19  pain?

20     A.    Yes.

21     Q.    And was it your opinion at that time that

22  some of his pain was caused by the high tibial

23  osteotomy?

24     A.    No.

25     Q.    The court asked you a question in

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 182

1   reviewing some of those x-rays of where all the

2   height or separation goes between the femoral bone

3   piece and the tibia.  And most of that is cartilage,

4   isn't it?

5       A.   The space between the --

6       Q.   The space.

7       A.   -- the femur and the thighbone and the leg

8   bone --

9       Q.   Yeah.

10      A.   -- which is the femur and the tibia, is

11  cartilage.

12      Q.   Yeah.  And in Mr. Crisco's case, after

13  laying carpets and doing stuff for 40 years, it was

14  just worn out, wasn't it?

15      A.   Yeah.  The knee was worn out.  But I was

16  pointing out the height, actual level of the knee

17  joint.  You know, the level of the joint can go up

18  or down based on how much bone is removed.  Besides

19  the fact that the padding inside the knee can wear

20  out.

21      Q.   Wear out; okay.

22      A.   So...

23      Q.   Those are the -- you were comparing the

24  side-by-side x-rays?

25      A.   Yes.

Summit Court Reporting, LLC
907/264-6776

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

Page 183

1       Q.    Okay.  That's good.

2             That didn't make Mr. Crisco less of a

3       candidate to have his knee replaced, did it?  The

4       fact that he had had a high tibial osteotomy?

5       A.    No.

6       Q.    Despite that you think that a bone scan is

7       not -- and correct me if I'm overstating this or

8       misstating.

9             Despite that you think that a bone scan is

10      not properly diagnosed at -- diagnostic if it's not

11      later than a year after the implantation, did you

12      review the bone scan that Dr. Hall took and make a

13      judgment as to whether his findings were correct or

14      not?

15      A.    I have not seen that.  I have read reports

16      on that.

17      Q.    Okay.

18      A.    I've read the report.  And I'm not saying

19      it is wrong to do a bone scan.  It's just you have

20      to interpret it more carefully if it's early on,

21      because it may cause you to do things which may not

22      be appropriate.

23      Q.    There are many reasons to do a revision to

24      a knee, correct?

25      A.    Yes.  That is correct.

Page 184

```
 1        Q.    Many of them are not at all related to any
 2   failure to meet the standard of care; would you
 3   agree with that?
 4        A.    Yes, that is correct.
 5        Q.    Infection is one of them, correct?
 6        A.    Yes.
 7        Q.    Malpositioning is one of them, is a reason
 8   to do a revision?
 9        A.    It is a relatively rare indication.  The
10   top reasons are infection and loosening of the
11   implants.
12        Q.    And loosening of the components, that's
13   another one.
14              Would you agree with me, Doctor, that the
15   literature says that 11 percent of the revisions are
16   done because of malpositioning of components?
17        A.    Approximately --
18        Q.    Approximately 11 percent.
19        A.    -- that.
20        Q.    All right.  Would you further agree with
21   me, Doctor, that most of those revisions are done
22   within a year, for malpositioning of components,
23   most of those revisions, based on the literature, 11
24   percent are done -- not 11 percent of those, but 11
25   percent of the revisions done for malposition, most
```

September 17, 2007

Page 185

 1    of those, more than 50 percent of them, are done

 2    within a year?

 3        A.    Once again, I'm going to say yes, but

 4    this -- just like you pointed out, you know, is this

 5    a malposition of the slope or is it a malposition of

 6    the varus and valgus, which is the sideways rather

 7    than front to back angulation.  Because I think that

 8    if -- again, you know, you have to see if it's

 9    causing instability.  If it's causing limited range

10    of motion.

11            You know, the reasons to do a revision are

12    not what the picture shows, what the x-ray shows.

13    That is very important to distinguish here.  You

14    know, when you say that revisions are done for

15    malalignment or malposition, it's not that people

16    are looking at an x-ray and saying "oh, this needs a

17    revision," that is absolutely not the case.

18            So it is true that, you know, revisions

19    are done for malalignment, 10 percent or so.  And it

20    is -- it's almost exactly the number that I was

21    stating outside that ideal range, even when

22    experienced surgeons do that.  So it coincides very

23    well with the literature that, you know, the knees

24    are not aligned well about 10 percent of the times.

25    But those have to be associated with some symptoms

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

                                                                    Page 186

 1   or findings of instability, you know, a loose knee,

 2   that would -- that's what causes you to do -- redo a

 3   revision, not just a picture.

 4        Q.   What about the picture that Dr. Hall at

 5   least sees as being significantly having a wrong

 6   slope, then accompanied by pain; would that be a

 7   valid reason to do a revision?

 8        A.   That's where opinions come in.  That's

 9   where -- you know, when you train on different sets

10   of implants you can have different opinions.

11             MR. KAPOLCHOK:  Dr. Bhagia, thank you.

12             Thank you, Your Honor.

13                  REDIRECT EXAMINATION

14   BY MR. POMEROY:

15        Q.   I just have a couple questions to clarify

16   a couple of points that Mr. Kapolchok raised.

17             You testified that during your time when

18   you began at the VA in October 1998 to the time of

19   Mr. Crisco's surgery, you estimate you did about 40

20   to 50 total knee replacements.

21             Did you do any total knee replacements

22   either as the primary surgeon or as assisting when

23   you were in your residency in India, residency for

24   orthopedic surgery.

25        A.   No, I did not.

Page 187

1     Q.   Okay.  So how many total knee replacement

2  surgeries did you participate in, in one form or

3  another, during your residency at the medical

4  college in Georgia?

5     A.   Again, I can figure up probably a hundred.

6  Around a hundred.  It's a rough number.  Because,

7  you know, we just -- we do a tally at the end of the

8  residency, and you come out with certain hundred

9  numbers of joints.  And we just -- you know, the

10  first three years you are basically assisting, and

11  then you are doing it.  So I would say about a

12  hundred.

13     Q.   And...

14          MR. POMEROY:  Actually, those are the only

15  points I wanted to clarify.  Thank you.

16          THE COURT:  It's almost 4 o'clock.  Let's

17  call it a day at this point.

18          Thank you, Doctor --

19          THE WITNESS:  Thank you, sir.

20          THE COURT:  -- you may step down.

21          We'll resume at 9 o'clock tomorrow

22  morning.

23          And if you would not forget to give us a

24  rundown on exactly what x-ray exhibits we have

25  admitted.

Page 188

1            We're in recess until 9 o'clock tomorrow

2    morning.

3            THE CLERK:  All rise.

4            This matter is in recess until 9 a.m.

5    tomorrow.

6        (Proceedings recessed; Counter 3:56:00.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Crisco v. United States of America
September 17, 2007                                    Case No. 3:03-cv-0011-HRH

                                                                Page 189

  1                    TRANSCRIBER'S CERTIFICATE

  2

  3          I, KATHERINE L. NOVAK, RPR, Registered

  4    Professional Reporter, hereby certify that the

  5    foregoing transcript is a true, accurate, and

  6    complete transcript of proceedings in Case No.

  7    3:03-cv-0011-HRH, Crisco versus USA, transcribed by

  8    me from a copy of the audiotaped recording to the

  9    best of my ability.

 10          Further, that I am a disinterested person

 11    to said action.

 12

 13

                  _____
 14               Date

 15

 16

                  _____
 17               Katherine L. Novak, Transcriber

 18

 19

 20

 21

 22

 23

 24

 25