**GEORGE M. KAPOLCHOK**
**KAPOLCHOK LAW OFFICES, LLC**
**360 K Street, Suite 100**
**Anchorage, Alaska 99501**
**Phone: (907) 278-8850**
**Fax: (907) 278-8860**
**E-mail: lawoffices@kapolchok.com**

**Attorney for Plaintiffs**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHNNIE CRISCO and THE ESTATE OF ANNA CRISCO by HER PERSONAL REPRESENTATIVE, ROBIN BOOKER, ) ) ) ) ) | Case No. 3:03-cv-0011-HRH |
| Plaintiffs, ) ) | **PLAINTIFFS' FINAL ARGUMENT** |
| vs. ) ) | |
| UNITED STATES OF AMERICA, ) ) | |
| Defendant. ) ) | |

## Introduction

On January 10, 2001, Johnnie Crisco underwent a left, total knee replacement performed by orthopedic surgeon Umesh T. Bhagia who at the time was employed by the Veteran's Administration. Mr. Crisco brings a claim for improper

medical care, and his now deceased wife, Anna Crisco, joins with a derivative loss of consortium claim through her personal representative.

There appears to be no dispute as to the applicable law, and plaintiffs have presented a general discussion of Alaska medical negligence law in plaintiffs' proposed Findings of Fact and Conclusions of Law.

Plaintiffs have had prepared certified transcripts of all the physicians who testified in court, and these are attached hereto. References to this testimony will be made throughout this pleading as "Tr. (doctor's name) and page number." In addition to the transcripts of the testimony of Drs. Hall, Bhagia, Chansky, and Vigeland, the depositions of Drs. Schumacher and Ross are also in evidence. Thus, all medical testimony is in transcript form for confirmation.

The essence of this case falls into the general category established and used by the medical licensing boards, national data bank, and insurers associations as "improper performance." More specifically, this case contends a failure in surgical technique which resulted in the malposition of the tibial component such that the top or "tray" of the tibia was tilted forward (anterior slope) 5° - 7° as opposed to the recommended and natural rearward (posterior slope) of 7°. The liability portion of this case can logically be broken down as follows:

- Was the tibial component installed with a significant anterior slope.
- If so, did this malposition cause pain and instability.
- If so, was a revision to correct this malposition a reasonable course to take, and did this result in infection and ultimate amputation.

## Duty, Breach, and Causation

Plaintiffs' liability case rests primarily on the testimony of orthopedic surgeon, Dr. Robert J. Hall, although substantial support is garnered from the other physicians' testimony. This case is unusual in that Dr. Hall is one of Mr. Crisco's treating physicians as opposed to a retained expert. Early in the litigation, the defendant conceded that plaintiffs could meet their burden to prove negligence by expert medical testimony through the opinions of Dr. Hall. (See Docket No. 37.) Thus, Dr. Hall as a hybrid witness was permitted to testify as to the standard of care and not required to file a written report required by Rule 26(a)(2)(B).

**Dr. Robert Hall.** Because this is final "argument," plaintiffs' counsel is compelled to note, and it has most probably been the court's experience that treating physicians generally eschew all legal matters, and that it is often most difficult to get them to provide even the most mundane, factual testimony about their treatment. Dr. Hall should be applauded for his courage, and he obviously did not take any pleasure when offering the opinion that Dr. Bhagia's surgical implant was below the standard of care.[1]

Dr. Hall presented as an accomplished orthopedic surgeon, in private practice with six other specialists of Orthopedic Physicians of Anchorage. Dr. Hall specializes in joint replacement, has been board certified since 1997, licensed since 1995, and was educated and trained at some exemplary universities and hospitals.[2]

---

[1] Tr. Hall, p. 49.
[2] Tr. Hall, pp. 5 – 7.

Dr. Hall explained at trial that a person's normal anatomy presents an architecture where the top of the tibia is not perpendicular to the long axis of the shaft of the tibia bone, but in fact has a natural posterior slope. He explained that this posterior slope works in conjunction with the end of the femur which is not a half circle but "oblong shaped," and if the top of the tibia is not tilted rearward, the femur has trouble coming around when the knee is flexed.[3]

As a consequence, Dr. Hall, who uses the Zimmer knee replacement, installs the knee with a 7% posterior slope.[4] It will later be shown that Dr. Ross and Dr. Vigeland and now Dr. Bhagia use the Zimmer knee and install it with 7° posterior slope.

When Johnnie Crisco despaired after nine months of enduring a painful knee and falling down, especially on stairs, he sought out the care of Dr. Hall in October of 2001. It is suggested that Dr. Hall's testimony and his medical records surrounding his diagnosis show that he was cautious, careful and thorough.

- Dr. Hall took a history from Mr. Cisco, and did a physical examination.
- The doctor reviewed the VA medical records and x-rays.
- From the x-rays, he noticed a mechanical malpositioning of the knee.
- The doctor reviewed VA lab studies which were negative for infection.

---

[3] Tr. Hall, pp. 11 – 13.
[4] Tr. Hall, p. 14.

- Dr. Hall included loosening, infection and RSD in his differential diagnosis.
- He ordered a bone scan and personally interpreted it.
- He ordered additional x-rays.[5]

It should be noted that no defense medical doctor criticized Dr. Hall or his decision to offer Mr. Crisco a revision to correct the pain and mechanical problems he was having.

Plaintiffs introduced a VA x-ray, Ex. 6(3A). Dr. Hall reviewed this with the court to show how that lateral view of the knee shows the malposition of the tibial components. Lines were drawn on the x-ray using the most conservative measurements, and demonstrated a 5° - 7° anterior slope.

Dr. Hall meticulously ruled out infection. He cited to the VA lab studies that were negative. His physical exam of Mr. Crisco showed no signs of infection.[6] Later, Dr. Hall would double check and reconfirm his diagnosis ruling out infection. The pre-operative clearance by an internal medicine doctor, Dr. Makin, who did a full workup of blood panels, sedimentation rate, etc., were all normal.[7]

Finally, by use of a confirmatory retrospective analysis, Dr. Hall, during the revision surgery, took fluid samples and tissue samples and sent them to pathology.[8] Again, they were negative for infection.

---

[5] Tr. Hall, pp. 15 – 20, 24; Ex. 2, CRI 5002 - 5005.
[6] Tr. Hall, pp. 28, 29.
[7] Tr. Hall, p. 38; Ex. 7, 12840.
[8] Tr. Hall, pp. 40, 41.

Dr. Hall also explained to the court why he ordered a bone scan, what it is, and what it shows. Dr. Hall always reads the bone scans himself, and this was no exception. Dr. Hall testified that a bone scan is one of the best tests to help rule out RSD. In Johnnie's test, there were no <u>diffuse</u> signs of "uptake of tracer" affecting the white blood cells. In fact, the bone scan did show overload or stresses in the areas where the components were malpositioned. Combining this with the new x-rays, which showed the femur not touching the plastic liner and the knee not being able to achieve full extension but "levering out," Dr. Hall's conclusion was that the pain was coming from the malposition of the tibial base plate, and that the retention (leaving in) of the posterior ligament compounded the problem.[9]

Unfortunately, the risks of infection for revision of a total knee replacement are twice as great. This was explained by Dr. Hall. Mr. Crisco wished to proceed.[10]

In his operative chart note and from the new preoperative x-rays, Dr. Hall confirmed that the tibial component of the knee had a 7% anterior slope.[11] Dr. Hall also opined that if a trial or test of the components had been done, one should be able to see that the slope is 14° off.[12]

Dr. Hall, based on his experience and training, his thorough workup, bone scan, x-rays, lab studies, and examination, concluded that the surgery was appropriate to

---

[9] Tr. Hall, pp. 29 – 35, and 97, 98.
[10] Tr. Hall, p. 43.
[11] Tr. Hall, pp. 44, 45; Ex. 7, 12844.
[12] Tr. Hall, p. 48.

correct the malposition, that Mr. Crisco's knee was not infected, that Mr. Crisco did not present with RSD, and that the malpositioned knee was below the standard of care.[13]

Initially, Johnnie Crisco was doing well. He was able to walk and was discharged in a short period of time. Post surgical x-rays confirmed that the malposition was corrected and things looked good.[14] The remainder of Dr. Hall's testimony dealt with the roller coaster battle with infection, the multiple surgical procedures, and the eventual amputation. This will be covered in the damage portion of plaintiffs' final argument.

**Dr. Gregory Schumacher**. Dr. Schumacher's deposition was submitted to the court as Exhibit D-2. His chart note is Exhibit D-1. Plaintiffs reviewed this chart note with Dr. Hall who found this young doctor's findings fully consistent with his own.[15] It is uncertain whether Dr. Schumacher reviewed the x-rays (D-2, p. 12).

Dr. Schumacher's note (D-1) confirms Dr. Hall's findings:

- Chief complaint knee pain with weight bearing. (Mr. Crisco testified the more he used it, the worse it got. Physical therapy caused increased pain.)

- No significant back pain.

- No radicular pain (i.e. from spinal nerve).

- No hip pain.

- No fever or chills (i.e. infection).

---

[13] Tr. Hall, pp. 48, 49; Ex. 1.
[14] Tr. Hall, pp. 51, 52; Ex. 7, 12846.
[15] Tr. Hall, p. 82.

- Dr. Schumacher did lab study to check for infection. This was negative.
- Dr. Schumacher's conclusion – painful knee, no infection.

Dr. Schumacher, who saw Mr. Crisco four months post Bhagia surgery, does not support defendant's contention of RSD or infection.

**Dr. Peter Ross**. The deposition of Dr. Ross was submitted as Exhibit D-36. Like Dr. Schumacher, Dr. Ross had recently completed his residency in 1999 (D-36 at 4). On October 2 of 2001, Dr. Ross was also seeing Mr. Crisco for a wrist fracture resulting from a fall (D-36 at 8). Dr. Ross did not offer a diagnosis, but considered the possibility of RSD (D-36 at 12). Dr. Ross does not recall what x-rays he reviewed (D-36 at 19). Using the Zimmer component, Dr. Ross follows the manufacturer's guidelines and uses 5° - 7° of posterior slope and never an anterior slope (D-36 at 23).

**Dr. Howard Chansky**. Mr. Crisco went to Seattle on August 27, 2001, and was seen by Dr. Chansky.[16] According to Mr. Crisco and confirmed by Dr. Chansky's notes (Ex. D-5), no records were available. Dr. Chansky concluded that infection was unlikely.[17] However, the doctor had the impression that RSD was a possibility.[18] Interestingly, Chansky noted a lack of extension which is consistent with Dr. Hall's and Dr. Vigeland's response to the effects of anterior slope.[19] Again, Dr. Chansky highly doubts infection.[20]

---

[16] Tr. Chansky, p. 7.
[17] Tr. Chansky, p. 9.
[18] Tr. Chansky, p. 10.
[19] Tr. Vigeland, p. 58; Ex. 2, CRI 5005.
[20] Tr. Chansky, p. 18.

**Dr. Umesh Bhagia**.   This case is not about Dr. Bhagia being a bad person or a bad doctor. His fortitude in studying medicine in India and then the United States, to finally become a licensed physician, is impressive. His recent one-year fellowship in orthopedics also bespeaks a man intent on learning his craft. One can criticize the defendant for remembering this knee replacement in too much detail. For example, he recalls not using the Profix cutting jig for 4° posterior slope, but is sure he used a 0° cut. Yet, it is not in the operative notes.[21] Similarly, the operative note does not reflect a test or trial after the final components were cemented (Ex. D, p. 104). Dr. Bhagia felt compelled to be his own advocate. The x-ray of 10/12/00, Ex. 6(3A), even though accepted by Dr. Hall and Dr. Vigeland as a true lateral showing anterior slope, did not in Dr. Bhagia's opinion show enough of the tibia.[22] Bone scans were not useful tests until one year after surgery[23], even though Dr. Vigeland stated three months was the measure. Dr. Bhagia refused to acknowledge that malposition with anterior slope could cause pain. For some reason, Dr. Bhagia (like Dr. Vigeland) never looked at the bone scan that Dr. Hall interpreted and relied on.[24] He admitted that the 40 or 50 knee replacements he had done prior to Crisco had "at least" a 3° posterior slope.[25] Plaintiffs suggest that at the time Dr. Bhagia implanted Mr. Crisco's knee, Dr. Bhagia had limited training and experience, was unlicensed, and not Board Certified, and he simply made an error of surgical technique which he did not catch, and fell below the standard of care.

---

[21] Tr. Bhagia, p. 168; Ex. D-3, p. 104.
[22] Tr. Bhagia, p. 171.
[23] Tr. Bhagia, pp. 173, 174.
[24] Tr. Bhagia, p. 183.
[25] Tr. Bhagia, p. 176.

**Dr. Theodore Vigeland**. There were interesting moments during Dr. Vigeland's testimony. He had not reviewed his expert report, did not have a copy of it, and had no recall of what he had opined.[26] Some bias could be argued based upon his doing surgery two days (now one) per week at the VA hospital.[27] He, like Dr. Hall, had never used a Profex knee system for a primary install, uses the Zimmer, and always with a 7° posterior slope.[28]

Dr. Vigeland is not sure he has in 30 plus years ever seen RSD related to a total knee replacement.[29]

Dr. Vigeland opined that anterior slope is "not a significant factor in post operative pain,"[30] but admitted that the goal is not to have anterior slope, and thus there is no literature on the subject.[31] At first, Dr. Vigeland testified that a bone scan should be valid three months post implant,[32] but then waffled on this.

Dr. Vigeland admitted that a 7° anterior slope would lead to a failing grade of himself and his students.[33]

Most importantly, Dr. Vigeland admitted that after his review of all the x-rays, he conceded that he determined Mr. Crisco's Bhagia-installed knee to have 2°- 7° anterior slope.[34]

---

[26] Tr. Vigeland, p. 53.
[27] Tr. Vigeland, p. 50.
[28] Tr. Vigeland, pp. 45, 47.
[29] Tr. Vigeland, p. 32.
[30] Tr. Vigeland, p. 30.
[31] Tr. Vigeland, p. 42.
[32] Tr. Vigeland, p. 37.
[33] Tr. Vigeland, p. 49.
[34] Tr. Vigeland, p. 53.

Dr. Vigeland also admitted that Ex. 6 (3A), the lateral film was a good film to determine the slope of the tibial component.[35]

Perhaps most importantly, Dr. Vigeland agreed with Dr. Hall that anterior slope would cause flexion instability and create problems such as "going down stairs."[36] Rather incredibly, Dr. Vigeland did not examine the bone scan films that Dr. Hall used to help rule out infection, RSD, and helped confirm malposition stress.[37] Dr. Vigeland does agree, however, that the "hot spots" or uptake on the bone scan can very well be abnormal stress transferred to the bones.[38] He qualified this with, "it depends how active one is."[39]

**Conclusion**. A fair weighing of all of the medical testimony should lead the court to conclude:

- The 5° - 7° anterior slope was below the standard of care, and negligent.

- Mr. Crisco did not have an infection until after the revision.

- Mr. Crisco did not have RSD.

- The revision for malposition which was causing disabling pain and flexion instability resulting in falling was a reasonable medical approach.

---

[35] Tr. Vigeland, p. 55.
[36] Tr. Vigeland, p. 58.
[37] Tr. Vigeland, p. 59.
[38] Tr. Vigeland, p. 61.
[39] Tr. Vigeland, p. 62.

**Damages**

Plaintiffs seek solely non-economic damages for Johnnie Crisco, both past and future, and loss of consortium damages for Anna Crisco from January 2001 to November of 2004. Virtually all of Mr. Crisco's medical expenses were paid by the government, either VA or Medicare. Although he was working at the Chugiak Senior Center and Carr's right up to the surgery, his income offset his social security benefits, and a loss of earnings or earning potential seemed illogical.

In support of his non-economic losses, plaintiffs presented the testimony of Mr. Crisco, Anna Crisco by deposition, Robin Booker, and Arthur Bowen.

The law in Alaska recognizes pain, suffering, loss of quality or enjoyment of life, disfigurement, physical impairment, and inconvenience as compensable items. Plaintiffs assume that the disfigurement and severe physical impairment resulting from an above the knee amputation will not be challenged by the government. In 1997, the Tort Reform Act, AS 09.17.010, was repealed and reenacted. The term, "severe physical impairment," is now defined as a physical condition that substantially and permanently limits one or more of a person's major life activities. These include caring for one's self, performing manual tasks, and walking. It is plaintiffs' position that the statutory cap of $400,000.00 applicable at the time, does not apply, and the secondary cap of $1,000,000.00 is applicable.

Loss of consortium has been defined as the fair value of the loss of society, comfort, care, protection, affection, and companionship that results from the closeness and harmony between spouses.

**Dr. Robert Hall**.  Dr. Hall perhaps somewhat clinically, but also with obvious disappointment and compassion for his patient, detailed the ups and downs of Mr. Crisco's fight with infection following his revision in November of 2001.  Dr. Hall brought in an infectious disease specialist, Dr. Buntzen, to deal with the onset of the staph aureus.[40]  Dr. Hall just performed surgery to wash out the knee and exchange the plastic liner.[41]

In November, Dr. Hall removed the knee components, and installed a block of cement with antibiotic inserts.[42]  The infection was eradicated, and a new knee was installed in January 2002.[43]  The infection returned, and another debridement and liner exchange were necessary.[44]  Mr. Crisco was hospitalized February into March, and a Groshong catheter was installed.[45]  Mr. Crisco battled infection the next 18 months, and amputation was discussed in December of 2003.[46]  The left leg was amputated above the knee on February 25th of 2004.[47]

In September of 2004, Mr. Crisco was rear ended while in an automobile.  The stub of his leg impacted the dash of his vehicle, and required another surgical revision.[48]

---

[40] Tr. Hall, p. 56.
[41] Tr. Hall, p. 58.
[42] Tr. Hall, p. 60.
[43] Tr. Hall, p. 62; Ex. 7, 12861.
[44] Tr. Hall, p. 68.
[45] Tr. Hall, p. 71.
[46] Tr. Hall, p. 78.
[47] Tr. Hall, p. 79.
[48] Tr. Hall, p. 80; Ex. 7, 12995.

**Johnnie Crisco**.   At the risk of dating one's self, Mr. Crisco is a lot like John Cameron Swaze's Timex watch.  From his early injury with the Coast Guard, Mr. Crisco has continually worked hard physical jobs for over forty years to support his wife, and raise his daughter.  As his "golden years" approached, his independence and ability to help his wife, actively interact with his grandchildren, pursue his passions of cooking and fishing were essentially gone.  His daughter, Robin Booker, explained how he is now dependent, little help around the household, cannot be relied on to baby sit, and, in short, very, very restricted.  Were it not for his daughter and son-in-law, Mr. Crisco could not live on his own.

Admittedly, a friend, Arthur Bowen, described the level of activity Mr. Crisco maintained before the January 2001 knee surgery.  Mr. Bowen also told us of the effect Johnnie's battles with infection and eventual amputation had on Mrs. Anna Crisco, and described the worry and stress he observed.  Unfortunately, the only presentation of Mrs. Crisco was through a discovery deposition, and the enormous emotional impact of losing her by Mr. Crisco and Robin Booker.

### Conclusion

There is no formula to calculate the "non economic" value of the stormy course Mr. Crisco has had to endure since January 2001.  The then wiry, active independent 62-year-old gentleman is still on this planet, and is now approaching 70.  The undersigned would not presume to suggest any specific number to this court.  It would seem that any award of less than $500,000.00 in the aggregate would not be just.

DATED this  28th  day of September, 2007, in Anchorage, Alaska.

KAPOLCHOK LAW OFFICES, LLC


/s/ George M. Kapolchok
George M. Kapolchok
360 K Street, Suite 100
Anchorage, AK 99501
Phone: (907) 278-8850
Fax:  (907) 278-8860
lawoffices@kapolchok.com
Alaska Bar No. 7510071
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of September 2007, a true and correct copy of the foregoing document was served electronically upon:

Richard L. Pomeroy
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West 7th Avenue, #9, Room 253
Anchorage, AK  99513-7567


/s/ Paula Beneke
Kapolchok Law Offices, LLC