IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

JOHNNIE CRISCO and THE ESTATE )
OF ANNA CRISCO, by her Personal )
Representative, ROBIN BOOKER, )
                              )
         Plaintiffs,          )
                              )
    vs.                       )
                              )
UNITED STATES OF AMERICA,     )
                              )   No. 3:03-CV-0011-HRH
         Defendant.           )
_____)

FINDINGS OF FACT
AND CONCLUSIONS OF LAW

I. Proceedings

Plaintiffs Johnnie Crisco and Robin Booker, as the representative of the Estate of Anna Crisco, sue the United States for damages in connection with a medical procedure performed by a United States Veterans' Administration doctor. Jurisdiction is pursuant to 28 U.S.C. §§ 1346(b) and 2401 and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80.

Plaintiffs' amended complaint[1] states a cause of action against the defendant United States of America for medical

---

[1]Docket No. 29.

malpractice. More specifically, plaintiff Johnny Crisco contends that on January 10, 2001, Dr. Umesht Bhagia, a Veterans Administration physician, negligently performed a total arthroplasty of plaintiff's left knee. Plaintiff claims that as a result of Dr. Bhagia's medical negligence, he has endured and will continue to suffer extreme pain and disability. Anna Crisco, Johnny Crisco's spouse of many years, now deceased and represented by her personal representative (Robin Booker), claims a loss of consortium, etc.

Defendant's answer to plaintiffs' amended complaint admits plaintiffs' jurisdictional allegations and denies plaintiffs' allegations of negligence. By way of affirmative defenses, defendant contends that it violated no actionable duty to the plaintiffs, that any injuries or damages suffered by plaintiffs were not proximately caused by the negligent acts of an employee of the United States, and that any recovery should be proportionately reduced by reference to the degree of comparative negligence between the parties.

The case was tried to the court sitting without a jury. Trial began on Monday, September 17, 2007, and ended on Tuesday, September 18, 2007. The court called for and reviewed simultaneous written final argument and proposed findings of fact and conclusions of law. Transcripts of all the medical testimony were made available. This decision will serve as the court's final findings of fact and conclusions of law on the issues of negligence, causation, and damages.

## II. Legal Issues

No legal issues appear to be in dispute, but a general discussion of the law applicable to cases involving claims of improper health care is necessary.

1. The court concludes that it has jurisdiction of plaintiffs' claims based upon 28 U.S.C. §§ 1346(b), 2401, and 2671-80.

2. Pursuant to 28 U.S.C. § 2674, the court looks to Alaska law applicable to private individuals for purposes of resolving the plaintiffs' malpractice claim against the United States.

3. In order to establish a claim of negligence under Alaska law, a plaintiff must prove the following elements by a preponderance of the evidence: (1) duty, (2) breach of duty, (3) causation, and (4) damages. Parks Hiway Enter., LLC v. CEM Leasing, Inc., 995 P.2d 657, 667 (Alaska 2000). In health professional malpractice cases, the duty and the standards for determining a breach of duty are set by statute, AS 09.55.540, which provides:

> (a) In a malpractice action based on the negligence or wilful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence
>
> (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;
>
> (2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

>      (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
>
>      (b) In malpractice actions there is no presumption of negligence on the part of the defendant.

     4.   The Alaska Supreme Court has concluded that except where negligence would be obvious to a layperson, expert testimony is required to evaluate a practitioner's performance. See Parker v. Tomera, 89 P.3d 761, 766 (Alaska 2004), and Trombley v. Starr-Wood Cardiac Group, PC, 3 P.3d 916, 919 (Alaska 2000).  Plaintiffs' claim is based upon the surgical implantation of a total knee replacement.  This procedure is not a matter within the common experience of lay people; therefore, we must depend upon medical expert testimony to answer the questions posed by this case.

     5.   Proximate cause, the third element of an Alaska malpractice claim, is also referred to as "legal cause."  Vincent ex rel. Staton v. Fairbanks Memorial Hosp., 862 P.2d 847, 851 n.7 (Alaska 1993).  "[L]egal cause encompasses two concepts."  Howarth v. State, Public Defender Agency, 925 P.2d 1330, 1333 (Alaska 1996).  "The first is actual causation, or 'but for' cause: 'The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event if the event would have occurred without it.'"  Id. (quoting Vincent, 862 P.2d at 851).  "The second element of legal cause is founded in legal policy.  It

asks 'whether the conduct has been so significant and important a cause that the defendant should be legally responsible.'"  Id.

    6.   The two-prong test that Alaska uses for legal causation in all negligence cases, including medical malpractice cases, is reflected in the Alaska pattern jury instruction for "legal cause":

> A legal cause of harm is an act or failure to act which is a substantial factor in bringing about the harm.  An act or failure to act is a substantial factor in bringing about harm if it is more likely true than not true that:
>
>    (1) the act or failure to act was so important in bringing about the harm that a reasonable person would regard it as a cause and attach responsibility to it; and
>
>    (2) the harm would not have occurred but for the act or failure to act.

Alaska Civil Pattern Jury Instruction 03.06.

### III. Findings of Fact

#### A. Chronology and Stipulated Facts

The court adopts the parties' stipulated facts as follows:

    1.   Plaintiff Johnnie Crisco was born in Rockingham, North Carolina, on August 14, 1938.  His formal education ended after he completed the seventh grade.  He enlisted in the Coast Guard in 1958 and was honorably discharged in 1960.  He and Anna married in 1959. They moved to Alaska in 1996. He worked a variety of jobs over the years, his last being a bagger at Safeway in 2000.

    2.   Mr. Crisco has an extensive medical history.  In 1973, he was involved in an elevator accident in which both knees were injured.  He had left and right knee arthroscopies in 1978 to remove cartilage.

3. He was injured in a motor vehicle accident on March 20, 1983. In May 1983 he was diagnosed with osteoarthritis of both knees, the right being worse than the left. He was hospitalized on July 7, 1983, with severe bilateral post-traumatic degenerative arthritis of his knees and abdominal pain. Mr. Crisco rejected the option to have his right knee joint fused. On November 2, 1984, he received a right total knee replacement at the Veteran's Administration Medical Center in Durham, North Carolina. He later had a revision of this knee replacement performed.

4. On October 14, 1986, Mr. Crisco had a high tibial valgus osteotomy on his left leg to alleviate pain. He reported to his doctor continued pain in the knee on January 28, 1987.

5. Mr. Crisco had his gallbladder removed in 1996. He had back surgery in February and March of 1998. He had shoulder surgery in 1999.

6. On November 9, 2000, Mr. Crisco informed VA physician assistant Ben Hull that he wanted to proceed with a replacement of his left knee after the first of the year. He was scheduled for surgery in January 2001.

7. On January 9, 2001, Mr. Crisco was informed by Dr. Bhagia of the risks of surgery, including the risk of infection, implant failure, and the need for further surgery. X-rays showed advanced degenerative joint disease in the left knee, with total loss of medial joint space and osteophyte formation. His left knee range of motion was 5° to 120°.

8. The total left knee replacement surgery was performed on January 10, 2001, at the DOD/VA joint venture hospital at Elmendorf Air Force Base, Alaska. Mr. Crisco complained of significant pain after the surgery. He was given IV morphine. On January 13, 2001, he reported that his knee was feeling good and he was ambulating with crutches. He was discharged that day.

9. Mr. Crisco returned to the VA on January 22, 2001, complaining of pain. His range of motion was 15° to 75°. He reported falling down some stairs on January 28, 2001; findings were negative. By February 13, his range of motion had improved to 10° to 110°. The incision at the staple removal site had become infected and Mr. Crisco was prescribed antibiotics. A suture that was sticking out of the incision site was removed on February 20. Mr. Crisco reported falling on the ice on February 28, but did not recall whether he fell on his left leg. Mr. Crisco continued to complain of knee pain. An examination on April 12, 2001, revealed no effusion of the left knee, a range of motion of 5° to 100°, the incision site was well healed, the joint was stable, and the patella and joint line anteriorly seemed tender.

10. On April 16, 2001, Mr. Crisco requested a second opinion. He saw Dr. Gregory Schumacher, an orthopedic surgeon at Elmendorf AFB on May 8, 2001.

11. Mr. Crisco complained of continued pain on June 11, 2001. His range of motion was 0° to 115° and X-rays showed no evidence of loosening and good patellar tracking. He was prescribed Percocet and advised to follow up in three months. Again on July 19, 2001,

Mr. Crisco complained of constant pain and swelling. His range of motion was 5° to 90° and significant quadricep atrophy was noted. Mr. Crisco again requested a second opinion.

12. Mr. Crisco went to the VA Medical Center in Seattle for another opinion. He was seen by Dr. Howard Chansky on August 27, 2001.

13. Mr. Crisco requested revision surgery on September 17, 2001. He wanted a prosthesis similar to the one in his right knee. Dr. Bhagia requested a pain clinic consult.

14. On October 2, 2001, Mr. Crisco was referred to Dr. Peter Ross, an orthopedic surgeon at Elmendorf, for another opinion.

15. On October 5, 2001, Mr. Crisco went to Dr. Robert Hall, an orthopedic surgeon in Anchorage in private practice. Dr. Hall had a bone scan and X-rays taken. He told Mr. Crisco that the tibial plateau appeared to have been placed in anterior slope rather than posterior slope, producing abnormal body mechanics which most likely was contributing to his pain.

16. A revision to the left knee was performed on November 7, 2001, by Dr. Hall at Providence Hospital. Mr. Crisco was discharged on November 11.

17. Mr. Crisco returned to the hospital on November 15, complaining of pain in his left knee. He was readmitted for pain control and diagnosed with a S. aureus infection that was resistant to penicillin. Dr. Bundtzen treated Mr. Crisco for this infection. He prescribed an 8-week IV antibiotic treatment. Mr. Crisco was

transferred from Providence Hospital to the Transitional Care Unit at Alaska Regional Hospital on November 22, 2001.

18.  Because of the persistent infection around the knee and Mr. Crisco's pain, Dr. Hall removed the left knee prosthesis on December 8, 2001, and replaced it with a spacer containing antibiotics.  Mr. Crisco was placed in a knee immobilizer.  He still reported pain.  By December 13, Mr. Crisco's white blood cell count and C-reactive protein levels were decreasing, indicating that the infection was decreasing.  His leg was put in a cast on December 18.  Dr. Brundtzen also noted on that day that the pain medication requirements were decreased.  Mr. Crisco was discharged on December 18.

19.  A left knee prosthesis was reimplanted by Dr. Hall on January 25, 2002, at Providence Hospital.  Mr. Crisco was discharged on January 30.

20.  Mr. Crisco was readmitted to Providence on February 19, 2002, complaining of knee pain and purulent drainage from his knee.  Cultures grew S. aureus.  IV antibiotics were administered for the infection.  He was discharged on March 5, 2002.  IV antibiotics were discontinued in April.

21.  Through 2002 and 2003, Mr. Crisco continued to have problems with infection and with pain in his left knee.

22.  Mr. Crisco's left leg was amputated above the knee on February 25, 2004.

23.  On June 8, 2004, Mr. Crisco was involved in an automobile accident in which he injured his left leg.  A lawsuit was filed in

state court that was settled on October 28, 2004. Mr. Crisco received $58,562.33.

24. In early November, 2004, Anna Crisco died. Her daughter, Robin Booker, has been substituted as the administrator of her estate.

25. Mr. Crisco was diagnosed with lung cancer in 2006. He had surgery to remove part of his lung.

26. Mr. Crisco is not making a claim for any economic damages.

B. Court Findings of Fact

1. Plaintiffs allege and defendant admits that all required administrative proceedings were pursued to a denial of plaintiffs' claims by the Veterans Administration, and suit was timely brought by plaintiffs pursuant to 28 U.S.C. § 2675.

2. The Veterans Administration (sometimes referred to in these proceedings as the "VA health care system" or the "Department of Veterans Affairs") is an agency of the United States Government.

3. At all times relevant hereto, Dr. Umesht Bhagia was an employee of the Veterans Administration, acting within the course and scope of his employment.

4. Robin Booker is the duly appointed personal representative of Anna Crisco, deceased, and is the representative of the Estate of Anna Crisco.

5.  Following Dr. Bhagia's treatment of plaintiff,[2] Dr. Robert J. Hall, a private physician and orthopedic surgeon, became plaintiff's treating physician.

6.  Without objection from defendant, Dr. Hall testified as plaintiff's treating physician as well as a plaintiff's expert. The court finds that Dr. Hall is duly licensed and has a specialty in orthopedic surgery, including joint replacement. By education and experience, he is qualified to offer expert medical opinions with respect to plaintiff's left knee replacement by Dr. Bhagia, <u>et sequelae</u>.

7.  Dr. Theodore Vigeland served as defendant's medical expert. The court finds that Dr. Vigeland is duly licensed and has a specialty in orthopedic surgery, including joint replacement. By education and experience, he is qualified to offer expert medical opinions with respect to plaintiff's left knee replacement by Dr. Bhagia, <u>et sequelae</u>.

8.  There is no significant disagreement between the medical experts as regards the degree of knowledge or skill required of an orthopedic surgeon who undertakes a knee arthroplasty. Synthesizing the testimony of both experts, the court finds that a "Profix" artificial knee should be installed so that the top of the metal tibial component (the tibial tray) has no more than a 3° anterior slope up to a 4° posterior slope, such that upon

---

[2] Hereinafter, the court refers to Johnny Crisco as "plaintiff". The claims of the Estate of Anna Crisco by her personal representative will be separately addressed in the court's conclusions of law.

installation of the plastic liner that separates the metal tibial and femoral components and which has a built-in 3° posterior slope, the net slope of the whole replacement knee will be between 0° and 7° posterior.

    a.   Dr. Bhagia retained plaintiff's posterior cruciate ligament and did not resurface plaintiff's patella in performing the left knee replacement. Neither retention of the posterior cruciate ligament nor not resurfacing the patella are outside the standard of care.

    b.   When the posterior cruciate ligament is not removed during an arthroplasty, a net, neutral or 0° slope of the tibial tray plus plastic liner is not inappropriate.

    c.   Dr. Bhagia did not fail to "trial" (that is, articulate plaintiff's left knee with new components in place) before cementing the permanent components in place and otherwise completing the surgery. Dr. Bhagia's trial of the new components indicated a satisfactory result: no evidence of "lift-off" (that is, pinching of the plastic liner between the tibial and femoral components), no unacceptable tightness, nor a lack of flexibility or stability in the new knee.

    9.   In performing plaintiff's arthroplasty, Dr. Bhagia employed the tools (a rod and cutting block) provided by Profix. The rod is employed to position a cutting block, which is the device that guides the surgeon in removing the top of the tibia. The rod is inserted in a hole drilled in the top of the tibia before it is cut, the hole serving as a guide for the rod as well

as being the receptacle for the shaft of the metal tibial component of the artificial knee. Drilling the hole for the rod is critical to the cut of the top of the tibia, which in turn determines the slope of the tibial tray. The surgeon must simply rely upon his skill in aligning the hole to the axis of the tibia. While this procedure strikes the court as primitive, this procedure is beyond any question within the standard of care. In performing plaintiff's arthroplasty, Dr. Bhagia sought to employ the Profix tools in such a fashion as to achieve a cut of the top of plaintiff's tibia that would be neutral, that is, neither an anterior nor a posterior slope. In light of the fact that the plastic liner mentioned above has a built-in 3° posterior slope, Dr. Bhagia's goal was to achieve a net posterior slope of 3°. It is extremely difficult to drill a hole at a particular, desired angle without some kind of guide. Perfection is not required by the standard of care for knee arthroplasties. A result consistent with the standard of care (0° to 7° posterior slope of the whole knee) requires skill.

10. As regards the question of the slope of the tibial tray of plaintiff's artificial knee, post-Bhagia surgery, the evidence is in conflict. Dr. Hall believes that the top of the tibial tray of plaintiff's artificial knee had an anterior slope of 5°, which, in light of the 3° posterior slope of the plastic liner, would give a net anterior slope of 2° with respect to the entire artificial knee. Dr. Vigeland has reported or testified to various measurements. Dr. Vigeland's report says that the slope of the

tibial tray is anterior, between 2° and 7°.  At his deposition, he testified to 5° or 6° anterior slope.  At trial, Dr. Vigeland testified that from some X-rays there appears to be a 3° or 5° anterior slope, and from yet another there appears to be no slope (which is what Dr. Bhagia was aiming for).

    11.  The X-ray admitted as plaintiff's Exhibit 6-3A, a lateral view of plaintiff's left knee, post-Bhagia surgery, has received the most attention by the experts and the court.  It is the best available "picture" of plaintiff's left knee, post-Bhagia arthroplasty and pre-Hall revision.  Someone (who was not identified) has drawn pencil lines on this exhibit which purport to reflect the axis of plaintiff's tibia, purport to show a line at 90° to that axis, and purport to show the angle between the 90° line and the actual slope of the top of the tibial tray of plaintiff's artificial knee.  There are significant problems with the pencil lines on this exhibit.

    a.  Based upon Dr. Vigeland's testimony, which the court finds persuasive, the axis line drawn on Exhibit 6-3A, that does not extend from plaintiff's knee to his ankle, is not reliable.  To have reliably drawn that axis line, a knee-to-leg X-ray would be needed, and no such X-ray is known to exist.

    b.  The pencil line that purports to be at 90° to the axis of plaintiff's tibia is in fact not at 90° to the purported axis line.

    c.  The line on Exhibit 6-3A that purports to reflect the top of the tibial tray is probably accurately drawn, and this line is at approximately 95° to the pencil line purporting to reflect the

axis of plaintiff's tibia, which implies that the top of plaintiff's tibial tray is 5° off the perpendicular to the purported axis line of plaintiff's tibia.

    d.   Based upon all of the evidence, the court concludes that the purported axis line of plaintiff's tibia is not reliable. Based upon its own evaluation of Exhibit 6-3A, the court finds that the line drawn on Exhibit 6-3A may fail to reflect the true axis of plaintiff's tibia by as much as 2°.[3] Plaintiff's evidence fails to establish by a preponderance of the evidence what the true slope of the top of plaintiff's tibial tray was post-Bhagia surgery.

    12.  As reflected by the foregoing, and viewing the expert medical testimony as a whole, the court finds that it is not possible on the basis of the expert testimony to determine with any reasonable degree of accuracy the slope of the top of the tibial tray of plaintiff's artificial knee, post-Bhagia surgery.

    13.  Both before and after Dr. Bhagia's replacement of plaintiff's left knee, plaintiff's range of motion of the left knee was within normal limits, given plaintiff's age and a prior osteotomy of the left knee. Plaintiff's range of motion of his artificial knee, post-Bhagia surgery, was within expectations for a good result. Post-Bhagia surgery, plaintiff's flexion was at all

---

[3] A 2° shift of the line of the axis of plaintiff's tibia in the direction which would correct the axis line error perceived by the court would reduce what presently appears to be a 5° anterior slope of the top of the tibial tray of plaintiff's artificial knee to 3° such that the end, net result as to the whole artificial knee would be 0° of slope, a result not outside the standard of care.

times within expectations.  There is no evidence of mechanical alignment problems.

    14.  Plaintiff has the burden of proving a breach of the duty of care owed by a physician, and plaintiff's proof fails to establish by a preponderance of the evidence that Dr. Bhagia's installation of plaintiff's artificial knee was outside the applicable 0° to 7° posterior slope standard of care.

    15.  Plaintiff has failed to prove by a preponderance of the evidence that defendant's employee lacked the requisite degree of skill, and has failed to prove by a preponderance of the evidence that defendant's employee failed to exercise the requisite degree of care.

    As discussed hereinabove, the plaintiff in a medical malpractice case must also establish that the physician's lack of skill or failure to exercise the requisite degree of care was the proximate cause of plaintiff's injuries.  Plaintiff must establish "but for" causation as well as legal causation — that the act or failure to act was so important in bringing about plaintiff's harm that a reasonable person would regard it as a cause and attach responsibility to it.  In the following findings, the court assumes for the sake of discussion how it would decide the causation issue <u>if</u> a breach of duty had been established by the plaintiff.

    16.  As set forth above in the stipulated facts, plaintiff's complaint (injury) that brought him to Dr. Hall was his unremitting pain following Dr. Bhagia's installation of an artificial knee. Dr. Hall is of the opinion that plaintiff's pain was caused by

installation of an artificial knee with an anterior rather than a posterior slope. Dr. Vigeland's opinion is diametrically opposed.

17. The court finds that plaintiff suffered unremitting, narcotic-requiring pain subsequent to Dr. Bhagia's work.

18. There is no known diagnostic tool or test by which a physician can identify the precise cause of pain post-arthroplasty of the knee.

   a. Doctors for the parties discuss at length a bone scan that was ordered. A bone scan tells a physician that some form of cell activity is occurring, e.g., infection or bone cell turnover. A bone scan is not diagnostic of the cause of the activity. The doctors disagree about the results of the bone scan. In the end, the court concludes that the experts are talking about two different phases or aspects of a bone scan, that both physicians are correct in their discussion of the bone scan, but the bone scan is not diagnostic of the cause of plaintiff's pain.

   b. Doctors for the parties discuss at length whether plaintiff's pain was the result of RSD (more properly now called complex regional pain syndrome). The medical evidence neither establishes nor convincingly rules out RSD as the source of pain following plaintiff's initial, left knee replacement.

   c. More probably than not, plaintiff's pain in the initial knee replacement was not caused by infection, loosening of the components, or the two falls which plaintiff experienced post-Bhagia surgery.

    d.    Persistent, unexplained pain of unknown etiology occurs in up to 10% of knee arthroplasties.  Post-operative pain can require between a year and five years to resolve completely.  Pain of unknown etiology is more common than RSD in knee arthroplasty cases.  Persistent, unremitting pain — especially where, as here, there has been a prior knee surgery — was a known risk which was explained to plaintiff by Dr. Bhagia.

    19.    Assuming for the sake of discussion that Dr. Bhagia installed plaintiff's artificial knee such that the net result was an anterior slope of the whole knee, plaintiff's proof does not establish that, "but for" an anterior slope, plaintiff's artificial knee would have been free from the immediate, unremitting, narcotic-requiring pain of which plaintiff complained.  Similarly, plaintiff's proof fails to establish by a preponderance of the evidence that the assumed anterior slope of plaintiff's whole artificial knee was a substantial factor in bringing about the pain that plaintiff experienced.

    20.    The court finds persuasive Dr. Vigeland's explanation of why plaintiff's pain is unlikely to have been caused by an anterior slope of his artificial knee.  More probably than not, had plaintiff's artificial knee been installed with an anterior rather than a posterior slope, plaintiff would not have experienced immediate, unremitting pain; rather, plaintiff would have at some date, possibly long post-surgery, experienced stress of the knee, pain, and/or premature wearing of the components.

21. The court is not persuaded by Dr. Hall's opinion that Dr. Bhagia's placement of plaintiff's artificial left knee was the cause of plaintiff's pain. As a follow-up treating physician after Dr. Bhagia, Dr. Hall's principal job was to evaluate plaintiff's complaints of pain which he (Crisco) attributed to Dr. Bhagia's work. Dr. Hall formed an opinion as to the cause of plaintiff's pain as a preliminary to concurring in Crisco's desire for revision of Dr. Bhagia's work. Dr. Hall has also offered an expert opinion as to the cause of plaintiff's pain. As a consequence, the court does not have an <u>independent</u> evaluation of what it perceives to be the most critical aspect of this case — the cause of pain in Crisco's left knee following Dr. Bhagia's work. Dr. Hall has been called upon to evaluate his own work. Such self-evaluation is inherently difficult and risky because of the very human tendency to see what we want to see when it comes to validating our own prior decisions. On the issue of the cause of Crisco's pain, which was in turn the precipitating cause for Dr. Hall's revision surgery, <u>et sequelae</u>, the court is not persuaded by Dr. Hall's opinion because he is evaluating his own prior decision.

C. <u>Conclusions of Law</u>

1. The court has jurisdiction of plaintiffs' claims by virtue of the provisions of the Federal Tort Claims Act. 28 U.S.C. § 2401, <u>et seq.</u> Required administrative proceedings were employed and plaintiff's complaint was timely filed.

2. Robin Booker is the duly designated personal representative of Anna Crisco, deceased, and is legally entitled to pursue the claims, if any, of the Estate of Anna Crisco.

3. Plaintiff has failed to establish by a preponderance of the evidence that defendant's employee, Dr. Bhagia's arthroplasty of plaintiff's left knee was professional malpractice as defined by AS 09.55.540. The court concludes that Dr. Bhagia did not breach the applicable standard of care, nor was plaintiff's pain post-surgery legally or proximately caused by Dr. Bhagia's arthroplasty of plaintiff's left knee.

4. Because plaintiff's claim for medical malpractice fails, the dependent claims for loss of consortium of Robin Booker, personal representative of Anna Crisco, deceased, and the Estate of Anna Crisco fail as a matter of law.

5. Defendant has not proved comparative negligence on plaintiff's part. Defendant's other affirmative defenses need not be addressed.

6. The clerk of court shall enter judgment dismissing plaintiffs' complaint against the United States of America with prejudice.

DATED at Anchorage, Alaska, this <u>4th</u> day of December, 2007.

/s/ H. Russel Holland
United States District Judge